## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

GEORGE ASSAD, directly on behalf of )
himself and all others similarly situated, and )
derivatively on behalf of PERSHING )
SQUARE TONTINE HOLDINGS, LTD., )
)
          Plaintiff, )
)
    v. )
)
PERSHING SQUARE TONTINE )     **CASE NO. 1:21-cv-06907(AT)(BCM)**
HOLDINGS, LTD., )
)     **JURY TRIAL DEMANDED**
          Nominal Defendant, )
)
    v. )
)
PERSHING SQUARE TH SPONSOR, LLC, )
LISA GERSH, MICHAEL OVITZ, )
JACQUELINE D. RESES, JOSEPH S. )
STEINBERG, PERSHING SQUARE, L.P., )
PERSHING SQUARE INTERNATIONAL, )
LTD., AND PERSHING SQUARE )
HOLDINGS, LTD., )
)
          Defendants. )

## VERIFIED DIRECT AND DERIVATIVE AMENDED COMPLAINT
## FOR BREACH OF THE INVESTMENT COMPANY ACT OF
## 1940 AND THE INVESTMENT ADVISERS ACT OF 1940

Plaintiff George Assad ("Plaintiff") brings this action as a holder of common stock of

Nominal Defendant Pershing Square Tontine Holdings, Ltd. ("PSTH," or the "Company"), a

Delaware corporation, on behalf of the Company and on behalf of himself and all others similarly

situated, against (i) Pershing Square TH Sponsor, LLC (the "Sponsor Defendant"), a Delaware

limited liability company; (ii) Lisa Gersh, Michael Ovitz, Jacqueline D. Reses, and Joseph S.

Steinberg, directors of the Company (the "Director Defendants"); and (iii) Pershing Square, L.P.,

a Delaware limited partnership, Pershing Square Holdings, Ltd., a Guernsey company, and

Pershing Square International, Ltd., a Cayman Islands exempted company (together, the "Pershing Fund Defendants," and with the Sponsor Defendant and Director Defendants, the "Defendants").

Plaintiff seeks a declaratory judgment, damages, and rescission of contracts that violate the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 *et seq.* ("ICA"), and the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1 *et seq.* ("IAA"). In support thereof, Plaintiff alleges as follows:

## I.   NATURE AND SUMMARY OF THE ACTION

1.      PSTH is the largest special purpose acquisition company, or "SPAC," ever to have offered shares to the public. PSTH is the product of Pershing Square Capital Management, L.P. ("PSCM"), one of Wall Street's most prominent advisers of investment funds and investment companies. PSTH is PSCM's latest investment fund product.

2.      This case arises because PSTH qualifies as an "Investment Company" as that term is defined in the ICA and PSCM qualifies as PSTH's "Investment Adviser" as that term is defined in the ICA and IAA. The ICA and IAA are key federal laws that regulate the rights of an investment company's shareholders and the form and amount of its managers' compensation. By telling the world that PSTH is not an "Investment Company" as that term is defined in the ICA, Defendants have structured PSTH so as to charge its public investors what amounts to hundreds of millions of dollars in compensation. Under the ICA and IAA, the form and amount of this compensation are illegal.

3.      Under the ICA, an Investment Company is an entity whose primary business is investing in securities. And investing in securities is basically the only thing that PSTH has ever done. From the time of its formation, PSTH has invested all of its assets in securities. And it has spent nearly all of its time negotiating a transaction that would have invested those assets in still more securities.

2

4.      In 1940, Congress passed the ICA to protect investors from Depression-era "abuses [that] stemmed from the control of investment companies by banking, brokerage, or dealer interests."[1] Because investment companies had no employees or resources of their own, they were especially vulnerable to exploitation by outside financial advisers, who sometimes called themselves "sponsors" and who controlled the investment companies that they established and managed. Congress expressed concern that "control [of investment companies would be] . . . exercised to benefit the sponsor[s]" or advisers of investment companies, exposing the companies' investors to risks of confusion and abuse. [2]

5.      In response, Congress passed the ICA and its sister statute, the IAA. Together, these statutes impose a comprehensive regulatory regime to address abuses that arise when outsiders dominate an investment company. The law regulates the capital structure of an investment company, as well as the rights and powers of investors and the kind and amount of compensation that investment advisers and directors can be paid. The law also grants shareholders private rights of action to seek damages and to rescind agreements that violate these statutes.

6.      In addition to popular investment vehicles such as mutual funds and exchange-traded funds, or "ETFs," the ICA also covers a broad scope of other types of companies in order to accomplish its goal of protecting investors. The ICA applies to *any* company that satisfies the statute's definition of an "investment company," which includes any entity that is "engaged primarily" "in the business of investing, reinvesting, or trading in securities." The IAA likewise applies to any person that satisfies the definition of an "investment adviser," which the statute

---

[1] Note, *The Investment Company Act of 1940*, 50 Yale L.J. 440, 441-442 (1941) (citing *Hearings Before Subcomm. of Sen. Comm. on Banking and Currency*, S.3580, 76th Cong., 3d Sess. 34, 783 (1940)).

[2] *Id.*, at 442.

10070414v1/017257

defines to mean "any person who, for compensation, engages in the business of advising others" "as to the advisability of investing in, purchasing or selling securities."

7.      Accordingly, the ICA and IAA have been held by courts to apply to a wide range of entities, including so-called "acquisition companies" that sell off their former operating assets and primarily hold securities while searching for new operating businesses to acquire. The SEC has applied the ICA to companies, like PSTH, that raise money and invest it in government securities as they search for acquisitions in real estate or other areas.

8.      PSTH is an investment company under the ICA because its primary business is to invest in securities. Since the Company's initial public offering more than a year ago, investing in securities is all the Company has ever done. From the moment of its IPO, PSTH has invested all of its assets in securities of the United States government and shares of money market mutual funds. PSTH and its advisers have spent most of their time working for PSTH negotiating a purchase of still more securities in a recently-abandoned agreement that would have caused the Company to invest the great majority of its assets in the common stock of Universal Music Group B.V. ("UMG," and the "UMG Securities Purchase").

9.      Likewise, PSCM is the Company's investment adviser under the IAA. PSTH has no full-time employees of its own and is therefore completely dependent upon PSCM for investment expertise and administrative resources. In this regard, the relationship between PSTH and PSCM is virtually identical to the pattern that characterizes relations between investment advisers and other types of investment companies, such as mutual funds and hedge funds. Indeed, the relationship between PSCM and the Company closely resembles the relationship between PSCM and the hedge funds and closed-end funds that it manages alongside PSTH. PSCM is already one of Wall Street's most prominent advisers of investment funds.

10. Defendants' decision to avoid registering the Company as an investment company has allowed them to use their positions of control to extract compensation from PSTH in forms and amounts that violate federal law. Rather than pay reasonable fees and structure them in the standardized and transparent ways required by the ICA and IAA, the Company has compensated its investment advisers indirectly in the form of complex warrants and forward purchase rights that were never offered for purchase by the Company's public investors. Although these warrants and rights have not yet been exercised and in some cases have not yet become exercisable, the Defendants' option to exercise them in the future carries tremendous value under basic principles of finance.

11. The Defendants' actions pose the precise danger the ICA and IAA sought to address. Although PSCM has sometimes described itself and its affiliates as having charged the Company less than other SPAC sponsors, in fact the compensation the Defendants have taken from the Company is astronomical.

12. Among other things, less than twelve months after the Company allowed the Sponsor and Director Defendants to purchase identical warrants on PSTH shares, the Company agreed to repurchase some of those warrants at a valuation that implied the warrants were worth, in the aggregate, more than $880 million—thirteen times what the Sponsor and Director Defendants originally paid for them. This staggering compensation was promised at a time when the returns to the Company's public investors have starkly underperformed the rest of the stock market. That is hardly the arms'-length bargain the ICA and IAA demand.

13. The Defendants suggest that they can avoid the ICA and IAA because, they say, PSTH is not an investment company but a SPAC. They state that the Company's primary purpose is not to invest in securities but instead to acquire an operating business. However, investing in

securities is all the Company has ever done since its IPO. And investing in securities is the only significant endeavor that management has ever pursued, with PSCM's management team having spent most of the past year negotiating the recently abandoned purchase of securities from UMG. Moreover, the abstract intention to identify an operating business to acquire at some undefined time in the future is insufficient to allow an entity that otherwise qualifies as an investment company to avoid regulation under the ICA nd IAA.

14.     Wherever the line between an investment company and an operating company is located, there can be no doubt that PSTH is on the investment-company side of it.

15.     Accordingly, Plaintiff respectfully requests that this Court enter a declaratory judgment stating that the Company is an investment company under the ICA and that PSCM is the Company's investment adviser under the IAA and the ICA.

16.     Plaintiff also requests that this Court enter an order rescinding certain elements of the agreements and arrangements between PSTH and the other Defendants. Plaintiff further requests that this Court enter an order for damages reflecting Defendants' breach of their fiduciary obligations under the ICA and such other relief as this Court may deem just and proper.

## II.     JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to ICA Sections 36(b), 44, and 47(b), 15 U.S.C. §§ 80a-35(b), 80a-43, 80a-46(b), as well as IAA Sections 214(a) and 215(b), *id.* §§ 80b-14(a), 80b-15(b).

18.     Section 36(b) of the ICA "grant[s] individual investors a private right of action for breach of fiduciary duty" related to any payment of a material nature received by any investment adviser or director of a registered investment company. *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 340 (2010) (citing 15 U.S.C. § 80a-35(b)). Federal courts have exclusive jurisdiction over any such claim. 15 U.S.C. § 80a-35(b)(5).

19.     ICA Section 47(b) confers "an implied private right of action for rescission" of contracts that violate the ICA. *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 102 (2d Cir. 2019). The ICA provides the "district courts of the United States" with jurisdiction over such suits. 15 U.S.C. § 80a-43.

20.     IAA Section 215 "provides that contracts whose formation or performance would violate the [IAA] 'shall be void . . . as regards the rights of' the violator'" and confers a private right of "suit for rescission or for an injunction against continued operation of the contract, and for restitution." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 16, 19 (1979) (quoting 15 U.S.C. § 80b-15). The IAA provides that "the district courts of the United States . . . shall have jurisdiction" over such suits. 15 U.S.C. § 80b-14(a).

21.     This Court has personal jurisdiction over each of the Defendants because each of the Defendants transacts business within the state of New York and/or is a resident of New York. Among other things, the principal office of the Company, the Sponsor, and each of the PSCM-related entities is in New York and Defendants have sent numerous communications regarding the Company to and from New York.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2).

### III.    THE PARTIES

23.     Plaintiff George Assad purchased shares of PSTH on or about May 12, 2021. Plaintiff continues to hold PSTH shares and will continue to hold shares through this litigation.

24.     Nominal defendant Pershing Square Tontine Holdings (the "Company" or "PSTH") is a blank check company incorporated under the laws of Delaware and headquartered in New York.

25.     Pershing Square TH Sponsor, LLC (the "Sponsor Defendant"), is the Company's sponsor. The Sponsor Defendant is organized under the laws of Delaware.

26.     The Sponsor Defendant is wholly owned by Pershing Square Holdings, Ltd., Pershing Square, L.P., and Pershing Square International, Ltd. (together, the "Pershing Fund Defendants").

27.     Defendant Pershing Square Holdings, Ltd., is an investment fund organized as a Guernsey company.

28.     Defendant Pershing Square, L.P., is an investment fund organized as a Delaware limited partnership.

29.     Defendant Pershing Square International, Ltd., is an investment fund organized as a Cayman Islands exempted company.

30.     The Pershing Fund Defendants are all advised by Pershing Square Capital Management, L.P. ("PSCM"). PSCM is a registered investment adviser, with approximately $14 billion in assets under management.

31.     Defendant Lisa Gersh is a member of the Company's Board of Directors.

32.     Defendant Michael Ovitz is a member of the Company's Board of Directors.

33.     Defendant Jacqueline Reses is a member of the Company's Board of Directors.

34.     Defendant Joseph Steinberg is a member of the Company's Board of Directors. Gersh, Ovitz, Reses, and Steinberg are together referred to herein as the "Director Defendants."

## IV.     FACTUAL ALLEGATIONS

### A.     The Company's Origins and IPO

35.     PSTH was incorporated in Delaware on May 4, 2020. On June 22, 2020, PSTH filed a registration statement with the SEC describing itself as a "special purpose acquisition company," or SPAC.

36.     In the IPO, the Company sold securities to public investors in the form of what it called "units" (each, an "IPO Unit"). After developing the below-described capital structure and marketing it to investors, the Company consummated its IPO on July 22, 2020.

37.     The Company sold 200 million IPO Units at a price of $20 each, raising approximately $4 billion, thus making PSTH the largest SPAC in history.

38.     As is common for SPAC entities, the Company had no business at the time of its formation. PSTH proposed to use the proceeds of its IPO to invest in securities as it sought to complete an "initial business combination" (the "Initial Business Combination") as defined by the Company's amended and restated Certificate of Incorporation.

39.     Under the terms of the Certificate of Incorporation, this Initial Business Combination had to be completed within "24 months from the closing of the [IPO] or 30 months from the closing of the [IPO] if the Company has executed a letter of intent."[3] If the Company failed to complete the transaction in this amount of time, the certificate of incorporation required the Company to wind up its business and liquidate and distribute its assets back to its stockholders.[4]

40.     Each IPO Unit consisted of one share of PSTH Class A common stock and 1/9 of a warrant (a "Public Warrant"). Each Public Warrant provided its holder with the right to purchase a share of Class A common stock at $23 per share within a predetermined time after the closing of the Initial Business Combination.

41.     The Company's Class A common stock carries a right to redemption. During the time that the Company is searching for a business combination, each share of Class A common

---

[3] PSTH, Amended Prospectus (Form S-1/A), at 15 (July 16, 2020) (hereinafter "PSTH S-1"); *see also* Pershing Square Tontine Holdings, Ltd., Amended Prospectus (Form S-1/A), at Ex. 3.4 (July 20, 2020), Second Amended and Restated Certificate of Incorporation of Pershing Square Tontine Holdings, Ltd., at § 9.1(b) (hereinafter "PSTH Certificate of Incorporation").

[4] PSTH Certificate of Incorporation, *supra* note 3 § 9.2(d).

stock trades freely on the New York Stock Exchange. Five days prior to the consummation of the Initial Business Combination, each holder of Class A common stock has the right to tender her shares back to the Company and receive in exchange a cash amount equal to the pro rata value per share of the Company's assets, which is expected to be worth the same $20 originally invested in the IPO, plus investment income accrued on the portfolio of securities in which the Company has invested the proceeds of its IPO.

42.     On September 11, 2020, the Public Warrants detached from the Class A common stock and the two classes of securities began trading separately on the New York Stock Exchange.[5]

**B.     The Company Invests Its IPO Proceeds in Securities**

43.     After the IPO, the Company promptly invested the proceeds of its IPO in securities. The Company's Prospectus explained that the IPO proceeds, along with approximately $35,000,000 in proceeds from the sale of certain warrants to the Director Defendants and the Sponsor, would be placed in a trust account for the benefit of the Company's Class A shareholders.[6]

44.     The Company's agreement with its trustee specified the money was to be "invested only in U.S. Treasury obligations with a maturity of 180 days or less or in money market funds . . . which invest only in U.S. Treasury obligations."[7]

---

[5] PSTH, Tender Offer Statement by Issuer (Form SC TO-I), at Ex. (a)(1)(i), at 134 (July 8, 2021), (hereinafter "PSTH Offer to Redeem").

[6] *See* PSTH S-1, *supra* note 3, at 33.

[7] *See id.*; *see also id.* at Exh. 10.3, Form of Investment Management Trust Agreement, at § 1(c).

45.     Accordingly, since the IPO, the Company has invested substantially all of the proceeds of its IPO in securities.[8] Of the $4.03 billion in total assets the Company possessed as of June 30, 2021, fully $4.002 billion were invested in securities of the U.S. government, with the remainder in shares of money market funds.[9]

## C.     The Company is Completely Controlled By and Dependent Upon PSCM

46.     From the moment of its founding, the Company has been completely controlled by and dependent upon PSCM. PSCM and its affiliates took all of the actions required to establish the Company. The Sponsor Defendant and PSCM now completely control the Company's governance and supply all of the investment expertise and other resources the Company requires for its investments and operations.

47.     The Sponsor Defendant was established solely for the purpose of advising the Company. It has no other business. The Sponsor Defendant is wholly owned by three investment funds that are in turn advised by PSCM—the three Pershing Fund Defendants.[10]

48.     Although the Sponsor Defendant is owned by the Pershing Fund Defendants, it is ultimately controlled by its manager, PSCM.[11] PSCM has disclosed through one of the Pershing Fund Defendants that "the business and affairs of [the Sponsor Defendant] are managed

---

[8] *See, e.g.*, Pershing Square Tontine Holdings, Quarterly Report (Form 10-Q), at 1, 6 (Nov. 12, 2020) ("Immediately following the [IPO], the funds placed in the Trust Account was [sic] used to purchase U.S. Treasury bills with a face value of $4,001,488,000.").

[9] *See, e.g.*, PSTH, Quarterly Report (Form 10-Q), at 1 (August 13, 2021).

[10] *See* PSTH S-1, *supra* note 3, at cover ("Our sponsor is wholly owned by Pershing Square Holdings, Ltd. . . Pershing Square, L.P. . . and Pershing Square International, Ltd.").

[11] Pershing Square Capital Mgmt., L.P., Form ADV Brochure Part 2A (Mar. 31, 2021) (hereinafter "PSCM Form ADV"), at 2 (describing PSCM as a "non-member manager" of the Sponsor Defendant). Notably, PSCM's filings with the SEC as a registered investment adviser include, under the heading "Advisory Services" PSCM's "form[ation]" of PSTH. *Id*. at 1.

exclusively by. . . PSCM."[12] PSCM cannot be removed as the manager of the Sponsor Defendant because PSCM is also the registered investment adviser to the Pershing Fund Defendants, which own the Sponsor Defendant. PSCM dominates the Pershing Fund Defendants and controls every aspect of their businesses and affairs.

49.     PSCM benefits from any compensation that the Company pays to the Sponsor Defendant and the Pershing Fund Defendants. PSCM provides its investment advisory services to the Pershing Fund Defendants in exchange for a fee that will increase with the funds' performance.[13] These funds' performance will improve with any payments made to them and with any payments made to the Sponsor Defendant. A portion of any payment made by the Company to the Sponsor Defendant or the Pershing Fund Defendants therefore ultimately benefits PSCM.

50.     The Company is completely dependent on the Sponsor Defendant and PSCM as a result of two structural arrangements.

51.     *First*, the Sponsor Defendant and PSCM control the Company's governance. On May 7, 2020, the Company granted the Sponsor Defendant exclusive ownership of the Company's Class B shares. Under the Company's Certificate of Incorporation, these shares grant the Sponsor Defendant the exclusive right to elect and remove the Company's directors prior to the Initial Business Combination. The Sponsor Defendant effectively controls 100% of the Company's voting power with respect to the election and removal of directors.

---

[12]   Pershing Square Holdings, Ltd. 2020 Annual Report, at 73 (Mar. 29, 2021), https://assets.pershingsquareholdings.com/2021/03/29115525/Pershing-Square-Holdings-Ltd.-2020-Annual-Report-1.pdf.

[13] In its form ADV filing with the SEC, PSCM explains that it is paid quarterly management fees on the basis of the value of the assets in the funds that PSCM advises as well as performance allocations on the basis of these funds' investment performance. *See* PSCM Form ADV, *supra* note 11, at 5.

10070414v1/017257

52.     **Second**, PSTH does not "have any full-time employees prior to [its] initial business combination."[14] Instead, the Company relies exclusively upon PSCM and the Sponsor Defendant to provide all of the investment advice and administrative resources the Company requires to run its investing business.

53.     The Company's senior-most executives are all supplied and compensated by PSCM. William A. Ackman, the Company's CEO and Chairman of the Board of Directors, is also the CEO, founder, and major owner of PSCM; Ben Hakim, the Company's Chief Financial Officer, is Ackman's partner at PSCM. PSTH discloses that it relies on the expertise of a group of professionals who are employed and compensated primarily by PSCM and whom PSCM calls the "PSCM investment team."[15] PSTH also relies on "the other employees of, and resources available to, PSCM."[16]

54.     The Company's prospectus describes at length the investment acumen of the Pershing Square investment team, which "is comprised of seven investment professionals with tenures at [PSCM] of 3 to 16 years, who prior to [PSCM], served in analyst and associate roles at Apollo, Blackstone, KKR, Goldman Sachs, and Hellman & Friedman."[17] The Prospectus emphasizes that the members of the PSCM investment team "bring significant *investment expertise . . . .*"[18]

55.     Ackman, the CEO of both the Company and PSCM, has principal executive authority over the Company's affairs. The Sponsor Defendant, PSCM, and Ackman (in his dual

---

[14] PSTH S-1, *supra* note 3, at 68.

[15] *Id.* at 8.

[16] *Id.*

[17] *Id.*

[18] *Id.* (emphasis added).

13

role as an executive of both the Company and PSCM) participated in advising the Company regarding the kinds of securities it should purchase immediately after its IPO. The Sponsor Defendant, PSCM, and Ackman accomplished this by negotiating and causing the Company to enter an agreement with the Company's trustee (the "Investment Management Trust Agreement"), which specified the kinds of securities in which the trustee may invest the funds the Company raised in its IPO.

56.     Taken together, the arrangements between the Company, PSCM, and the Sponsor Defendant create a multi-party contract in which PSCM supplies investment advisory services to the Company in exchange for the Company's agreement to pay massive compensation to the Pershing Fund Defendants, both directly and through the Pershing Fund Defendants' ownership of the Sponsor Defendant.

57.     PSCM receives consideration in the form of the increase in advisory fees it receives as a result of the compensation paid to the Sponsor Defendant and the Pershing Fund Defendants. In exchange for paying this compensation, the Company receives investment advisory services and other resources from PSCM and its employees.

10070414v1/017257



FIGURE 1: ORGANIZATION OF PERSHING AND AFFILIATED ENTITIES

58.     Besides the employees and partners of PSCM, the only other people with significant involvement in the affairs of the Company are the four Director Defendants.

**D.     The PSCM Investment Team's Advice and the UMG Securities Purchase**

59.     Although the Company's Certificate of Incorporation requires the Company to complete an Initial Business Combination within a certain period of time, it defines such a

combination broadly. Such a combination may include a "merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination."[19]

60.     Consistent with the possibility of a "stock purchase," PSCM focused its early efforts on a deal with Vivendi S.E. ("Vivendi") to purchase a portion of the equity securities comprising Vivendi's 80% stake in Universal Music Group ("UMG"), the largest owner of recorded music by global market share.

61.     As Ackman explained to investors, early on in his work for PSTH, he personally "dug in" on the possibility of an investment in UMG.[20] "I was a bit like the dog that grabbed the bumper of the car and wouldn't let go," Ackman said, "because this was precisely what we were looking for."[21]

62.     Beginning in October 2020, the Company and "members of the PSCM Investment Team began conducting initial due diligence on UMG based on publicly available information."[22] "On October 29, 2020, [Director Defendant] Jacqueline Reses . . . introduced Mr. Ackman [to] an independent member of Vivendi's supervisory board to facilitate a discussion to explore whether UMG" could be an investment target for the Company.[23]

63.     On the advice of and with the assistance of PSCM, the Company's efforts focused on purchasing common stock representing a minority position in UMG.

64.     "On December 7, 2020, the Company shared a draft non-binding term sheet with Vivendi" providing for the Company to "acquir[e] 15% of the ordinary shares of UMG with

---

[19] PSTH Certificate of Incorporation, *supra* note 3 § 4.3(b)(i).

[20] PSTH, Investor Call Transcript (June 23, 2021) (hereinafter "PSTH Investor Call Tr."), at 45.

[21] *Id.*

[22] PSTH Offer to Redeem, *supra* note 5, at 135.

[23] *Id.*

10070414v1/017257

warrants for additional shares to be issued to the Sponsor and the Company's independent directors to reflect the intent of the Director Warrants and the Sponsor Warrants."[24]

65.     On December 8, December 9, December 29, January 13, and March 19, the PSCM Investment Team met with the Company's Board of Directors to provide advice about "various industry risks and the overall structure of the music industry, including valuations and growth," as well as "tax considerations and certain structuring considerations" with respect to a potential transaction through which PSTH would invest in UMG securities.[25]

66.     On June 4, 2021, the Company announced that it had entered into a definitive agreement with Vivendi to purchase shares of UMG. Under the terms of the agreement, which were memorialized in a share purchase agreement executed on June 20, 2021 (the "Share Purchase Agreement"), the Company agreed to acquire 10% of the outstanding shares of UMG (the "UMG Securities Purchase").

67.     The Share Purchase Agreement contemplated that Vivendi would arrange for UMG shares to be publicly listed on the Euronext Amsterdam N.V. market and the Company would purchase 184.8 million shares of UMG (the "UMG Shares"), amounting to 10% of UMG's outstanding stock, for approximately $4 billion in cash, including a portion of $1.6 billion that would have been contributed by the Pershing Fund Defendants pursuant to their purchase of Forward Purchase Units under the Forward Purchase Agreement, as described below.

68.     As the transaction was initially disclosed to the public, the UMG Shares would eventually have been transferred to a liquidating trust (the "Liquidating Trust") and then distributed from the Liquidating Trust to holders of the Company's Class A common stock.

---

[24] *Id.*

[25] *Id.* at 134.

Following the distribution of the UMG Shares to the Company's shareholders, the Company would have continued to hold approximately $1.6 billion in assets.

69.     PSTH then would have continued investing those remaining assets in U.S. government securities and shares of money market funds. The Company would have had no limit on how long it could invest in securities and no binding legal obligation to use its assets for any purpose other than investing in securities.

70.     On July 19, 2021, PSTH issued a letter to shareholders announcing the termination of the UMG Securities Purchase.

71.     After PSTH terminated the UMG Securities Purchase, PSTH assigned its rights to purchase the UMG stock to the Pershing Fund Defendants and another PSCM affiliate. Under the terms of this assignment, the Pershing Fund Defendants and the other PSCM affiliate agreed to purchase 5% of the share capital of UMG on the same terms and subject to the same conditions that applied to PSTH in the original share purchase agreement between PSTH and Vivendi S.E., UMG's parent company.[26]

---

[26] PSTH, Current Report (Form 8-K), at Item 1.01 (July 18, 2021).

10070414v1/017257



FIGURE 2: PSTH TIMELINE

72.     On August 10, 2021, Vivendi announced that it had reached a final deal with Ackman and PCSM. Under the terms of the deal, Vivendi sold "7.1% of UMG's share capital to Pershing Square Holdings and affiliates, which are managed by Mr. William Ackman," for $2.8 billion. The deal further included a right for Ackman "to acquire, by September 9, 2021, up to an additional 2.9% of UMG's share capital through funds which he manages or in which he holds the majority of economic interest," based on the same UMG enterprise value.[27]

73.     Since the IPO on July 22, 2020, the Company has performed poorly. The Company has announced no material activities other than the failed deal with UMG. The price of the

---

[27] Vivendi, *Press Release* (August 10, 2021), available at https://www.vivendi.com/wp-content/uploads/2021/08/20210810_VIV_PR_Vivendi-sells-71-of-UMGs-share-capital-to-Pershing-Square-Holdings.pdf.

Company's Class A common stock on the NYSE has underperformed the rest of the stock market, rising only about 1.25% above the IPO price of the IPO Units, even as the S&P 500 index rose over that same period by about 36%.[28] On June 4, the day PSTH confirmed news reports of the UMG Securities Purchase, the Company's shares lost 12% of their total value and almost 60% of their value in excess of the approximate redemption value of $20. The Company's stock price now trades close to this redemption value.

### E.    The Defendants' Compensation

74.    In many of its public communications, the Company has claimed that none of the Defendants has ever been compensated for their work. Ackman has even told investors that the Director Defendants "work for free."[29] Though the Company acknowledges that the Defendants have each been granted securities of various kinds in the Company, the Company and the Defendants have claimed that the Defendants purchased these securities for fair value and that the Company has therefore never paid the Defendants or PSCM for their labor. This claim is facially beyond credulity.

75.    In fact, the Company has compensated the Defendants by issuing them two different types of securities, thereby compensating the Defendants at an unreasonable level in violation of the ICA and IAA. The Company has issued these securities either for free or for prices far below the securities' actual value. By the Company's and Defendants' own admissions, the combined value of the various securities granted to Defendants amounts to hundreds of millions of dollars and many times more than what the Defendants originally paid.

---

[28] These returns are calculated using closing prices of the S&P 500 index and the PSTH Class A Common stock on August 13, 2021.

[29] PSTH Investor Call Tr., *supra* note 20, at 45.

76.     Although the rights granted to the Defendants in order to compensate them have not yet been exercised and in some cases have not yet become exercisable, the rights have nevertheless already been granted and therefore already carry tremendous value under basic principles of finance governing the valuation of contingent and future claims.

77.     The first type of security issued to the Pershing Fund Defendants was a set of rights to purchase what the company called "Forward Purchase Units" (the "Forward Purchase Units.") By the terms of an agreement dated June 21, 2020 (the "Forward Purchase Agreement"), the Company committed to issue these Forward Purchase Units to the Pershing Fund Defendants by virtue of their ownership of the Sponsor Defendant. Each Forward Purchase Unit may be purchased by the Pershing Fund Defendants at a future date for $20, and upon purchase will consist of one Class A share in the Company and one third of a warrant to purchase another Class A share at a still later date for $23.[30]

78.     Some of these Forward Purchase Units are mandatory and some are optional. The mandatory portion (the "Mandatory Forward Purchase Units") require the three Pershing Fund Defendants to purchase 50 million Forward Purchase Units for a total of $1 billion at some time prior to the Initial Business Combination.[31] The Mandatory Forward Purchase Units are immensely valuable because, in contrast to the IPO Units, which had to be purchased at the time of the IPO, the Mandatory Forward Purchase Units may be purchased at any time prior to the Initial Business Combination, thereby allowing the Pershing Fund Defendants to delay paying the price of the Mandatory Forward Purchase Units until the closing of the Initial Business Combination.  Moreover, because of the control exercised by the Pershing Fund Defendants over

---

[30] PSTH S-1, *supra* note 3, at Ex. 10.9, Forward Purchase Agreement, dated June 21, 2020, at § 1(a)(iii) (hereinafter "Forward Purchase Agreement").

[31] *Id.* at § 1(a)(i).

PSTH, the Mandatory Forward Purchase Units contain the value of an implicit option in the sense that the Pershing Fund Defendants control whether an Initial Business Combination ever occurs and, if so, which one.

79.     The optional portion of the Forward Purchase Units (the "Optional Forward Purchase Units") gives the same three Pershing Fund Defendants the discretionary option to purchase an additional 100 million Forward Purchase Units for total consideration of $2,000,000,000. The Pershing Funds may purchase the Optional Forward Purchase Units at any time prior to the Initial Business Combination.[32]

80.     Although the price at which the Forward Purchase Units may be purchased is the same as the price at which the IPO Units were sold to the public—$20—the Optional Forward Purchase Units are much more valuable than the IPO Units because they include an element of optionality. They may be purchased on a delayed basis and do not have to be purchased at all. This effectively makes the Optional Forward Purchase Units into a $2 billion set of call options. The Sponsor paid nothing for these options other than providing investment advisory services.

81.     In its public financial reporting, the Company has acknowledged that the right to purchase the Forward Purchase Units is worth hundreds of millions of dollars.[33] The Company has admitted that the rights to purchase the Forward Purchase Units are worth this amount despite including assumptions in its valuation models that depress the valuations of the Forward Purchase Units inaccurately.

---

[32] *Id.* at § 1(a)(ii).

[33] *See, e.g.*, PSTH, Quarterly Report (Form 10-Q), at Note 7 (May 24, 2021).

10070414v1/017257

82.     The Company also agreed to sell two Directors Forward Purchase Units for $6,000,000.[34]   The Forward Purchase Units sold to the Directors are substantially the same as the Mandatory Forward Purchase Units.   On July 21, 2020, Director Ovitz agreed to purchase 250,000 Forward Purchase Units and Director Reses agreed to purchase 50,000.[35]

83.     The second set of securities that PSTH issued as compensation were the Sponsor Warrants and Director Warrants.

84.     On July 21, 2020, the Company entered into an agreement (the "Sponsor Warrant Purchase Agreement") commiting to issue the Sponsor Warrants to the Sponsor Defendant for aggregate consideration of $65,000,000. The Sponsor Warrants permit the Sponsor Defendant, at an exercise price of $24 per share, to purchase whatever number of shares will equal 5.95% of the common stock of the fully diluted post-business-combination entity. The Sponsor Warrants may not be sold, transferred, or exercised until three years after the Initial Business Combination.[36] They may then be exercised at any time until ten years after the date of the Initial Business Combination.

85.     At the same time the Company agreed to issue the Sponsor Warrants to the Sponsor, it also agreed to issue warrants to the Director Defendants (the "Director Warrants") on identical terms. The Prospectus stated that the Director Warrants "have terms identical to those of the

---

[34] PSTH S-1, *supra* note 3, at Ex. 10.10, Director Forward Purchaes Agreement, dated July ___, 2020, at § 1(a).

[35] PSTH, Current Report (Form 8-K), at Ex. 10.10 & 10.11 (July 21, 2020) (hereinafter, the "Director Forward Purchase Agreements").

[36] PSTH S-1, *supra* note 3, at Ex. 10.6, Form of Sponsor Warrant Purchase Agreement, at § (1)(C)(iii).

23

Sponsor Warrants," including the same strike price and exercise periods and substantially similar transfer restrictions.[37]

86.     Thus, the Director Defendants bought warrants entitling them to purchase an amount of common stock equal to 0.2597% of the fully diluted stock of the post-business-combination entity.[38] The Prospectus indicated that together, the Director Warrants and Sponsor Warrants entitle their holders to purchase 6.21% of the fully diluted equity of the post-business-combination entity. Though the Director Defendants purchased a smaller amount of these warrants than the Sponsor, they paid the same price on a percentage basis.

87.     In its Prospectus, the Company acknowledged that because the Sponsor controls the Company, the "purchase price for the Sponsor Warrants was not determined . . . between arms'-length third parties."[39] The same was true with regard to the Director Warrants.

88.     The Sponsor and the Company purportedly hired a third-party valuation firm, which estimated the value of the Sponsor Warrants at $65 million. The third-party valuation firm applied that same valuation to the Director Warrants, thereby valuing them at $2,837,500.

89.     The Sponsor Defendant thus paid $65 million for the Sponsor Warrants. And Director Defendants Ovitz, Reses, and Steinberg each paid the Company $812,500 for their Director Warrants. Director Defendant Gersh paid the Company $400,000 for her Director Warrants. Each Director Defendant received an amount of Director Warrants in proportion to the amount paid to purchase them.

---

[37] PSTH S-1, *supra* note 3, at 175.

[38] The amount paid for the Director Warrants, $2,837,500, divided by the amount paid for the Sponsor Warrants, $65,000,000, is equal to 0.043654. Multiplying that number by 5.95% gives .02597%, which is the percentage of the post-business-combination entity that the Director Warrants entitle their holders to purchase.

[39] PSTH S-1, *supra* note 3, at 95.

90.     These prices did not reflect fair market value.

91.     The best evidence of the true value of the Sponsor and Director Warrants came on June 20, 2021, when Ackman and the Director Defendants caused the Company to enter an agreement with the Director Defendants to buy back the Director Warrants in connection with the UMG Securities Purchase.[40]

92.     Acknowledging the conflict of interest inherent in this change in compensation, the Company again employed a third-party valuation firm to value these warrants.[41] Based on the value provided by this firm, the Company agreed to buy back 72% of the Director Warrants in exchange for shares of Class A common stock in the Company that at that time were worth about $26.5 million.[42]

93.     Applying this same valuation to all 100% of the Director Warrants implies a total worth for the Director Warrants of an astonishing $36,807,104. This is no less than *thirteen times* the $2,837,500 the Defendant Directors paid for their Warrants just eleven months earlier.

94.     This valuation appears even more extraordinary when applied to the Sponsor Warrants. In its Prospectus, the Company stated that the Director Warrants "have terms identical to those of the Sponsor Warrants."[43] And in its financial reporting, the Company has listed the values of the Sponsor Warrants and Director Warrants together on the same on the same line.

---

[40] PSTH Offer to Redeem, *supra* note 5, at Ex. (d)(ii).

[41] PERSHING SQUARE TONTINE HOLDINGS, TRANSACTION OVERVIEW (June 20, 2021), at 18.

[42] The number of shares to be granted to the Director Defendants was 1,167,450. The closing price on June 18, 2021, the trading day prior to the amendment to the Director Warrant Agreement, was $22.70. The decision to repurchase 72% of the Director Warrants reflected the Company's plan to spend about 72% of its assets on the UMG Securities Purchase, leaving the remaining 28% of the assets inside the Company. PSTH Investor Call Tr., *supra* note 20, at 44.

[43] PSTH S-1, *supra* note 3, at 175.

10070414v1/017257

95.     One can therefore estimate the value of the Sponsor Warrants by applying to them the same valuation method the Company applied to the Director Warrants. The valuation of the Director Warrants that the Company employed in connection with the UMG Securities Purchase implies that on June 20, 2021, the Company believed the Sponsor Warrants were worth a staggering $843,289,449.[44] Although the UMG Deal was never completed and the plan to repurchase the Director Warrants was never carried out, the valuations the Company placed on the Sponsor and Director Warrants in connection with the UMG Deal demonstrates how much the Sponsor and and Director Warrants could plausibly be worth.

96.     There are several reason why the Sponsor and Director Warrants are so valuable. Unlike the 20% of shares granted to the Sponsor in a conventional SPAC, the percentage of shares purchasable under the Sponsor Warrants applies to the post-business combination entity rather than the pre-business combination SPAC. Hence, if the Company merges with a company worth $10 billion, the Sponsor would receive the right to buy not just 5.95% of the $4 billion originally raised by the SPAC, but 5.95% of all $14 billion of the combined entity. And even in the combined entity, the 5.95% would be calculated on a fully-diluted basis—that is, as if all of the Public Warrants and an additional class of public warrants known as "Tontine Warrants," as well as the Sponsor Warrants, Director Warrants, and Forward Purchase Units, had been purchased or exercised. Since the purchase or exercise of these rights could theoretically bring in many billions of dollars more cash into the Company, the 5.95% could grow to an enormous number of shares.

97.     Additionally, the Sponsor and Director Warrants have an extraordinarily long exercise period. They are exercisable any time over a seven-year span beginning three years and ending ten years after the Initial Business Combination. The exercise price is also comparatively

---

[44] $843,289,449 = (5.95%/0.2597%)*$36,807,104.

low, sitting at just 20% above the IPO price of the common stock—an amount of appreciation that, over such a long period of time, might not even exceed the rate of inflation.

98.    The model used by the third-party valuation firm for the Sponsor and Dirctor Warrants also contained certain assumptions that inaccurately depressed the purchase price required of the Sponsor and Director Defendants. Among other things, the valuation firm assumed a level of volatility in a potential target company's stock price that turned out to be lower than the volatility actually realized.[45] The valuation firm also imposed a steep discount for the possibility that the Company would not be able to complete its Initial Business Combination.[46] This discount was much steeper than was warranted by the historical experience of other SPACs.

99.    The Forward Purchase Units and the Sponsor and Director Warrants clearly function as compensation for the Defendants. None of these securities was ever offered to the public on the same terms as they were offered to the Defendants, indicating that the terms were too favorable to be made available to people who were not being compensated for services. Additionally, the PSTH prospectus explained that the Company had, at the time of the IPO, "already determined director compensation," implying that the Company and the directors considered the Director Warrants and Director Forward Purchase Units to be the functional equivalent of compensation.[47]

100.    Further, in the Offer to Redeem that the Company filed with the SEC in connection with the UMG Deal, the Company disclosed that at a meeting of the Company's Board of Directors on June 17, 2020, the Company's directors specifically approved the buy-back of the Director Warrants in order to preserve what they understood to be compensation. The Company said:

---

[45] PSTH S-1, *supra* note 3, at 174-75; PSTH Investor Call Tr., *supra* note 20, at 46.

[46] PSTH S-1, *supra* note 3, at 174-75.

[47] PSTH S-1, *supra* note 3, at 142.

> As part of their discussion, the Board noted that the Director Warrants, which had been acquired for fair market value at the time of the Company's IPO, would not be exercisable . . . following the [UMG Securities Purchase, and] the [Defendant Directors] were *otherwise receiving no compensation for their role*. The Board of Directors therefore determined to amend the Director Warrants[.][48]

101.    Thus, despite Ackman's assertions that none of the Defendants have been compensated for their work, in fact the Defendants have received securities that under any plausible estimate are worth hundreds of millions of dollars—an unreasonable payment for the work performed.

## F.    The Class B Shares

102.    As described above, the Sponsor Defendant is the sole owner of the Company's Class B shares. Per the Certificate of Incorporation, these shares grant the Sponsor Defendant the exclusive right to elect and remove the Company's directors prior to the Initial Business Combination.[49]

103.    These exclusive voting rights are substantial and valuable. The Company's directors have the authority to direct the Company's business and affairs, including its investment of the IPO proceeds and its pursuit of an Initial Business Combination. The Sponsor Defendant's exclusive right to elect and remove those directors means that the Sponsor Defendant has tremendous control over the Company.

104.    Public shareholders, on the other hand, have no ability to vote for or against directors until after the Company has already effectuated its Initial Business Combination.

105.    The public shareholders were not only denied any say in the election of the Board when it was originally put in place, but they continue to be denied the right to elect directors at the

---

[48] PSTH Offer to Redeem, *supra* note 5, at 141.

[49] PSTH Certificate of Incorporation, *supra* note 3 §9.9.

Company's annual meeting. The Company has failed to hold an annual meeting to elect directors, notwithstanding the requirement to hold such an election in the Company's Certificate of Incorporation.[50]

106.     The Class B shareholders also receive 20% of the voting power of the common shareholders despite having paid only $25,000 for the 100 shares of Class B common stock.  Each Class B share carries the voting power of apporximatley 500,000 Class A shares.

## V.     PSTH IS AN INVESTMENT COMPANY UNDER THE ICA

107.     The activities and organization of PSTH all point to the legal conclusion at the heart of this action: the Company is an investment company as defined by the ICA.

108.     The ICA defines an investment company as a company that invests in securities. And investing in securities is all the Company has ever done or proposed to do with the great majority of its assets.

109.     The key definition of an investment company appears in section 3(a)(1)(A) of the ICA. That section provides:

> (a)(1) When used in this subchapter, "investment company" means any issuer which—
> (A) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities . . . .[51]

110.     Investing in securities is the Company's primary business because that is all the Company has ever done with its assets. Since the time of its IPO, the Company has invested nearly all of its assets in securities of the U.S. government and securities of money market mutual funds.

---

[50] PSTH Certificate of Incorporation, *supra* note 3 § 5.2.

[51] 15 U.S.C. § 80a–3(a)(1)(A). Prior to the passage of the National Securities Markets Improvement Act of 1996, § 3(a)(1)(A) was designated as § 3(a)(1). *See* National Securities Markets Improvement Act of 1996, Pub. L. No. 104-290, Oct. 11, 1996, 110 Stat. 3416, 3435.

Of the $4.03 billion in assets the Company owned as of June 30, 2021, it invested fully $4.02 billion in these two kinds of securities.[52] These instruments are the only source from which the Company has ever received any income.

111.    Now that the Company has abandoned the UMG Securities Purchase, the Company will continue investing all of its assets in government securities and money market funds for up to a total of two and a half years as it continues to search for a new way to deploy its billions of dollars of capital. The Company's Prospectus commits PSTH to invest all of that money in securities while it looks for an Initial Business Combination.

112.    Government securities and shares of stock in money market mutual funds are "securities" within the meaning of ICA Section 3(a)(1)(A). Section 2(a)(36) of the ICA defines the term "security" to include, among other things, any share of "stock" (which covers the Company's shares of stock in money market funds) and any "bond, debenture, [or] evidence of indebtedness" (which covers the Company's holdings of government bonds). The ICA definition of a security also includes "any interest or instrument commonly known as a 'security,'" which covers both the Company's shares in money market funds and its holdings of government bonds.[53]

---

[52] *See supra* ¶ 45.

[53] 15 U.S.C. § 80a-2(a)(36).

113.    The courts and the SEC have said many times that both U.S. government bonds[54] and shares of common stock in money market funds[55] are unambiguously "securities," not only under the ICA generally, but also specifically within the meaning of section 3(a)(1)(A).

114.    In addition to actually investing in government securities and money market funds since the time of its IPO, the Company has also "proposed" to invest in still more securities in connection with its Initial Business Combination. In the UMG Deal, the Company proposed to purchase shares of common stock in UMG. And because shares of "stock" are expressly included in the ICA's definition of a security,[56] the deal with UMG was plainly an investment in securities.

115.    Pursuing this investment is what the Company, its officers and directors, the Sponsor, and PSCM have spent the vast majority of their time and energy doing since the Company's IPO. As Ackman has repeatedly told the public, from December 2020 through July 2021, PSTH was focused almost exclusively on trying to complete the deal with UMG. In other words, the investment advisers for PSTH have focused their efforts primarily on investing the Company's assets in securities.

---

[54] *See, e.g.*, *S.E.C. v. Am. Bd. of Trade, Inc.*, 751 F.2d 529, 536 (2d Cir. 1984) (holding an issuer that invested solely in government securities to be an investment company under § 3(a)(1)(A)). *See also Baker, Watts e, Co.*, Fed. Sec. L. Rep. P 77,225 (S.E.C. No - Action Letter May 6, 1982) ("[A]n issuer could invest exclusively in Government securities, thereby owning no investment securities, and yet be an investment company under section 3(a)(1)[A] of the Act."); *Credit Suisse First Bos. Corp.*, 1998 WL 799305, at *3 (S.E.C. No - Action Letter Sept. 9, 1998) ("If a trust is engaged primarily in the business of investing in securities, it is an investment company even if it holds only government securities."); *Arizona Prop. Invs., Ltd.*, Fed. Sec. L. Rep. P 82,301 (S.E.C. No - Action Letter Aug. 9, 1979) (treating as an investment company under section 3(a)(1)(A) a company that planned to temporarily invest solely in government securities while waiting to acquire interests in real estate); *In the Matter of J. D. Gillespie, Tr. for Cleo George*, 13 S.E.C. 470, 475 n.4 (June 22, 1943) ("The broader term 'securities' used in section 3(a)(1)[A] obviously includes Government obligations.").

[55] Letter to Willkie Farr & Gallagher from the Office of Chief Counsel, U.S. Sec. & Exch. Comm'n Div. of Investment Management, at 7 (Oct. 23, 2000).

[56] 15 U.S.C. § 80a-2(a)(36).

## VI.  PSCM IS THE COMPANY'S INVESTMENT ADVISER

116.    PSCM is the Company's investment adviser. The term "investment adviser" is defined in both the IAA and the ICA. PSCM qualifies under both definitions.

117.    The IAA provides:

> "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities. . . .[57]

118.    PSCM satisfies this definition because it has, for compensation, engaged in the business of advising the Company about the "value of" and "advisability of investing in" and "purchasing" securities.

119.    As explained above, the Company's Prospectus and other documents describe an arrangement in which the Company has no full-time employees of its own and instead relies entirely on PSCM to provide the necessary investment advice.

120.    Both the CEO and CFO of the Company are employed by PSCM. The Prospectus also states that all of the professionals who will support the CEO and CFO are employed by PSCM. The Prospectus identifies PSCM as the source of the seven investment professionals who make up what the Prospectus calls the "PSCM Investment Team" and whom the Prospectus describes as supporting the CEO and CFO in their search for an acquisition target.[58] The Prospectus draws attention to the financial expertise of these professionals and makes clear that these professionals will be providing investment advice.

121.    The advice provided by PSCM concerns "the advisability of investing in, purchasing, or selling securities." For three reasons. ***First***, PSCM provided advice regarding the

---

[57] 15 U.S.C. § 80b-2(a)(11).

[58] *See supra* ¶ 54.

advisability of purchasing securities in UMG. **Second**, in completing any future Initial Business Combination, the Company will rely on PSCM's investment professionals to advise it in choosing among the different possible methods set out in the Certificate of Incorporation, which may include a purchase of securities. **Third**, PSCM has used its dominance over the Company to negotiate and establish the terms of the Investment Management Trust Agreement between the Company and its trustee. This agreement is what requires the Company to invest in government securities and shares of money market funds.

122.    Providing this kind of advice is the "business" of PSCM. PSCM is already registered with the SEC as an investment adviser. Its sole business is to advise the Company and the three investment funds that own the Company as to their investments in securities.

123.    PSCM has been compensated for its investment advice by the Company. As described above, that compensation has taken the form of the grants of securities of the Company to the Pershing Fund Defendants and the Sponsor Defendant, which indirectly benefit PSCM. Although the rights created by these securities have not yet been exercised and in some cases have not yet become exercisable, the possibility that they will be exercised in the future made them valuable from the moment they were granted.

124.    In addition to being an investment adviser under the Investment Advisers Act, PSCM is also an investment adviser under the Investment Company Act. The definition in the Investment Company Act provides:

> "Investment adviser" of an investment company means (A) any person (other than a bona fide officer, director, trustee, member of an advisory board, or employee of such company, as such) who pursuant to contract with such company regularly furnishes advice to such company with respect to the desirability of investing in, purchasing or selling securities or other property, or is empowered to determine what securities or other property shall be purchased or sold by such company, and (B) any other person who pursuant to

> contract with a person described in clause (A) of this paragraph
> regularly performs substantially all of the duties undertaken by such
> person described in said clause (A) . . . .[59]

PSCM satisfies this definition for the same reasons that it satisfies the definition under the Advisers Act.

125.    For present purposes, the only additional requirement in this definition is the reference to a "contract." The requisite contract here is the understanding, alleged above, under which PSCM agreed to supply the Company with the investment expertise and administrative services of PSCM in exchange for the Company's grant to the Sponsor Defendant and the Pershing Fund Defendants of rights to purchase or receive securities for free or for artificially low prices.

126.    Ultimately, the relationship between the Sponsor, PSCM, and the Company mirrors the standard pattern of relationships between investment advisers and investment companies generally. In this pattern, a business that specializes in giving investment advice (the investment "adviser") separately incorporates or organizes another business (the investment "company") for the purpose of investing in securities. The investment adviser then recruits other investors to invest in the company and profits from the company by charging it a fee or otherwise taking payments for the adviser's services.

127.    At the time the investment adviser establishes the investment company, the adviser establishes governance arrangements that allow it to dominate the company and control its affairs. The adviser then supplies all of the professionals, office space, and other operational resources the company requires to operate.

---

[59] 15 U.S.C. § 80a-2(a)(20).

128.    The investment company typically has no employees of its own. And the adviser may repeat this relationship with other investment companies, all of which will share the adviser's expertise and brand name.

129.    This pattern appears across the investment fund advisory industry and in almost every type of business the ICA is designed to regulate, including registered investment companies such as mutual funds, closed-end funds, and ETFs, as well as private vehicles that would be required to register as investment companies if they sold securities to the public, such as private equity funds, hedge funds, and venture capital funds.

130.    This pattern is so characteristic of the investment fund advisory industry that it even appears in the Pershing Square investment advisory business. PSCM established the three Pershing Fund Defendants and it now dominates them and supplies all of their administrative and investment needs in much the same way that it now does with the Company.

131.    Accordingly, the Company is effectively PSCM's latest investment fund. And PSCM is its investment advisor.

## VII.    THE CONTRACTS BETWEEN THE COMPANY AND THE DEFENDANTS VIOLATE THE ICA AND IAA

132.    Because the Defendants have taken their compensation from the Company in breach of the law's requirements for transparency, governance process, and reasonableness, the contracts that link the Company with the Defendants and PSCM violate the ICA and IAA in many ways.

133.    These illegal contracts include the Sponsor Warrant Purchase Agreement between the Company and the Sponsor Defendant dated July 21, 2020; the several Director Warrant Purchase Agreements dated July 21, 2020, between the Company and the Director Defendants; the Forward Purchase Agreement between the Company and the Pershing Fund Defendants dated June

21, 2020 the Director Forward Purchase Agreements between the Company and the Directors dated July 21, 2020; and the Certificate of Incorporation insofar as it gives the Class B shares exclusive voting rights prior to the Initial Business Combination.

134.    Collectively, these contracts between the Company, PSCM, the Sponsor Defendant, and the Director Defendants are referred to herein as the "Illegal Contracts." Each of these contracts violates the ICA for several reasons. These reasons include, but are not limited to, the following.

135.    *First*, the Illegal Contracts violate the ICA because they involve sales of securities without proper registration under the ICA by the Company. Section 7(a)(1) of the ICA provides that unless an investment company has duly registered with the SEC as an investment company under section 8 of the ICA, the investment company may not "offer for sale, sell, or deliver after sale, by the use of the mails or any means or instrumentality of interstate commerce, any security or any interest in a security, whether the issuer of such security is such investment company or another person."[60] Because the Illegal Contracts all involve the issuance of warrants and options that qualify as "securities"[61], these contracts are illegal.

136.    The Illegal Contracts further violate section 7(a)(1) because when the rights created by the Forward Purchase Agreement and Sponsor and Director Warrants are exercised, they will require the Company to issue more securities in violation of the ICA. Each of these rights will require the Company to issue shares of common stock and/or warrants at a time when the Company will not be registered as an investment company.

---

[60] 15 U.S.C. § 80a-7(a)(1).

[61] The definition of a "security" in section 2 of the ICA defines the term to include any "warrant or right to subscribe to or purchase" a security. 15 U.S.C. § 80a-2(a)(36).

137.   The Illegal Contracts further violate section 7(a)(4) of the ICA, which prohibits an unregistered investment company from "engag[ing] in any business in interstate commerce."[62] Through its ongoing performance of the Illegal Contracts, the Company has engaged and is now engaged in business in interstate commerce.

138.   **Second**, the Illegal Contracts violate section 18(d) of the ICA. That section prohibits an investment company from issuing "any warrant or right to subscribe to or purchase a security of which such company is the issuer, except in the form of warrants or rights to subscribe expiring not later than one hundred and twenty days after their issuance and issued exclusively and ratably to a class or classes of such company's security holders."[63] This section applies to the Illegal Contracts because each of the Illegal Contracts involves "warrants" or "rights to subscribe to or purchase" securities of which the Company is the issuer.

139.   The Illegal Contracts also violate section 18(d) because the warrants and rights they create expire later than 120 days after issuance. The Sponsor Warrants and Director Warrants do not expire until more than ten years from the date of the Company's Initial Business Combination. The Pershing Fund Defendants' and certain Director Defendants' rights to purchase the Forward Purchase Units does not expire until the closing of the Initial Business Combination—which may be up to two and a half years after the date the rights were issued to the Pershing Fund Defendants.

140.   **Third**, the Director Defendants hold their positions illegally. ICA section 16(a) provides that "No person shall serve as a director of a registered investment company unless elected to that office by the holders of the outstanding voting securities of such company."[64] The Director Defendants were never elected by the holders of the shares of Class A common stock,

---

[62] 15 U.S.C. § 80a-7(a)(4).

[63] 15 U.S.C. § 80a-18(d).

[64] 15 U.S.C. § 80a-16(a).

even though these shares are "outstanding voting securities" of the Company. The Director Defendants were elected solely by the Sponsor Defendant, which, by virtue of its status as the sole holder of the Company's Class B shares, has the exclusive right to elect and remove the Company's directors prior to the Company's initial business combination. The terms of the Company's Certificate of Incorporation prohibit the Class A shareholders from removing or voting for the annual replacement of the Directors, thereby violating the ICA.

141.   *Fourth*, section 18(i) of the ICA requires that "every share of stock . . . issued" by an investment company like the Company "shall be a voting stock and have equal voting rights with every other outstanding voting stock."[65] The Class B shares accordingly violate the ICA because they grant the Sponsor Defendant the exclusive right to elect and remove the directors.

142.   *Fifth*, the Illegal Contracts entered by the Sponsor Defendant and the Pershing Fund Defendants in consideration of the investment advisory services provided by PSCM violate section 203(a) of the IAA. That section prohibits an investment adviser "unless registered under this section" from making "use of the mails or any means or instrumentality of interstate commerce in connection with his or its business as an investment adviser."[66]

143.   PSCM has used the instrumentalities of interstate commerce in connection with operating PSTH, but it has never registered as an investment adviser in connection with its work for the Company because PSCM has not treated PSTH as a client in PSCM's Form ADV and other investment advisory registration materials filed with the SEC.

144.   *Sixth*, the Illegal Contracts entered by the Sponsor Defendant and the Pershing Fund Defendants in consideration of the investment advisory services provided by PSCM violate

---

[65] 15 U.S.C. § 80a-18(i).

[66] 15 U.S.C. § 80b-3(a).

section 205(a)(1) of the IAA. That section prohibits an investment adviser from entering into an investment advisory contract if the contract "provides for compensation to the investment adviser on the basis of a share of capital gains upon or capital appreciation of the funds or any portion of the funds of the client."[67] The Sponsor Warrants and the right to purchase the Forward Purchase Units entitle the Sponsor Defendant and its affiliates to purchase shares of common stock in the Company. And a share of common stock provides its holder with "a share of capital gains upon or capital appreciation of the funds" of the Company.

145.    **Seventh**, the Illegal Contracts provide the Sponsor Defendant and the Pershing Fund Defendants consideration for the investment advisory services provided by PSCM in violation of the requirements in section 15 of the ICA governing the manner in which a contract between an investment company and an adviser must be made. One requirement is that such a contract must be "approved by the vote of a majority of the outstanding voting securities" of the investment company.[68] None of the Illegal Contracts was ever approved by a vote of the Company's Class A common stockholders.

146.    Another requirement under section 15 is that an advisory contract must be "written."[69] But many of the elements of the contract between the Company and the Sponsor Defendant, the Pershing Funds, and PSCM were unwritten.

147.    The portions of the contract governing compensation may have been written in the form of the agreements governing the Sponsor Warrants and the Forward Purchase Units. But the

---

[67] 15 U.S.C. § 80b-5.

[68] 15 U.S.C. § 80a-15(a).

[69] *Id.*

10070414v1/017257

portions of the contract governing the investment advisory services for which this compensation was paid were not written.

148.     Although the Company is completely reliant upon the Sponsor Defendant and PSCM for its operations and investment decision-making, there is no written agreement that spells out the Sponsor Defendant's or PSCM's responsibilities in this regard. The Sponsor Warrants and the rights to purchase Forward Purchase Units are therefore illegal because they were granted to the Sponsor Defendant and the Pershing Fund Defendants as consideration for the services to be provided by PSCM under an unwritten contract.

149.     ***Finally***, all of the Illegal Contracts involve illegal consideration. Sections 22(g) and 23(a) of the ICA provide that "[n]o registered [open- or closed-end] company shall issue any of its securities . . . for services. . . ."[70] Because the Defendants either did not pay for the securities they received from the Company or paid far less than the securities' true value, it is clear that the securities were granted as compensation for the services to be provided by PSCM.

## VIII.     THE PAYMENTS MADE TO THE DEFENDANTS BREACH THE DEFENDANTS' FIDUCIARY DUTIES

150.     The Defendants have also breached their fiduciary duties with respect to the compensation and payments they have received from the Company, violating section 36(b) of the ICA. Section 36(b) provides:

> For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.[71]

---

[70] 15 U.S.C. §§ 80a-22(g), 23(a).

[71] 15 U.S.C. § 80a-35(b).

151.    This fiduciary duty is enforceable by an express private right of action.[72] This private right of action reaches any "compensation for services, or . . . payments of a material nature" granted to an "investment adviser or any affiliated person of such investment adviser."[73] The private right of action reaches the Sponsor Warrants and the right to purchase the Forward Purchase Units because PSCM is the Company's investment adviser and the Sponsor Defendant and Pershing Fund Defendants are affiliates of PSCM.

152.    The private right of action also reaches any "compensation for services, or . . . payments of a material nature" made to "any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments."[74]

153.    The persons enumerated in subsection (a) of section 36 include any "officer" or "director" of an investment company. Section 36(b) therefore applies to compensation paid and payments made to the Director Defendants. The Director Defendants owe the Company a fiduciary duty with respect to any compensation or payments received from the Company under the General Corporation Law of the State of Delaware. The payments made to the Director Defendants include the Director Warrants and the Director Forward Purchase Agreements.

154.    According to the Supreme Court and the Second Circuit, the fiduciary duty in section 36(b) prohibits any payment "that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."[75]

---

[72] *Id.*

[73] *Id.*
[74] *Id.*

[75] *Jones*, 559 U.S. at 346; *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982).

155.     The payments made by the Company to the Defendants bear no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining. The Sponsor Defendant has received payments that by the Company's own estimates have at times been worth more than $800 million in exchange for a payment of just $65 million and two to two and a half years of work. The Director Defendants have recieved securities that the Company has at times estimated to be worth about $36.8 million in exchange for just two to two and a half years of work and investments of just $2,837,500.

## IX.     HARM TO PSTH INVESTORS; DAMAGES

156.     Each of the Illegal Contracts has injured Plaintiff and the Company and enriched the Defendants by granting the Defendants compensation and payments worth hundreds of millions of dollars.

157.     Each of the Illegal Contracts grants the Defendants rights to buy shares of common stock or warrants from the Company in the future at prices that may be below the prevailing market prices. Any purchase at such a discounted price will dilute the value of the securities held by the Plaintiff and the Company's other public security holders. Even if the warrants and rights held by the Defendants are not "in the money" currently, the rights they offer in the future represent a source of immense value under standard principles of options pricing.

158.     The value granted to the Defendants under the Illegal Contracts will reduce the value of the Company for and come at the expense of the Company's Class A common stockholders.

159.     The Class B shares also give the Sponsor Defendant exclusive rights to elect directors prior to the Initial Business Combination and disproportionate voting power, at the expense of the Company's Class A common stockholders.

## X.     CLASS ALLEGATIONS

160.     In addition to asserting derivative claims on behalf of the Company, Plaintiff, a stockholder in the Company and a party to its certificate of incorporation, brings this action under section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all record and beneficial holders of PSTH Class A common stock, who hold such shares at the time of the filing of this action (except the Defendants herein, and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants) to redress the Defendants' breaches of fiduciary duties and other violations of law.

161.     The harm of losing the right to elect directors and thereby to influence the Company's affairs is personal to each shareholder of PSTH.

162.     This action is properly maintainable as a class action.

163.     A class action is superior to other available methods of fair and efficient adjudication of this controversy.

164.     The class is so numerous that joinder of all members is impracticable.  The number of class members is believed to be in the thousands, and they are likely scattered across the United States.  Moreover, damages suffered by individual class members may be small, making it overly expensive and burdensome for individual class members to pursue redress on their own.

165.     There are questions of law and fact which are common to all class members and which predominate over any questions affecting only individuals, including, without limitation:

    a.   whether PSTH is an investment company within the meaning of the ICA;

    b.   the proper remedy for PSTH's violations of the ICA;

    c.   whether the Illegal Contracts violate the ICA; and

d.   the existence and extent of any injury to the class or Plaintiff caused by any violations.

166.    Plaintiff's claims and defenses are typical of the claims and defenses of other class members and Plaintiff has no interests antagonistic or adverse to the interests of other class members. Plaintiff will fairly and adequately protect the interests of the class.

167.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

168.    Defendants have acted in a manner that affects Plaintiff and all members of the class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the class as a whole.

169.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

## XI.    DEMAND FUTILITY ALLEGATIONS

170.    Plaintiff is a current shareholder of the Company, was a shareholder of the Company at the time of the Defendants' wrongdoing alleged herein and has been a shareholder of the Company continuously since May 12, 2021.

171.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

172.    Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants because such demand is excused.

173.    Under section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), Plaintiff is entitled to bring this Action on behalf of the Company in the Plaintiff's right as a securityholder of the Company to redress the Defendants' breaches of their fiduciary duties with respect to the compensation and payments they have received from the Company.  Claims brought under Section 36(b) of the ICA do not require complaining stockholders to make a demand upon a company's board of directors. *Daily Income Fund v. Fox*, 464 U.S. 523, 527-542 (1984).

174.    Under section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), and section 215(b) of the IAA, 15 U.S.C. § 80b-15(b), Plaintiff is entitled to bring this action derivatively in the right and for the benefit of the Company to rescind the Illegal Contracts.

175.    As to any claims for which demand would otherwise be required, such demand would be a futile and useless act and is therefore excused because Ackman and each of the four Director Defendants is personally conflicted with respect to the institution of this suit.

176.    Demand would be a futile and useless act with regard to the Director Defendants because the Director Defendants are controlled by and serve at the pleasure of the Sponsor Defendant, the Pershing Fund Defendants, and PSCM.

177.    The Sponsor Defendant possesses all of the Company's Class B common stock, which grants the Sponsor Defendant the exclusive right to elect and remove the Company's directors prior to the Company's initial business combination.[76]

178.    The Sponsor Defendant's use of this right is controlled by the Pershing Fund Defendants, which are the sole owners and members of the Sponsor Defendant, and by PSCM, which is the sole manager of the Sponsor Defendant and the adviser of the Pershing Fund Defendants.

---

[76] PSTH Certificate of Incorporation, *supra* note 3 § 9.9.

179.     If this Action is successful, the Sponsor Defendant, the Pershing Fund Defendants, and PSCM stand to lose compensation and payments worth hundreds of millions of dollars because this Action seeks to rescind compensation and payments granted to them.

180.     Demand would also be a futile and useless act with regard to the Director Defendants because if this Action is successful, the Director Defendants will lose compensation and payments worth tens of millions of dollars.

181.     If the Court grants the Plaintiff's request to rescind the Director Warrants, those warrants will be worthless to the Director Defendants.

182.     Director Ovitz purchased Director Warrants for $812,500, which were valued at more than $10 million for purposes of the UMG Securities Purchase.  The potential loss of these valuable warrants renders demand futile with respect to Defendant Ovitz.  Director Ovitz also committed to purchase 250,000 Forward Purchase Units from PSTH.  The potential loss of this valuable right likewise renders demand futile with respect to Defendant Ovitz.

183.     Defendant Reses purchased Director Warrants for $812,500, which were valued at more than $10 million for purposes of the UMG Securities Purchase.  The potential loss of these valuable warrants renders demand futile with respect to Defendant Reses. Defendant Reses also committed to purchase 50,000 Forward Purchase Units from PSTH.  The potential loss of this valuable right likewise renders demand futile with respect to Defendant Reses.

184.     Defendant Steinberg purchased Director Warrants for $812,500, which were valued at more than $10 million for purposes of the UMG Securities Purchase.  The potential loss of these valuable warrants renders demand futile with respect to Defendant Steinberg.

185.     Defendant Gertsch purchased Director Warrants for $400,000, which were valued at more than $5 million for purposes of the UMG Securities Purchase.  The potential loss of these valuable warrants renders demand futile with respect to Defendant Gertsch.

186.     Demand would also be a futile and useless act with regard to Ackman, who is the Chairman of the Company's Board of Directors, because it would harm his financial interests. This Action seeks damages with respect to and rescission of the Forward Purchase Agreement. This Action likewise seeks damages with respect to and rescission of the Sponsor Warrants granted under the Sponsor Warrant Purchase Agreement to the Sponsor Defendant.

187.     This Action would therefore harm the financial interests of Ackman because Ackman is affiliated with the Pershing Fund Defendants and the Sponsor Defendant. Ackman is the founder and CEO and a major owner and partner of PSCM, which is the sole manager of the Sponsor Defendant and the investment adviser to the Pershing Fund Defendants. PSCM earns its money by charging fees to the Pershing Fund Defendants. The revenue from these fees will fall if this Action is successful and the Sponsor Defendant and the Pershing Fund Defendants are required to pay damages or the compensation and payments they have received from the Company are rescinded.

## COUNT I
## DECLARATORY JUDGMENT

188.     Plaintiff realleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

189.     As a result of the facts described above, an actual, present, and justiciable controversy exists between Plaintiff and Defendants.

190.     Accordingly, Plaintiff seeks a declaration that the Company is an investment company within the meaning of the ICA.

191.    Accordingly, Plaintiff further seeks a declaration that PSCM is an investment adviser within the meaning of the IAA and the ICA.

## COUNT II
## VIOLATION OF 15 U.S.C. § 80a-35(b)

192.    Plaintiff realleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

193.    Plaintiff asserts this claim on behalf of the Company in the Plaintiff's right as a securityholder of the Company.

194.    Under section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), each of the Forward Purchase Agreement, Director Forward Purchase Agreements, the Sponsor Warrant Purchase Agreement, and the Director Warrant Purchase Agreement constitutes a breach of fiduciary duty with respect to the receipt of compensation for services or of payments of a material nature paid by the Company or its security holders to the Defendants.

195.    Each of the Forward Purchase Agreement, the Direcetor Forward Purchase Agreements, the Sponsor Warrant Purchase Agreement, and the Director Warrant Purchase Agreement provides compensation so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining, as is required by section 36(b) of the ICA.

196.    The Sponsor Defendant and the Pershing Fund Defendants are liable for violations of ICA § 36(b) because they are "affiliated persons" of PSCM, which is the Company's investment adviser. *See* 15 U.S.C. § 80a-2(a)(3) (defining "affiliated person" to include "any person directly or indirectly controlling, controlled by, or under common control with, such other person").

197.    The Director Defendants are liable for violations of ICA § 36(b) because they are affiliated persons of PSCM and because they are directors of the Company. The Director

48

Defendants have a fiduciary duty with respect to compensation and payments received from the Company under ICA § 36(b) and the Delaware law of corporations.

## COUNT III
## VIOLATION OF 15 U.S.C. § 80a-46(b)

198.    Plaintiff realleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

199.    Plaintiff asserts this claim derivatively, on behalf of the Company.

200.    Plaintiff also asserts this claim directly, in his capacity as a holder of the Company's stock, on behalf of himself and all record and beneficial holders of PSTH Class A common stock, who hold such shares at the time of the filing of this action (except the Defendants herein, and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants).

201.    Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), provides:

> (1) A contract that is made, or whose performance involves, a violation of this subchapter, or of any rule, regulation, or order thereunder, is unenforceable by either party (or by a nonparty to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this subchapter or of any rule, regulation, or order thereunder) unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this subchapter.

> (2) To the extent that a contract described in paragraph (1) has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this subchapter.

> (3) This subsection shall not apply (A) to the lawful portion of a contract to the extent that it may be severed from the unlawful portion of the contract, or (B) to preclude recovery against any person for unjust enrichment.

202.    The Company is an "investment company" within the meaning of section 3(a)(1)(A) of the ICA.

203.    The rights granted to the Pershing Fund Defendants under the Forward Purchase Agreement is a contract that violations of the ICA, including but not limited to sections 7(a)(1), 18(d), 15(a), and 22(g) or 23(a) of the ICA.

204.    The Sponsor Warrant Purchase Agreement is a contract tha violates  the ICA, including but not limited to sections 7(a)(1), 18(d), 15(a), and 22(g) or 23(a) of the ICA.

205.    The right granted to certain Director Defendants under the Director Forward Purchase Agreements is a contract that violates the ICA, including but not limited to sections 7(a)(1), 18(d), 15(a), and 22(g) or 23(a) of the ICA.

206.    The Director Warrant Purchase Agreement is a contract that violates of the ICA, including but not limited to sections 7(a)(1), 18(d), 16(a), and 22(g) or 23(a) of the ICA.

207.    The disproportionate voting rights granted to the Class B shares by the Certificate of Incorporation violate section 18(i) and section 16(a) of the ICA.

208.    The Plaintiff and the other record and beneficial holders of PSTH Class A common stock are parties to PSTH's Certificate of Incorporation by virtue of their status as holders of the Company's common stock.

209.    The Company is a party to the Illegal Contracts by virtue of being governed by its Certificate of Incorporation and having entered the Forward Purchase Agreement, the  Sponsor Warrant Purchase Agreement, and the Director Warrant Purchase Agreement.

**COUNT IV**
**VIOLATION OF 15 U.S.C. § 80b-15(b)**

210.    Plaintiff realleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

211.    Plaintiff asserts this claim derivatively, on behalf of the Company.

212.    Section 215(b) of the IAA, 15 U.S.C. § 80b-15(b), provides:

50

> Every contract made in violation of any provision of this subchapter and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this subchapter, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

213.    PSCM is an investment adviser within the meaning of section 2(a)(11) of the IAA.

214.    PSCM has provided advice to the Company regarding the advisability of investing in or purchasing securities. PSCM has provided this advice in exchange for the compensation granted to the Pershing Fund Defendants and the Sponsor Defendant under the Forward Purchase Agreement and the Sponsor Warrant Agreement. PSCM has an indirect financial interest in the Pershing Fund Defendants and the Sponsor Defendant and exercises control over them.

215.    The right granted to the Pershing Fund Defendants under the Forward Purchase Agreement is a contract that violates the IAA, including but not limited to sections 203(a) and 205(a)(1) of the IAA.

216.    The Sponsor Warrant Agreement is a contract that violates the IAA, including but not limited to sections 203(a) and 205(a)(1) of the IAA.

217.    The Company is a party to the Illegal Contracts by virtue of being governed by its Certificate of Incorporation and having entered the Forward Purchase Agreement and the Sponsor Warrant Agreement with PSCM.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment as follows:

A.  Declaring that PSTH is an investment company within the meaning of the ICA;

10070414v1/017257

B.  Declaring that PSCM is an investment adviser of PSTH within the meaning of the IAA and the ICA;

C.  Rescinding the Forward Purchase Agreement and Director Forward Purchase Agreements

D.  Enjoining the Pershing Fund Defendants and the Directors from purchasing the Forward Purchase Units;

E.  Ordering the return to the Company of any equity or warrants issued to the Pershing Fund Defendants or the Director Defendants pursuant to the Forward Purchase Agreementand Director Forward Purchase Agreements;

F.  Rescinding the Director Warrant Purchase Agreement and declaring void the Director Warrants;

G.  Enjoining the Director Defendants from exercising any rights under the Director Warrants or the Director Warrant Purchase Agreement;

H.  Rescinding the Sponsor Warrant Purchase Agreement and declaring void the Sponsor Warrants;

I.  Enjoining the Sponsor Defendant from exercising any rights under the Sponsor Warrants or the Sponsor Warrant Purchase Agreement;

J.  Ordering the return to the Company of any equity or warrants issued to the Sponsor Defendant or the Director Defendants pursuant to any Sponsor Warrant Agreement or Director Warrant Agreement;

K.  Rescinding the portion of the Certificate of Incorporation that gives the Class B shares the exclusive rights to elect and remove directors and 20% of the total outstanding voting rights of the common stock of the Company prior to the Initial Business Combination;

L.  Awarding the Company damages for all compensation paid or payments of a material nature made by the Company to the Sponsor Defendant, the Pershing Fund Defendants, and the Director Defendants in breach of the fiduciary duties owed by PSCM, the Sponsor Defendant, the Pershing Fund Defendants, and the Director Defendants to the Company;

M.  Awarding the Company, the Plaintiff, and the plaintiff class pre-judgment and post-judgment interest, as well as its reasonable attorneys' and expert witness' fees and other costs; and

N.  Awarding Plaintiff and the Company such other relief as this Court deems just and proper.

Dated: New York, New York
October 15, 2021

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

*/s/ Mark Lebovitch*
Mark Lebovitch
Daniel E. Meyer
Joseph W. Caputo
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1519
Facsimile: (212) 554-1444
E-mail: MarkL@blbglaw.com

Gregory V. Varallo
500 Delaware Avenue
Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3601
E-mail: Greg.Varallo@blbglaw.com

**SUSMAN GODFREY L.L.P.**
Shawn J. Rabin
Stephen Shackelford
Cory Buland
Beatrice Franklin
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
E-mail: SRabin@susmangodfrey.com

**BUZIN LAW, P.C.**
Robert J. Jackson, Jr. (*pro hac vice*)
John Morley (*pro hac vice*)
111 Broadway, Suite 1204
New York, NY 10006
Telephone: (914) 819-7527
E-mail: john.morley@yale.edu

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Dr., Ste. 300
Berwyn, PA 19312
Telephone: (484) 258-1585
Facsimile: (484) 631-1305
E-mail: rm@rmclasslaw.com

## <u>VERIFICATION</u>

I, George Assad, hereby declare as follows:

I have been a beneficial owner of Pershing Square Tontine Holdings, Ltd. (the "Company") common stock at all relevant times alleged in the Verified Direct and Derivative Amended Complaint.

I am the plaintiff in this action.  I have retained competent counsel and I am ready, willing, and able to pursue this action vigorously on behalf of the Company. I confirm that I am not acting collusively and am capable of and willing to fairly and adequately represent the interests of the stockholders who are similarly situated in enforcing the rights of the Company.  I have read the Verified Direct and Derivative Amended Complaint.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the amended complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: October 8, 2021

*George Assad*
George Assad (Oct 8, 2021 11:13 EDT)
_____
George Assad