## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE ASSAD, directly on behalf of himself and all others similarly situated, and derivatively on Behalf of PERSHING SQUARE TONTINE HOLDINGS, LTD., ) ) ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | |
| PERSHING SQUARE TONTINE HOLDINGS, LTD., ) ) ) | **CASE NO. 1:21-cv-06907-AT** |
| Nominal Defendant, ) ) | |
| v. ) ) | |
| PERSHING SQUARE TH SPONSOR, LLC, LISA GERSH, MICHAEL OVITZ, JACQUELINE D. RESES, JOSEPH S. STEINBERG, PERSHING SQUARE, L.P., PERSHING SQUARE INTERNATIONAL, LTD., AND PERSHING SQUARE HOLDINGS, LTD., ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................. 1

STATUTORY AND FACTUAL BACKGROUND ...................................................... 4

ARGUMENT ............................................................................................................... 9

I.      PLAINTIFF HAS A PRIVATE RIGHT OF ACTION FOR HIS CLAIMS ...................... 9

        A.      Plaintiff Has a Cause of Action for a Declaratory Judgment.................................. 9

        B.      Plaintiff Has a Private Right of Action for His ICA and IAA Claims.................. 10

        C.      Plaintiff's Claims are in the Correct Forum......................................................... 12

        D.      The Acceptance of Registration Statements by the SEC is Irrelevant................. 13

II.     PLAINTIFF PLAUSIBLY PLEADS VIOLATIONS OF THE ICA. ............................. 15

        A.      PSTH Presently Invests All of Its Assets in Securities........................................ 15

                1.      PSTH Fails the *Tonopah* Standard........................................................... 16

                2.      PSTH Has Exceeded the Grace Period Under the ICA ............................ 25

        B.      PSTH Proposed to Invest in Securities in the UMG Deal .................................... 27

        C.      PSTH "Invests" in Securities ................................................................................ 29

        D.      PSTH Is Violating the ICA and Will Continue to Do So in the Future............... 30

III.    PLAINTIFF PLAUSIBLY PLEADS VIOLATIONS OF THE IAA ............................... 34

        A.       PSCM is an Investment Adviser under the ICA and IAA ................................... 34

        B.      The Illegal Contracts Violate the IAA ................................................................. 36

IV.     PLAINTIFF'S CLAIMS ARE TIMELY ........................................................................ 36

        A.      Plaintiff's ICA § 47 and IAA § 215 Claims are Timely ...................................... 36

                1.      The Applicable Statute of Limitations is Two Years................................ 37

                2.      Plaintiff's Claims are Timely Under a One-Year Statute of
                        Limitations ................................................................................................ 38

        B.      Plaintiff's ICA § 36(b) Claim is Timely .............................................................. 39

V.      PLAINTIFF HAS DERIVATIVE STANDING ................................................................ 41

      A.      Plaintiff Satisfies the Contemporaneous Ownership Requirement ...................... 41

      B.      Plaintiff has Adequately Pleaded Demand Futility ............................................... 43

CONCLUSION ....................................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abrahamson v. Fleschner*,
    586 F.2d 862 (2d Cir. 1977)............................................................................................36

*Assoc. Indem. Corp. v. Fairchild Indus., Inc.*,
    961 F.2d 32 (2d Cir. 1992)..............................................................................................41

*Avianca, Inc. v. Corriea*,
    1993 WL 797455 (D.D.C. May 13, 1993)......................................................................40

*Chevron Corp. v. Naranjo*,
    667 F.3d 232 (2d Cir. 2012).............................................................................................10

*Chevron USA v. Natural Res. Def. Council*,
    467 U.S. 837 (1984).........................................................................................................14

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012).........................................................................................................14

*Conrad v. Blank*,
    940 A.2d 28 (Del. Ch. 2007)...........................................................................................45

*CSX Corp. v. Children's Inv. Fund Mgmt.*,
    562 F. Supp. 2d 511 (S.D.N.Y. 2008).............................................................................13

*Curd ex rel. SEI Int'l Equity Fund v. SEI Inv. Mgmt. Corp.*,
    2015 WL 4243495 (E.D. Pa. July 14, 2015)...................................................................39

*Daily Income Fund v. Fox*,
    464 U.S. 523 (1984).............................................................................................17, 41, 43

*Dan River, Inc. v. Icahn*,
    701 F.2d 278 (4th Cir. 1983) ..........................................................................................16

*de Rothschild v. Serlin*,
    2021 WL 860227 (S.D.N.Y. Mar. 8, 2021) ....................................................................37

*Desimone v. Barrows*,
    924 A.2d 908 (Del. Ch. 2007)..........................................................................................45

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins.*,
    411 F.3d 384 (2d Cir. 2005)..........................................................................................9, 11

*Eaton Vance Senior Income Tr. v. Saba Capital Master Fund, Ltd.*,
    2021 WL 2222812 (Sup. Ct. Mass. Mar. 31, 2021)..................................................................42

*Forsythe v. Sun Life Financial, Inc.*,
    475 F. Supp. 2d 122 (D. Mass. 2007) .....................................................................................40

*Frank v. Elgamal*,
    2012 WL 1096090 (Del. Ch. 2012) .........................................................................................44

*Franklin v. Gwinnett Cty. Pub. Sch.*,
    503 U.S. 60 (1992).....................................................................................................................39

*Gabelli v. SEC*,
    568 U.S. 442 (2013)...................................................................................................................38

*Gartenberg v. Merrill Lynch Asset Management, Inc.*,
    528 F. Supp. 1038 (S.D.N.Y. 1981), *aff'd* 694 F.2d 923 (2d Cir. 1982) ..........................22, 30

*Hsu v. UBS Fin. Servs. Inc.*,
    2011 WL 3443942 (N.D. Cal. Aug. 5, 2011) ..........................................................................37

*Hunt v. Invesco Funds Group, Inc.*,
    2006 WL 1751900 (S.D. Tex. June 22, 2006)..........................................................................40

*In re Activision Blizzard, Inc. S'holder Litig.*,
    124 A.3d 1025 (Del. Ch. 2015)................................................................................................42

*In re AllianceBernstein Mutual Fund Excessive Fee Litig.*,
    2006 WL 74439 (S.D.N.Y. Jan. 11, 2006) .............................................................................40

*In re Bear Stearns Co. Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011)......................................................................................27

*In re Ebix, Inc. Stockholder Litig.*,
    2014 WL 3696655 (Del. Ch. July 24, 2014).............................................................................41

*In re Franklin Mut. Funds Fee Litigation*,
    478 F. Supp. 2d 677 (D.N.J. 2007) ..........................................................................................40

*In re Gartenberg*,
    636 F.2d 16 (2d Cir. 1980)........................................................................................................39

*In re George W. Helme Co.*,
    9 S.E.C. 16, 1941 WL 37265 (Apr. 11, 1941) ........................................................................18

*In re IPO Antitrust Litig.*,
    287 F. Supp. 2d 497 (S.D.N.Y. 2003).......................................................................................13

*In re Pacificare of Arizona, Inc.*
   2004 WL 2403824 (Oct. 25, 2004) ......................................................................................18

*In re Penn Cent. Transp. Co.*,
   341 F. Supp. 845 (E.D. Pa. 1972) ......................................................................................43

*In re Smiledirectclub,*
   2021 WL 2182827 (Del. Ch. May 28, 2021) ......................................................................42

*In re Twitter, Inc. Sec. Litig.*,
   2020 WL 9073168 (N.D. Cal. Apr. 20, 2020) ....................................................................14

*In re Warner Bros.*,
   11 S.E.C. Docket 2214, 1977 WL 175217 (Apr. 5, 1977) ..................................................18

*Ingenhutt v. State Farm Inv. Mgmt. Corp.*,
   2017 WL 1398646 (C.D. Ill. Apr. 18, 2017) ......................................................................39

*Jones v. Harris Assoc. L.P.*,
   559 U.S. 335 (2010) .....................................................................................................10, 39

*Kahn v. Kohlberg, Kravis, Roberts & Co.*,
   970 F.2d 1030 (2d Cir. 1992) ......................................................................................37, 40

*Krinsk v. Fund Asset Mgmt., Inc.*,
   875 F.2d 404 (2d Cir. 1989) ...............................................................................................33

*London v. Tyrrell*,
   2008 WL 2505435 (Del. Ch. June 24, 2008) ......................................................................44

*Matter of Living Benefits Asset Mgmt., LLC*,
   916 F.3d 528 (5th Cir. 2019) ..............................................................................................35

*Menowitz v. Brown*,
   991 F.2d 36 (2d Cir. 1993) ..................................................................................................38

*Miller v. Butler*,
   2014 WL 1716184 (D.N.J. Apr. 30, 2014) ........................................................................40

*Morada Music, LLC v. Hays*,
   2010 WL 11596237 (C.D. Cal. Jan. 27, 2010) ...................................................................40

*Moses v. Black,*
   1981 WL 1599 (S.D.N.Y. 1981) .........................................................................................18

*Norman v. Salomon Smith Barney*,
   350 F. Supp. 2d 382 (S.D.N.Y. 2004) ................................................................................37

*Oxford University Bank v. Lansuppe Feeder, LLC*,
    933 F.3d 99 (2d Cir. 2019)..........................................................................10, 11, 12

*Phoenix Four, Inc. v. Strategic Res. Corp.*,
    2006 WL 399396 (S.D.N.Y. Feb. 21, 2006)...........................................................37

*Roth v. The Goldman Sachs Grp.*,
    No. 12-2509, Dkt. No. 94 (2d Cir. Mar. 21, 2013) ................................................13

*Rubenstein v. Adamy*,
    2021 WL 1269080 (S.D.N.Y. Apr. 6, 2021)...........................................................42

*SEC v. Am. Bd. of Trade, Inc.*,
    751 F.2d 529 (2d Cir. 1984).....................................................................................18

*SEC v. Culpepper*,
    270 F.2d 241 (2d Cir. 1959).....................................................................................14

*SEC v. Fifth Ave. Coach Lines*,
    289 F. Supp. 3 (S.D.N.Y. 1968)...................................................................... *passim*

*SEC v. Hui Feng*,
    2016 WL 7443222 (C.D. Cal. Aug. 4, 2016)..........................................................14

*SEC v. Nat'l Presto Indus.*,
    486 F.3d 305 (7th Cir. 2007) ........................................................................ *passim*

*SEC v. S&P Nat'l Corp.*,
    360 F.2d 741 (2d Cir. 1966).........................................................................11, 29, 31

*Siemers v. Wells Fargo & Co.*,
    2007 WL 760750 (N.D. Cal. Mar. 9, 2007)......................................................41, 42

*Siimes v. Giordano*,
    1992 WL 301622 (D.N.J. Oct. 8, 1992)...........................................................15, 22

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944).................................................................................................14

*STAAR Surgical Co. v. Waggoner*,
    588 A.2d 1130 (Del. 1991) ......................................................................................42

*Strigliabotti v. Franklin Res., Inc.*,
    398 F. Supp. 2d 1094 (N.D. Cal. 2005) ..................................................................39

*Thomas v. Metropolitan Life Ins. Co.*,
    2008 WL 4619822 (W.D. Okla. Oct. 16, 2008) .....................................................37

*Tilden v. Cunningham,*
    2018 WL 5307706 (Del. Ch. 2018) ...................................................................................45

*Tonopah Mining Co. of Nev.,*
    26 S.E.C. 426 (1947).............................................................................................. *passim*

*Transamerica Mortgage Advisors, Inc. v. Lewis (TAMA),*
    444 U.S. 11 (1979)..............................................................................................9, 10

*UFCW Loc. 1500 Pension Fund v. Mayer,*
    2016 WL 6122458 (N.D. Cal. Oct. 19, 2016)................................................38, 39

*United Food & Commercial Workers Union v. Zuckerberg,*
    2021 WL 4344361 (Del. Sept. 23, 2021).......................................................43, 44

*Voigt v. Metcalf,*
    2020 WL 614999 (Del. Ch. Feb. 10, 2020) ...........................................................44

*Weiss v. Swanson,*
    948 A.2d 433 (Del. Ch. 2008).........................................................................44, 45

*Yi v. Sterling Collision Ctrs., Inc.,*
    480 F.3d 505 (7th Cir. 2007) ................................................................................14

**Statutes**

15 U.S.C. § 78c(a)(47)......................................................................................................37

15 U.S.C.§ 80a....................................................................................................... *passim*

15 U.S.C. § 80b....................................................................................................... *passim*

28 U.S.C. § 1658..............................................................................................................37

28 U.S.C. § 2201(a) ...........................................................................................................9

**Rules**

Fed. R. Civ. P. 23.1(b)(1)..................................................................................................42

**Regulations**

17 C.F.R. § 270.3a-2(a) ...................................................................................................26

17 CFR § 270.2a-7(a)(14)................................................................................................19

**Other Authorities**

*Arizona Property Investors, Ltd.*, SEC No-Action Ltr.,
    1979 WL 14220 (Aug. 9, 1979) ............................................................................16, 19, 21, 26

*Baker, Watts & Co.*, SEC No-Action Ltr.,
    1982 WL 29238 (May 6, 1982) ..............................................................................18, 20

*Centex Corp.*, SEC No-Action Letter,
    1986 WL 67311 (Oct. 10, 1986) ..............................................................................30

*Credit Suisse First Boston Corp.*, SEC No-Action Ltr.,
    1998 WL 799305 (Sept. 9, 1998) ..............................................................................19, 20, 30

*Financial Funding Group, Inc.*, SEC No-Action Ltr.,
    1982 WL 28965 (Mar. 3, 1982) ..............................................................................17, 19

*First United Mgmt. Co.*, SEC No-Action Ltr.,
    1974 WL 10912 (Aug. 13, 1973) ..............................................................................35

*Florida First Equities Corp.*, SEC No-Action Ltr.,
    1980 WL 14869 (Sept. 11, 1980) ..............................................................................26

*ICOS Corp.*, 1940 Act Rel. No. 19334,
    58 Fed. Reg. 15,392 (Mar. 22, 1993) ..............................................................................16, 17

*In re Snowflake, Inc.,* Rel. No. IC-34049,
    2020 WL 5993059 (Oct. 9, 2020) ..............................................................................18

*Inv. Adv. Act,* Rel. No. 1092,
    39 S.E.C. Docket 494 (Oct. 8, 1987) ..............................................................................35

*The Investment Company Act of 1940,*
    50 Yale L.J. 440 (1940) ..............................................................................1, 4

*J.D. Gillespie, Tr. for Cleo George*, Rel. No. IC-513
    13 S.E.C. 470 (1943) ..............................................................................20, 30

*Lyft, Inc.*, Rel. No. IC-33399,
    2019 WL 1199584 (Mar. 14, 2019) ..............................................................................18

*Medidentic Mortgage Investors*, SEC No-Action Ltr.,
    1984 WL 45320 (May 23, 1984) ..............................................................................26

Sam Goldfarb, *Some Investors Find Stability in SPACs*,
    Wall St. J. (Oct. 12, 2021) ..............................................................................1, 23

Transient Investment Companies,
　　46 Fed. Reg. 6882 (Jan. 22, 1981) ............................................................................26

*Willkie Farr & Gallagher*, SEC No-Action Ltr.,
　　2000 WL 1585635 (Oct. 23, 2000).............................................................................20

## PRELIMINARY STATEMENT

Pershing Square Tontine Holdings ("PSTH" or the "Company") is an illegal investment company under the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 *et seq*. ("ICA"). Its controller, Pershing Square Capital Management, L.P. ("PSCM"), is an illegal investment adviser under the ICA and the Investment Advisers Act of 1940. 15 U.S.C. §§ 80b-1 *et seq*. ("IAA").

PSTH is the largest SPAC in history and the latest product of PSCM, one of the world's most prominent advisers of hedge funds. PSCM organized PSTH to resemble an investment fund in many ways. Like a money market fund, PSTH offers redemption rights and direct access to the returns on a pool of U.S. government securities.[1] Like a private equity or mutual fund, PSTH has spent the bulk of its time trying to purchase securities, and when the SEC intervened earlier this year to stop PSTH from purchasing one block of securities, PSCM simply purchased those same securities via its other funds. And like every type of investment fund, PSTH has no full-time employees of its own, relying instead on a professional investment fund adviser, PSCM, to supply it with investment advice.

Defendants claim that because PSTH included certain disclaimers in its registration statement, PSTH and PSCM can avoid the ICA and IAA, opening up a loophole in the law through which Defendants can extract vast compensation from PSTH investors. Defendants are wrong: they have created the very sort of business that triggers the longstanding investor protections of the ICA and IAA. Instead of addressing these problems with their business on the merits, Defendants spend all but five of their forty-eight pages of briefing offering excuses for why they should never have to answer for their illegal scheme. Defendants devote nearly as much effort to

---

[1] *See, e.g.*, Sam Goldfarb, *Some Investors Find Stability in SPACs*, WALL ST. J. (Oct. 12, 2021), https://www.wsj.com/articles/some-investors-find-stability-in-spacs-11634007742.

attacking Plaintiff's counsel as to addressing the allegation that PSTH is an investment company.

Defendants' principal argument is that PSTH cannot be an investment company because the SEC has allowed the registration statements of other SPACs to become effective under the Securities Act of 1933. This theory is wrong for three reasons. First, PSTH is very different from other SPACs. It spent nearly the entirety of its first year trying to invest the bulk of its assets in a minority stake in a public company, a transaction that had no precedent among other SPACs. Second, Defendants offer no legally cognizable reason why the SEC's inaction under the 1933 Act bears on the meaning of the ICA or IAA. Third, there is no need for this Court to guess about what the SEC believes. If the Court wishes to know the SEC's views, Plaintiff urges the Court to issue an order asking the SEC to express those views directly to the Court. PSTH could also request the SEC's views itself by seeking a no-action letter or order under the ICA. PSTH has chosen not to ask the SEC because it fears what the SEC will say.

On the merits—which Defendants barely mention, and for good reason—the ICA defines an investment company as a business that invests primarily in securities. PSTH is an investment company because investing in securities is all it has ever done. From the time of its IPO in July 2020, PSTH has invested nearly 100% of its assets in, and derived 100% of its income from, securities of the U.S. government and money market mutual funds. And since then, PSTH has devoted much of its time to locating further investments in securities, leaning on PSCM to source a deal that would have invested nearly three quarters of PSTH's assets in a purchase of still more securities in the common stock of Universal Music Group ("UMG").

PSTH argues that it cannot be an investment company because although it invests all of its assets in securities now, it will eventually combine with an operating business later. This argument is inconsistent with PSTH's current and possibly future attempts to complete its business

combination through a further purchase of securities. And it is inconsistent with the longstanding views of the courts and the SEC, which have seen this argument about future intentions before—often in the failed defenses of other acquisition companies. Almost every company that finds itself in trouble under the ICA argues that *eventually* it will do something other than invest in securities. But although the law recognizes a grace period during which a company may invest in securities before becoming an investment company, the law has consistently limited that period to one year. PSTH would have blown through that period in July 2021 had the announcement of the UMG transaction not already rendered PSTH an investment company.

In addition to seeking relief under the ICA, Plaintiff also seeks relief under the IAA. Under that statute, an investment adviser is a person who provides advice regarding "the advisability of . . . purchasing . . . securities." Because PSTH leans entirely on PSCM to supply it with investment expertise, PSCM became an investment adviser to PSTH when PSCM advised PSTH on its proposed purchase of securities in UMG. 15 U.S.C. § 80b-2(a)(11).

The procedural arguments Defendants erect to avoid scrutiny do not hold up. Defendants' argument that Plaintiff lacks a right of action to challenge PSTH flies in the face of precedent. Defendants' arguments about timeliness and contemporaneous ownership all ignore the simple fact that no ICA claim arose until PSTH became an investment company, which occurred in June 2021, when PSTH announced the UMG transaction, or in July 2021, when PSTH invested all of its assets in securities for more than one year. As to demand futility, Defendants ignore the well-pleaded allegations in the Complaint that PSTH's four "independent" directors, unlike PSTH's other investors, were given the privilege of paying just $2.8 million for warrants that PSTH valued at more than $36 million one year later—compensation that is worthless if PSTH is found to be an investment company. None of this compensation was purchased at "fair market value."

The bottom line is that in order to win this case, Defendants will have to make new law. Defendants cannot cite any authority in which the SEC or the courts have knowingly authorized any issuer to offer redemption rights in a pool of securities comprising 100% of its assets with no operating business for two and a half years without becoming an investment company.

## STATUTORY AND FACTUAL BACKGROUND

In 1940, Congress passed the ICA and IAA to protect investors from Depression-era "abuses [that] stemmed from the control of investment companies by banking, brokerage, or dealer interests." Note, *The Investment Company Act of 1940*, 50 YALE L.J. 440, 441-42 (1940) (citing *Hearings Before Subcomm. of Sen. Comm. on Banking and Currency*, S.3580, 76th Cong., 3d Sess. (1940)). Because investment companies had no employees or resources of their own, they were especially vulnerable to exploitation by outside financial advisers, who sometimes called themselves "sponsors" and who controlled the investment companies that they established and managed. Congress expressed concern that "control [of investment companies would be] . . . exercised to benefit the sponsor[s]" rather than investors. *Id.* at 442.

In response, Congress passed the ICA and the IAA, which impose a comprehensive regulatory regime to address abuses that arise when outsiders dominate an investment company. The laws regulate the capital structure of an investment company, the rights and powers of investors, and the kinds and amounts of compensation that investment advisers, directors, and officers can be paid. The ICA applies to any company that satisfies the statute's definition of an "investment company," which includes any entity that is "engaged primarily" "in the business of investing, reinvesting, or trading in securities." 15 U.S.C. § 80a-3(a)(1)(A).

PSTH is dominated by an outside manager just like the companies the ICA and IAA were designed to regulate. PSTH was founded by PSCM, a professional investment fund management

company. Am. Compl. ("AC") ¶ 48. PSTH has no operational resources and no full-time employees of its own, depending entirely on the management of PSCM. *Id.* ¶ 52. PSCM controls PSTH through a network of affiliates that PSCM also controls. *Id*. ¶¶ 48, 51. These affiliates include three investments funds which PSCM also dominates as an investment adviser: Pershing Square, L.P., Pershing Square Holdings, Ltd., and Pershing Square International, Ltd. (collectively, the "Pershing Fund Defendants"). *Id.* ¶¶ 27-30. PSCM also dominates PSTH through a "sponsor" entity, Pershing Square TH Sponsor, LLC (the "Sponsor Defendant"), owned entirely by the Pershing Fund Defendants and in which PSCM serves as the sole manager. *Id*. ¶¶ 25-26. PSTH's Board of Directors consists of four outside directors, Defendants Gersh, Ovitz, Reses, and Steinberg (the "Director Defendants"), and William A. Ackman, who serves as CEO and Chairman of PSTH, and also as the CEO, founder, and major owner of PSCM. *Id*. ¶¶ 31-34, 53.

PSTH launched its IPO on July 22, 2020. *Id*. ¶ 36. It sold 200 million IPO units for $20 each, making it the world's biggest SPAC at $4 billion. *Id*. ¶ 37. Each IPO unit included one share of PSTH Class A common stock and 1/9 of a warrant, which provided its holder with the right to purchase more shares of Class A common stock in the future at a fixed price. *Id*. ¶ 40. Just before the business combination, a holder of Class A stock can redeem her shares by handing them over to PSTH and receiving in exchange the cash value of her pro rata portion of PSTH's portfolio of securities. *Id*. ¶ 41; PSTH Certificate of Incorporation ("COI") § 9.2.

Prior to its IPO, PSTH was an empty shell, with no business and no assets. Since the IPO, PSTH has invested nearly all of its more than $4 billion in securities of the U.S. government. AC ¶¶ 36, 43-45. PSTH still has no operations or business. *Id.* PSTH's COI allows the Company to use its assets to enter a business combination with an operating business, but the certificate grants the Company much longer than most SPACs to complete this combination—up to two and a half

years. *Id*. ¶ 39; COI § 9.1(b). Under the certificate, PSTH may complete this business combination by, among other things, purchasing more securities. COI § 4.3(b)(1). PSTH promised in its registration statement that it "will only complete [an initial] business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of a target or otherwise acquires an interest . . . sufficient for it not to be required to register as an investment company." PS Mot., Exh. B ("Prospectus"), at 16.

PSTH broke that promise on June 4, 2021, when it announced a definitive agreement to spend 72% of its assets on a purchase of a minority interest in the common stock of Universal Music Group ("UMG" and the "UMG Deal"). AC ¶¶ 66, 92 n.42. On July 19, 2021, PSTH withdrew from the UMG Deal after receiving regulatory objections from the SEC. AC ¶ 70; PS Mot. 11. PSTH then assigned its rights in the UMG deal to PSCM's other investment funds (the Pershing Fund Defendants) to purchase the same securities in UMG that PSTH had agreed to buy.[2]

PSCM arranged for PSTH to compensate PSCM for its management efforts through a series of payments to PSCM's affiliates on PSCM's behalf. AC ¶¶ 74-101. PSCM benefits from these payments through the fees these affiliates pay to PSCM for PSCM's services as an investment adviser. *Id*. To the Pershing Fund Defendants, PSTH issued Forward Purchase Rights that require these Defendants to purchase $1 billion and grant them the option to purchase another $2 billion worth of common stock and warrants in PSTH. *Id*. ¶¶ 77-81. The Forward Purchase Rights must be exercised prior to the business combination. To the Sponsor Defendant, PSTH issued Sponsor Warrants, allowing the Sponsor Defendant to purchase common stock and warrants in PSTH after the business combination. *Id*. ¶¶ 83-84.

---

[2]   *See* June 2021 Letter to Shareholders, *available at* https://assets.pershingsquareholdings.com/2021/11/04145531/Pershing-Square-Holdings-Ltd.-June-2021.pdf.

PSTH compensated the Director Defendants similarly, by issuing them Director Warrants with terms substantially identical to those of the Sponsor Warrants, *Id*. ¶¶ 85-86, and by issuing Defendants Ovitz and Reses Director Forward Purchase Rights with terms similar to the Forward Purchase Rights of the Pershing Fund Defendants. *Id*. ¶¶ 182-183. PSTH also granted to the Sponsor Defendant all the shares of PSTH's Class B common stock, thereby granting the Sponsor Defendant the exclusive right to elect and remove PSCM's directors prior to the business combination. *Id*. ¶¶ 26, 51.

The Forward Purchase Rights, Sponsor Warrants, and Director Warrants are immensely valuable because they grant Defendants rights to buy equity in PSTH at fixed prices that may be far lower than the market value of the equity at the time the rights are exercised. Although the exact difference between the fixed price and market price will depend on future changes in the market price, the rights are nevertheless valuable today because they are already legally enforceable.  Basic economic theory and law indisputably places a present value on rights such as these even when their ultimate payoffs may depend on future developments.

America's accounting standards board, for instance, has for decades required firms to disclose the present value of executive stock options exercisable in the future.[3]  And the SEC has long mandated disclosure of the present value of all kinds of rights that depend on future contingencies, from insurance-policy payouts to credit default swaps.[4] On this same logic, the SEC

---

[3] Disclosure of the full present value of executive stock options is required even though such options are contingent on the company's future stock price, the executive's continued service, and the executive's performance. FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS NO. 123(R) 250 (2004) (not using present value "results in financial statements that do not faithfully represent the economic transactions," "namely, the receipt and consumption of employee services in exchange for equity instruments").

[4] *See, e.g.*, FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS NO. 60 8-10 (1982) (requiring present-value disclosure of valid insurance claims, including those not yet made).

requires SPACs, including PSTH, to disclose the present value of warrants on their stock and PSTH has accordingly estimated the present value of the Forward Purchase Rights at hundreds of millions of dollars. AC ¶ 81. In the UMG Deal, PSTH estimated the present value of the Director Warrants by agreeing to buy them back from the Director Defendants at a valuation of $36.8 million. *Id.* ¶¶ 92-93.[5]

The Amended Complaint alleges that Defendants paid far less than the "fair market value" of these rights. For the Forward Purchase rights, the Pershing Fund Defendants paid exactly nothing—they received these rights entirely for free. *Id.* ¶ 80. For the Director Warrants, the Director Defendants paid just $2,837,500—less than one thirteenth the $36.8 million valuation used when PSTH offered to repurchase these warrants less than one year later. *Id.* ¶¶ 88-93. For the Sponsor Warrants, the Sponsor Defendant paid the same pro rata price that the Director Defendants paid for the Director Warrants, with an identically enormous discount from PSTH's own estimate of their worth. For the Class B shares and the right they carry to control all $4 billion of PSTH's assets, the Sponsor Defendant paid the peppercorn sum of just $25,000. *Id.* ¶ 106.[6]

Defendants profess that the prices they paid for the securities with which they compensated themselves were "based upon their fair market value as determined by a nationally recognized third-party valuation firm." PS Mot. 8-9. But that is not true. PSTH's registration statement makes clear that although PSTH "consulted with" a third-party valuation firm and "t[ook] into account such consultation," it was ultimately PSTH—and only PSTH—that made the determination that

---

[5] This valuation, when applied to the Sponsor Warrants, implicitly estimated the present value of the Sponsor Warrants at more than $843 million. AC ¶¶ 94-95.

[6] At most, Defendants' claim that they paid fair value—based on an analysis using "assumptions that inaccurately depressed the purchase price required of the Sponsor and Director Defendants," AC ¶ 98, in transactions PSTH itself said were "not [at] arms length," *id.* ¶ 87—raises disputed questions of fact, not a basis for dismissal.

8

the methodology and valuation were reasonable. Prospectus 11.

Plaintiff seeks a declaratory judgment that PSTH is an investment company and PSCM is its investment adviser; rescission of the purchase agreements for the Forward Purchase Rights and Sponsor and Director Warrants, the purchase agreement for the Class B shares, and the portion of PSTH's COI that governs the rights of the Class B shares (collectively, the "Illegal Contracts"); and other equitable relief and damages.

## ARGUMENT

## I.   PLAINTIFF HAS A PRIVATE RIGHT OF ACTION FOR HIS CLAIMS

### A.   Plaintiff Has a Cause of Action for a Declaratory Judgment

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). A court should grant a declaratory judgment where "the judgment will serve a useful purpose in clarifying or settling the legal issues involved" and "a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins.*, 411 F.3d 384, 389 (2d Cir. 2005). The IAA and ICA expressly contemplate that federal courts will have jurisdiction "of all suits in equity" brought under the statutes, including claims for declaratory relief. *See* 15 U.S.C. § 80a-43; 15 U.S.C. § 80b-14(a); *Transamerica Mortgage Advisors, Inc. v. Lewis (TAMA)*, 444 U.S. 11, 19 n.9 (1979) (IAA jurisdictional provision, identical to ICA provision, "would equally sustain actions where simple declaratory relief or rescission is sought").

Defendants cannot argue that there is no actual controversy in this case; that the Court lacks jurisdiction; or that a declaratory judgment would fail to serve a useful purpose in clarifying the

legal issues in this dispute. Instead, Defendants rely on a single case, *see* PS Mot. 14, which said only that the plaintiffs could not rely on a New York state statute recognizing foreign monetary judgments in order to *avoid* recognition of a foreign judgment—relief directly contrary to the purpose of the statute. *Chevron Corp. v. Naranjo*, 667 F.3d 232, 241 (2d Cir. 2012). Here, by contrast, the declaration Plaintiff seeks is in line with the purpose and remedies provided in the ICA and IAA and is a predicate to the several causes of action provided to private plaintiffs. Defendants' other citations are to out-of-circuit cases holding that there is no private right of action under section 47(b) of the ICA—a position that the Second Circuit has rejected. *See Oxford University Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 105 (2d Cir. 2019).

### B.       Plaintiff Has a Private Right of Action for His ICA and IAA Claims

Defendants cannot deny that the Second Circuit and Supreme Court have held that Plaintiff has a private right of action under sections 36(b) and 47(b) of the ICA and section 215(b) of the IAA. *See TAMA*, 444 U.S. at 24 (1979) ("[W]e hold that there exists a limited private remedy under the Investment Advisers Act of 1940 [section 215] to void an investment advisers contract."); *Jones v. Harris Assoc. L.P.*, 559 U.S. 335, 340 (2010) (section 36(b) "grants individual investors a private right of action for breach of fiduciary duty"); *Oxford University Bank*, 933 F.3d at 105 ("§ 47(b) unambiguously evidences Congressional intent to authorize a private right of action"). Defendants insist that only the SEC can determine who is an investment company or an investment adviser. PS Mot. 14-18. But this argument misses something basic about what the courts meant when they held that these rights of action were "private." By definition, a "private" action is one that does not belong exclusively to a public agency. And what Plaintiff is asking this Court to do is interpret the meaning of a federal statute—exactly what federal courts do every day.

Defendants contend that PSTH can avoid scrutiny under the ICA by illegally refusing to

register with the SEC as an investment company. PS Mot. 15-16. This argument has three problems. First, it fails with regard to section 7(a), which is the provision that mandates registration and therefore applies expressly to investment companies that have not yet registered. 15 U.S.C. § 80a-7(a). It also fails with regard to Plaintiff's claims under the IAA, which applies to any investment adviser, whether or not its client is an investment company, let alone a registered one.

Second, if PSTH is an investment company, there can be no question that its failure to register as one is a violation of the ICA. *See, e.g.,* 15 U.S.C. §§ 80a-7(a)(1), (2), (4). Defendants are thus effectively saying that the reason PSTH does not have to comply with the law is that it has not complied with the law. The SEC and the Second Circuit rejected similarly circular reasoning a generation ago in *S&P National Corp.*, when another investment company that illegally failed to register likewise tried to escape a provision governing "registered" investment companies. 360 F.2d 741, 746 (2d Cir. 1966). The court agreed with the SEC that "an investment company long operating unlawfully [by failing to register] should not be better off than one complying with the law [by duly registering]." *Id.*

Third, as noted above, Plaintiff has the right to a declaratory judgment to clarify whether PSTH must register. This would "serve a useful purpose in clarifying or settling the legal issues involved" by resolving whether PSTH is an investment company and must therefore register as one. *Duane Reade*, 411 F.3d at 389.

Defendants also misread *Oxford University Bank* in arguing that section 47(b) can target only contracts that turn a company into an investment company. PS Mot. 16-17. The plaintiffs in *Oxford University Bank* failed to state a claim because they did not allege that the contracts at issue violated a specific provision of the ICA. Had they done so, however, the Second Circuit made clear that the plaintiffs could have rescinded any contracts under section 47(b) "*whose terms or*

*performance violated the ICA.*" *Oxford University Bank*, 933 F.3d at 109.[7] Nothing in *Oxford* limited this right to the single contract that "makes" a company into an investment company— merely "*violat[ing]*" the statute was enough. To read *Oxford* otherwise would be unworkable. A company becomes an investment company only through the joint working of many different contracts (e.g., the many classes of securities it issues, the many securities it buys, its certificate of incorporation, etc.). No court could ever identify any single contract that by itself makes any company into an investment company.

### C.    Plaintiff's Claims are in the Correct Forum

Trying to avoid this unfavorable precedent, Defendants argue that Plaintiff's claim for declaratory relief and direct claim under ICA section 47(b) should be dismissed under the forum selection clause in PSTH's COI. PS Mot. 30. Defendants have not actually moved to sever these claims or change forum, however. And Defendants do not and cannot say which of the forum selection clause's four types of covered claims is implicated here. COI § 12.1. The declaratory judgment and direct section 47(b) claims are not derivative claims; they do not allege a breach of fiduciary duty; they arise under the ICA rather than the Delaware General Corporation Law or the Company's COI or bylaws; and they have nothing to do with the internal affairs doctrine, which is a doctrine of corporation law.

More broadly, the forum selection clause expressly excludes any "suit" that contains a claim for which federal jurisdiction is exclusive. COI § 12.1. This suit contains such a claim in

---

[7] Defendants' acknowledgement that *Oxford University Bank* creates a private right of action for contracts that turn a company into an investment company is also a tacit admission that Defendants do not truly believe that only the SEC can declare a company to be an investment company. PS Mot. 17.

ICA section 36(b), meaning that the entire suit, and not merely the section 36(b) claim, is exempted. 15 U.S.C. § 80a-35(b)(5).

### D.     The Acceptance of Registration Statements by the SEC is Irrelevant

Defendants argue that the SEC has already implicitly approved PSTH by accepting its registration statement and those of other SPACs under the Securities Act of 1933. But the SEC's inaction in allowing these registration statements to become effective says nothing about the SEC's views regarding the status of PSTH and PSCM under the ICA.

As an initial matter, there is no need to speculate about the SEC's views: If Defendants are certain that the SEC approves of what they have done, they should join Plaintiff in urging the Court to seek the SEC's views directly. *See, e.g.*, *CSX Corp. v. Children's Inv. Fund Mgmt.*, 562 F. Supp. 2d 511, 518-519 (S.D.N.Y. 2008) (seeking SEC's views); *In re IPO Antitrust Litig.*, 287 F. Supp. 2d 497 (S.D.N.Y. 2003) (same); *Roth v. The Goldman Sachs Grp.*, No. 12-2509, Dkt. No. 94 (2d Cir. Mar. 21, 2013) (same). PSTH could also request these views itself, via an application to the SEC for a no-action letter or an order under ICA sections 3(b)(2) or 6(c). PSTH has not sought the SEC's views because it fears what the SEC would say.

Second, the effectiveness of a SPAC registration statement under the 1933 Act sheds no light on the SEC's views of any SPAC's legality under the ICA. Defendants cite no authority in which the SEC has ever expressed a position on whether any SPAC is an investment company. A registration statement under the 1933 Act is not such an expression because it has no legal significance under the ICA. In fact, a registration statement under 1933 Act does not even express a view regarding an issuer's compliance with the 1933 Act. *See* INVESTING IN AN IPO 1, OFF. OF INV. EDUC. & ADVOC., SEC. & EXCH. COMM'N, https://www.sec.gov/files/ipo-investorbulletin.pdf.

The act of declaring a registration statement effective does not warrant judicial deference. Courts have developed an extensive doctrine governing when to defer to the action of an administrative agency. *Chevron USA v. Natural Res. Def. Council*, 467 U.S. 837 (1984); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Defendants cite none of this doctrine because it establishes that an action warrants judicial deference only when an agency intends to speak with the force of law or when the action is thoroughly reasoned. *Chevron*, 467 U.S. at 844-45; *Skidmore*, 323 U.S. at 140. A registration statement does not speak with the force of law because the SEC expressly disavows the notion that its willingness to allow a registration statement to become effective amounts to a view of the statement's accuracy or legality. *Supra*, at 13. A registration statement's effectiveness also requires no statement of reasons from the SEC. And mere non-enforcement by the SEC is not an action to which a court can defer. *See, e.g.*, *In re Twitter, Inc. Sec. Litig.*, 2020 WL 9073168, at *8-9 (N.D. Cal. Apr. 20, 2020); *SEC v. Hui Feng*, 2016 WL 7443222, at *4 n. 8 (C.D. Cal. Aug. 4, 2016); *see also SEC v. Culpepper*, 270 F.2d 241, 248 (2d Cir. 1959).[8]

Defendants argue that Plaintiff's claims would damage the market for other SPACs. PS Mot. 28. But this court need not decide the legality of other SPACs because PSTH's pursuit of the UMG Deal and uncommonly lengthy lifespan make it different from other SPACs. In fact, by trying to purchase shares of stock representing a minority stake in a target company through the UMG Deal, PSTH did something it specifically said it would not do in its registration statement.

---

[8] The two cases Defendants cite are not to the contrary. In *Yi*, the Department of Labor had provided formal guidance on interpreting the statutory provision at issue supporting the defendant's precise position. *See Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 510 (7th Cir. 2007). And the language Defendants cite from *SmithKline Beecham* in fact comes from the Supreme Court's discussion of why the agency's statutory interpretation was *not* entitled to deference. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157 (2012). The Court went on to "acknowledge that an agency's enforcement decisions are informed by a host of factors, some bearing no relation to the agency's views regarding whether a violation has occurred." *Id.*

Prospectus 16 ("[W]e will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target . . . .").

Defendants argue that the SEC approved a stock exchange listing rule requiring a SPAC to deposit its assets with a trustee. PS Mot. 5. But here again Defendants fail to offer a reason why this matters under the ICA. Nothing in the exchange rule says anything about a SPAC's status under the ICA. The rule offers no reasoned interpretation of the ICA that could possibly be a basis for judicial deference. And the rule does not even require a SPAC to invest in securities—it permits a SPAC trustee to hold cash. *See* NYSE LISTED COMPANY MANUAL 102.06.

## II.    PLAINTIFF PLAUSIBLY PLEADS VIOLATIONS OF THE ICA.

Under section 3(a)(1)(A) of the ICA, an investment company is a business that "is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing . . . in securities." 15 U.S.C. § 80a-3(a)(1)(A). PSTH is an investment company under section 3(a)(1)(A) for two independent reasons, each of which is sufficient to make PSTH into an investment company. First, PSTH presently invests 100% of its assets in securities. Second, PSTH proposed to invest the bulk of its assets in a purchase of more securities in the UMG Deal.

### A.    PSTH Presently Invests All of Its Assets in Securities

The first reason PSTH is an investment company is that it presently invests nearly 100% of its assets in securities. AC ¶ 110. Defendants' only defense is to point to the future by arguing that although PSTH invests all of its assets in securities now, it may combine with an operating business in the future. The courts and the SEC have seen this argument many times before, however, and have consistently rejected it in the failed defenses of other acquisition companies that likewise invested in securities while hoping to make acquisitions. *SEC v. Fifth Ave. Coach Lines*, 289 F. Supp. 3 (S.D.N.Y. 1968), *Siimes v. Giordano*, 1992 WL 301622 (D.N.J. Oct. 8, 1992),

*Tonopah Mining Co. of Nev.*, 26 S.E.C. 426 (1947); *Arizona Property Investors, Ltd.*, SEC No-Action Ltr., 1979 WL 14220 (Aug. 9, 1979). So many acquisition companies like PSTH have been found to be investment companies as a result of their investments in securities that acquisition companies have been described by the courts as the very "model" of an inadvertent investment company under the ICA. *SEC v. Nat'l Presto Indus.*, 486 F.3d 305, 312 (7th Cir. 2007).

### 1.   PSTH Fails the *Tonopah* Standard

The SEC developed a standard to balance future plans against present investments for purposes of defining an investment company decades ago. In *Tonopah Mining Co. of Nev.*, 26 S.E.C. 426 (1947), the Tonopah Mining Company was an acquisition company much like PSTH. It invested in securities while trying to acquire an operating company. The SEC assessed the company's primary business under the ICA with a five-factor test: "1) the company's historical development; 2) its public representations of policy; 3) the activities of its officers and directors; and, most important, 4) the nature of its present assets; and 5) the sources of its present income." 26 S.E.C. at 427. *Tonopah* has received extensive deference from the courts and the SEC.[9]

***Present assets and present income.*** Of the five factors in the test, the *Tonopah* order declared that the "most important" are the "nature of the company's present assets" and "the sources of its present income." 26 S.E.C. at 428-430. The SEC has emphasized many times that assets and income are the "most important" factors. *See, e.g.*, *ICOS Corp.*, 1940 Act Release No. 19334, 58 Fed. Reg. 15,392, (Mar. 22, 1993) ("The Commission accorded the fourth and fifth factors the most weight."); Robert H. Rosenblum, INVESTMENT COMPANY DETERMINATION UNDER

---

[9] *Dan River, Inc. v. Icahn*, 701 F.2d 278, 291 n.14 (4th Cir. 1983). Although *Tonopah* was an order issued under ICA section 3(b)(2), it has also guided interpretation of section 3(a)(1)(A) because sections 3(b)(2) and 3(a)(1)(A) use similar language. Each assesses a company's "primary" business. Section 3(a)(1)(A) was previously codified as section 3(a)(1) and section 3(a)(1)(C) was previously codified as section 3(a)(3).

THE 1940 ACT § 6.3 n. 17 (2003). The SEC has also emphasized that these factors focus only on the *present*. *Tonopah*, 26 S.E.C. at 427. Because, like PSTH, the Tonopah Mining Company tried to highlight the assets it might acquire through a business combination *in the future*, the SEC made clear in *Tonopah* that what mattered was only the company's income and assets in the *present*.

Under these "most important" factors, PSTH's status is beyond dispute. Nearly 100% of the Company's present assets and income are derived from securities. AC ¶¶ 45, 110. If 100% is not enough to make securities investing into PSTH's "primary" business, then nothing is.

Defendants argue that the amount of income PSTH derives from securities is "de minimis." PS Mot. 27. But PSTH has no other source of income and no operations that could generate any. AC ¶¶ 45, 110. And if Defendants are correct that a low level of investment income could allow an issuer to escape the ICA, then any investment company could avoid ICA scrutiny by merely making investments that turned out to be minimally profitable. Moreover, the amount of income PSTH generates from securities could easily change with investment fortunes. If interest rates rise, PSTH's investment income will rise along with them. And whatever PSTH's level of *income*, nearly 100% of its *assets* consist of securities.

PSTH's levels of assets and income from securities greatly exceed the levels permitted to other companies in the past. Under *Tonopah*, an issuer generally is deemed to be engaged primarily in the business of investing in securities so long as *a mere majority* of its assets and income are derived from securities. *ICOS Corp.*, 58 Fed. Reg. at 15,393. The SEC staff has refused to grant a no-action letter under section 3(a)(1)(A) to any issuer that derives more than 45% of its assets and income from securities. *Financial Funding Group, Inc.*, SEC No-Action Ltr., 1982 WL 28965, at

*1 (Mar. 3, 1982).[10] In every single case in which a company has been deemed not to be an investment company, the company managed within a year to develop real operations and to derive more than a majority of either its assets, income, or revenues from operations.[11] Defendants have not cited a single case or administrative action in which the SEC or the courts have knowingly allowed any issuer to avoid becoming an investment company while deriving 100% of its assets, income, and revenues from securities while having no operations for more than a year.

Defendants also argue that PSTH's investments in U.S. government securities are conservative and were chosen for the purpose of preserving capital. PS Mot. 26. But the SEC and the courts have specifically held many times that investments in U.S. government securities are enough to make a company into an investment company even if these investments comprise the bulk or even the entirety of the company's portfolio.[12] Were it not so, the ICA could not reach the

---

[10] Defendants argue that under ICA Rule 3a-1, the 45% standard applies only to the definition of an investment company in section 3(a)(1)(C). PS Mot. 26 n.2. This ignores the SEC's staff's decision to apply the same standard to section 3(a)(1)(A) in *Financial Funding Group*.

[11] In *National Presto*, the issuer invested only 60% of its assets in securities and derived only 50% of its net income and a mere 10% of its gross revenues from securities. 486 F.3d at 313-314. In *Moses v. Black*, the issuer derived only 49% of its assets from securities and less than 10% of its income. 1981 WL 1599, at *7 (S.D.N.Y. 1981). In *In re Warner Bros.*, 11 S.E.C. Docket 2214, 1977 WL 175217 (Apr. 5, 1977), securities comprised 40% of assets and 21% of income. *Id.* at *1 n.1, *2. In *In re George W. Helme Co.*, 9 S.E.C. 16, 1941 WL 37265 (Apr. 11, 1941), securities comprised 46.48% of assets and 21% of income. *Id.* at *1. In *Snowflake* and *Lyft*, the issuers proposed for securities to comprise a relatively large portion of their total assets (89% for Snowflake and 68.8% for Lyft), but only a sliver of their revenues (4% to 9% for Snowflake and 2% to 3% for Lyft). *In re Snowflake, Inc.*, Rel. No. IC – 34049, 2020 WL 5993059, *4 (Oct. 9, 2020); *Lyft, Inc.*, Release No. IC – 33399, 2019 WL 1199584 (Mar. 14, 2019). *In Pacificare of Arizona, Inc.*, the level of the company's assets and income in securities varied, but its revenues from securities comprised only 1% of total revenue. 83 S.E.C. Docket 3191, 2004 WL 2403824, *5 (Oct. 25, 2004).

[12] *See, e.g.*, *SEC v. Am. Bd. of Trade, Inc.*, 751 F.2d 529, 536 (2d Cir. 1984) (holding an issuer that invested solely in government securities to be an investment company under § 3(a)(1)(A)); *Baker, Watts & Co.*, SEC No-Action Ltr., 1982 WL 29238, at *1 ("[A]n issuer could invest exclusively in Government securities, thereby owning no investment securities, and yet be an investment

thousands of money market mutual funds that make up the core of the regulated investment company industry. Many of these funds are required by administrative rule to invest almost identically to PSTH. *See, e.g.*, 17 CFR § 270.2a-7(a)(14).[13]

Defendants further argue that PSTH's "assets" include its expectation of future gains from a business combination. PS Mot. 26-27. But Defendants cite no precedent in which any court has treated the future hopes of a company with no presently operating business as an asset. *Nat'l Presto Indus.*, 486 F.3d at 314 (referring only to the going concern value of a presently operating business).

Seeing that they lose under the two "most important" factors of the *Tonopah* test, Defendants try to change the subject by pointing the court to an alternate definition of an investment company in ICA section 3(a)(1)(C). Defendants argue that because PSTH's U.S. government securities are not "investment securities" within the meaning of section 3(a)(1)(C) of the ICA, PSTH must somehow not be in the business of investing in "securities" within the meaning of section 3(a)(1)(A). PS Mot. 27.

As Defendants acknowledge, however, section 3(a)(1)(C) is not at issue here. PS Mot. 24. Only section 3(a)(1)(A) is. And section 3(a)(1)(A) does not use the term "investment securities."

---

company under section 3(a)(1)[A] of the Act."); *Credit Suisse First Boston Corp.*, SEC No-Action Ltr., 1998 WL 799305, at *3 (Sept. 9, 1998) ("If a trust is engaged primarily in the business of investing in securities, it is an investment company even if it holds only government securities."); *Financial Funding*, 1982 WL 28965, at *1 ("The fact that these securities may also be United States Government securities is irrelevant for purposes of section 3(a)(1)[A]."); *Arizona Property Investors, Ltd.,* 1979 WL 14220 (indicating an acquisition company would become an investment company if it invested 100% of its assets in U.S. government securities for more than a year).

[13] Defendants similarly insist that PSTH's investments will not generate much profit because they are low risk. PS Mot. 26-27. But this argument reflects a misunderstanding of risk and profit. Even if PSTH's conservative investments yield little cash income, they may still prove highly profitable in economic terms if they manage to avoid large losses compared to other possible investments. Further, even if PSTH's investments in U.S. government securities pose little *credit risk* (i.e., risk of nonrepayment), they still bear significant *interest rate risk* (i.e., risk that interest rates will rise or fall after the securities are purchased and make the portfolio more or less valuable).

It uses the broader term, "securities." As Defendants also acknowledge, unlike the term "investment securities," the term "securities" includes PSTH's government securities and money market fund shares.[14] PS Mot. 26. The courts and the SEC have said many times that the term "securities" is broader than "investment securities." As the SEC staff has stated, "[A]n issuer could invest exclusively in government securities, thereby owning no investment securities [for purposes of section 3(a)(1)(C)], and yet be an investment company under section 3(a)(1)[A] of the Act."[15] To hold that PSTH is not an investment company because it holds no "investment securities" would render the distinction between "securities" and "investment securities" meaningless.

*Historical Development.* After assets and income, the next factor in the *Tonopah* test is a company's historical development. This factor weighs in favor of treating PSTH as an investment company because PSTH has no history of operations. It began life as a pool of securities knowing that it might never run a real business at all. And although PSTH has committed to liquidate after two and a half years if it fails to complete a business combination, AC ¶ 39, the certainty of this date hurts PSTH because, as explained below, two and a half years is far beyond the one-year period ordinarily permitted for temporary concentrations in securities. *Infra*, at 25-27.

*Activities of Officers and Directors.* PSTH next argues that it is not an investment company because its officers and directors have spent the bulk of their time seeking to complete a business combination. PS Mot. 25-26. As explained below, however, the business combination PSTH's

---

[14] *J.D. Gillespie, Tr. for Cleo George*, Rel. No. IC-513, 13 S.E.C. 470, 475 n.4 (1943) ("The broader term 'securities' used in section 3(a)(1)[A] obviously includes Government obligations."); *Willkie Farr & Gallagher*, SEC No-Action Ltr., 2000 WL 1585635, at *6 (Oct. 23, 2000) (warning that although market fund securities are not "investment securities" under section 3(a)(1)(C), they are "securities" under section 3(a)(1)(A)).

[15] *Baker, Watts & Co.*, SEC No-Action Ltr., 1982 WL 29238, at *1 (May 6, 1982); *see also Credit Suisse First Boston Corp.*, SEC No-Action Ltr., 1998 WL 799305, at *3 (Sept. 9, 1998) ("If a trust is engaged primarily in the business of investing in securities, it is an investment company even if it holds only government securities.").

officers and directors have spent most of their time seeking was the UMG Deal, which was nothing less than an investment in securities.

Moreover, the officers and directors have avoided spending time managing the Company's portfolio of U.S. government securities only because they have delegated that job to an outside trustee. AC ¶¶ 43-44. The trustee acts as an agent of PSTH and was selected by the Company's directors. In this regard, PSTH is no different from a mutual fund, which likewise outsources the management of its portfolio to a professional outside management firm. *Id.* ¶ 129. The SEC and its staff have also said that when a company invests as heavily in securities as PSTH does for more than a year, it may be an investment company even if its officers and directors spend the bulk of their time looking for acquisitions. *See, e.g.*, *Arizona Property*, 1979 WL 14220, at *1.

Defendants argue that if PSTH fails to complete a business combination, they will receive no compensation. Dir. Mot. 8. But Defendants have not explained why that matters under the ICA. Compensation is not a consideration under the *Tonopah* factors or any relevant case. Moreover, as explained above, all of Defendants' compensation has already been granted. *Supra*, at 7-8. Although Defendants have not yet exercised all the rights they possess, some of the rights (the Forward Purchase Rights and Class B shares) may be exercised right now and the other rights (the Sponsor and Director) are already contractually issued and legally enforceable. Defendants' claim to be at the mercy of chance regarding a business combination is also disingenuous. Defendants and PSCM control PSTH and have the power to decide whether a business combination happens.

***Public representations of policy.*** Defendants lean heavily on PSTH's public representations of policy, arguing that PSTH did not intend to be an investment company and has not held itself out as one. PS Mot. 25. It cannot be the case, however, that representations alone

determine a company's status under the ICA. If all a company had to do to avoid becoming an investment company was to say that it was not one, then the ICA would be a dead letter.

The courts and the SEC thus tend to weigh a company's self-serving statements about its intentions lightly. Almost every company that has ever lost a fight under section 3(a)(1)(A) has gone down claiming that it was not an investment company. *See, e.g.*, *Fifth Ave. Coach Lines*, 289 F. Supp. at 27-28, 30; *Siimes*, 1992 WL 301622, at *1. The Second Circuit and the Southern District of New York have specifically noted that section 3(a)(1)(A) applies not only to a company that "holds itself" out as an investment company, but also to a company that "is" an investment company, making clear that public representations alone do not control. *Fifth Ave. Coach Lines*, 289 F. Supp. at 27-28, *aff'd SEC v. Fifth Ave. Coach Lines, Inc.*, 435 F.2d 510 (2d Cir. 1970).

Defendants similarly argue that PSTH's investing program was fully disclosed. But the definition of an investment company makes no reference to disclosure. Like the regulation of other kinds of companies, such as airlines and pharmaceutical manufacturers, the regulation of investment companies turns on the substance of a company's activities, not its disclosures or intentions. In almost every case in which an acquisition company has been found to be an illegal investment company, its securities investing program has been fully disclosed. *See, e.g.*, *Fifth Ave. Coach Lines*, 289 F. Supp. at 27-28; *Siimes*, 1992 WL 301622, at *1-*2. In *Tonopah*, the SEC even weighed the company's disclosures of its investing policies as a factor *in favor* of treating the company as an investment company because the disclosures revealed that the company was investing in securities. 26 S.E.C. at 428-430. And courts have specifically held that section 36(b) of the ICA can reach payments made by an investment company even when the payments have been fully disclosed. *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 528 F. Supp. 1038, 1047 (S.D.N.Y. 1981), *aff'd* 694 F.2d 923 (2d Cir. 1982).

PSTH also has many structural features that make it look like an investment vehicle. The most important is the right of PSTH Class A common stockholders to redeem. AC ¶ 41; COI § 9.2. Under PSTH's COI, any Class A stockholder can return her shares to the company just before a business combination and receive in exchange the pro rata value of the securities in the company's investment portfolio. An investor who redeems in this way gives up any right to participate in the business combination, ensuring that *she receives only the return on the portfolio of investment securities, independent of the success or failure of the business combination.* The right to redeem is the defining feature of the "open-end" mutual funds that dominate the investment company industry. 15 U.S.C. § 80a-5(a)(1).

A similar right of redemption also appears in other SPACs, and studies show that the great majority of SPAC investors choose to exercise these rights.[16] Most SPAC investors, in other words, never go forward with their business combinations, electing to take only the return on the SPACs' government and money market fund securities. It is thus likely that *even if PSTH completes a business combination, the only source of return most of its public stockholders will ever experience will be the company's investments in securities.* Although Defendants say that PSTH's pool of securities is one of the Company's "least salient traits," PS Mot. 26 n.1, in fact for many of PSTH's investors, the pool of securities is the only trait that will ever truly matter. PSTH's investors are not alone in this regard. Many SPAC investors buy SPAC stock solely in anticipation of using their redemption rights to gain exposure to the returns on U.S. government securities.[17]

PSTH is thus very different from other companies that have been held not to be investment

---

[16] *See, e.g.*, AC ¶ 64 & n.21; Michael Klausner, et al., A Sober Look at SPACs, 10 tbl. 1 (forthcoming Yale J. Reg. 2022) (showing that in the median SPAC, 73% of investors redeem), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3720919.

[17] Sam Goldfarb, *Some Investors Find Stability in SPACs*, Wall St. J. (Oct. 12, 2021), https://www.wsj.com/articles/some-investors-find-stability-in-spacs-11634007742.

companies. In *National Presto*, for instance, the court specifically observed that investors in the defendant company could not separate the returns on operations from the returns on securities. *Nat'l Presto*, 486 F.3d at 313. Defendants can point to no other acquisition companies discussed in caselaw—not even any that were held to be investment companies—that allowed their investors to separate the returns on securities investing from the returns on operations as brazenly as PSTH.

PSTH also resembles an investment company in its organization. PSTH is dominated by PSCM, one of the world's most prominent advisers of hedge funds. AC ¶¶ 52-58. PSTH has no operational resources and no full-time employees of its own. *Id.* ¶ 52. It relies entirely for its investment needs on employees of PSCM. *Id*. ¶ 54. This pattern of dominance by a professional investment fund manager is similar to that of other investment funds, including PSCM's hedge funds, which PSCM similarly dominates from the outside. *Id.* ¶¶ 126-31. The conflicts created by this pattern of dominance are a central concern of the ICA. 15 U.S.C. § 80a-1(b)(2).

PSTH strongly represents and holds itself out as being an investment vehicle under the management of PSCM. The Company's registration statement discusses *ad nauseum* the Company's management by PSCM and emphasizes its character as a prominent adviser of hedge funds. *See, e.g.*, AC ¶¶ 53-54; Prospectus 4, 8-9, 12. The registration statement describes many times the "investment" expertise to be provided by a group of PSCM hedge fund management professionals, whom the prospectus calls the "Pershing Square Investment Team." Prospectus 103, 108. The registration statement specifically draws attention to the extensive overlap between the business models of PSTH and PSCM's "other investment vehicles," cautioning about the conflicts of interest inherent in this overlap. Prospectus 113, 143.

Even if Defendants claim there are minor differences between PSTH and some investment companies, they cannot possibly argue that PSTH looks to investors more like an operating

enterprise. *See Nat'l Presto*, 486 F.3d at 315 ("[W]hat principally matters is the beliefs the company is likely to induce in investors. Will its portfolio and activities lead investors to treat a firm as an investment vehicle or as an operating enterprise?"). In *National Presto*, the court held that investors will view a company like an operating enterprise only if it has substantial "ongoing" operations. *Id.* at 313. The court held that acquisition companies like PSTH are the "model" of inadvertent investment companies because they have no ongoing operations. *Id.* PSTH does not offer any hint of present operations. It does not even have a single full-time employee. AC ¶ 52.

### 2.    PSTH Has Exceeded the Grace Period Under the ICA

Although PSTH invests all of its assets in securities, Defendants argue that PSTH warrants a grace period before investing in securities becomes its "primary" business. Plaintiff agrees. Where Plaintiff and Defendants disagree is on when the grace period ends. On this crucial question, Defendants say nothing. But in considering other acquisition companies, the courts and the SEC have consistently fixed the period at around one year. PSTH has gone well past this line.

The grace period received a clear articulation decades ago in *Fifth Avenue Coach Lines,* where the court considered a company whose assets had been seized in a condemnation proceeding. 289 F. Supp. at 9-10. The proceeds of the condemnation award left the company in a position similar to PSTH, with a pool of cash that it invested in securities as it sought to acquire an operating business. *Id.* at 30. The court held that although the company invested heavily in securities, these investments did not become the company's "primary" business immediately. The company had a brief grace period before investing in securities became its primary business. But this grace period was not unlimited. "The time must eventually come," the court held, "when a corporation initially possessed of cash and no real business, by spending its cash becomes engaged in a business of

some sort"—i.e., the business of investing in securities. *Id.* at 29. The grace period the court allowed was nine months, at which point the company became an investment company. *Id.*

Since *Fifth Ave. Coach Lines*, the grace period has been extended to one year. This is the period the SEC staff has granted in no-action letters to companies that propose to invest the bulk of their assets in securities before commencing actual operations. *E.g., Medidentic Mortgage Investors*, SEC No-Action Ltr., 1984 WL 45320 at *2 (May 23, 1984) ("We would generally consider a period of up to one year to be temporary"); *Florida First Equities Corp.*, SEC No-Action Ltr., 1980 WL 14869 (Sept. 11, 1980); *Arizona Property Investors, Ltd.*, 1979 WL 14220. On the basis of "previous no-action assurances in this area" like these, the SEC has also written the one-year period into a safe harbor available to all companies under ICA Rule 3a-2. 17 C.F.R. § 270.3a-2(a) (2020); Transient Investment Companies, 46 Fed. Reg. 6882, 6882 (Jan. 22, 1981).[18]

In adopting Rule 3a-2, the SEC made it clear that very few companies would be allowed to go beyond one year. The release adopting the rule declared, "The Commission stresses that a company's inability to become engaged primarily in a non-investment company business within the rule's one-year period would raise serious questions concerning the applicability of the Act to that company." 46 Fed. Reg. at 6883. PSTH does not deserve more than the usual one-year limit. PSTH invests a far greater share of its assets in securities than other companies that have avoided the ICA. It is not making incremental progress toward building its operations—its assets are still entirely invested in securities. And PSTH plans to far exceed the usual one-year period,

---

[18] In adopting Rule 3a-2, the SEC made clear that it intended only a safe harbor. The Rule does not supplant the grace period that had developed under other law prior to the rule's adoption. A company may continue to receive a one-year grace period on the same terms as under prior law even if the company does not comply with procedural aspects of Rule 3a-2. *See, e.g.*, *Medidentic Mortgage Investors*, SEC No-Action Ltr., 1984 WL 45320 at *2 (May 23, 1984) (no-action letter adopting a one-year grace period three years after the adoption of Rule 3a-2.)

guaranteeing itself in its COI up to two and a half years to complete a deal. Defendants do not cite any case or action in which the SEC or a court has knowingly allowed any company to derive 100% of its assets, income, and revenue from securities with no full-time employees or other present operations for more than one year without becoming an investment company.

PSTH also does not deserve extra time because many of its features make it look even more like an investment company than many other acquisition companies that have already failed the investment-company test. These features include PSTH's reliance on a professional investment fund adviser; its offer of redemption rights that separate the returns on securities from future operations; and its attempted purchase of even more securities in the UMG Deal. Additionally, PSTH has faced no factors beyond its control that could have prevented it from moving into operations. Many other SPACs have completed their acquisitions within a year and many have even limited themselves to one year in their certificates of incorporation.[19] PSTH may argue that it attempted to complete the UMG Deal less than one year from PSTH's IPO. But as explained below, the UMG Deal was itself an investment in securities.

### B.      PSTH Proposed to Invest in Securities in the UMG Deal

In fact, the UMG Deal is a separate and independent reason why PSTH is an investment company, apart from PSTH's investments in government securities. The definition in section 3(a)(1)(A) applies to three different types of companies: one that "*is*…engaged" primarily in the business of investing in securities, one that "*holds itself out* as being" so engaged, or one that "*proposes* to engage." 15 U.S.C. § 80a-3(a)(1)(A). When PSTH signed the UMG Deal, it qualified

---

[19] *See, e.g.*, CF Acquisition Corp. VII, Am. No. 4 to Form S-1, at i (Mar. 10, 2021) (promising redemption if business combination is not completed within 12 months); Montes Archimedes Acquisition Corp., Form 8-K (Sept. 30, 2021) (business combination completed within one year of October 7, 2020 IPO). The Court may take judicial notice of these documents. *See, e.g.*, *In re Bear Stearns Co. Litig.*, 763 F. Supp. 2d 423, 582 (S.D.N.Y. 2011) (collecting cases).

under the third heading because it "proposed to engage" primarily in the business of investing in securities by investing 72% of its assets in shares of UMG common stock. AC ¶¶ 60-67.

These shares of common stock were indisputably "securities." 15 U.S. Code § 80a–2(a)(36) (defining "security" to include "stock"). And an investment of 72% of the Company's assets was plainly enough to qualify as the Company's "primary" business, especially given that PSTH would have had no other operating business and the proposed investment would have comprised the final and permanent use of the relevant assets. AC ¶¶ 67-68. PSTH's agreement with UMG was also final enough to qualify as a "proposal." PSTH and UMG signed a definitive legally binding purchase agreement. AC ¶ 66. And throughout its communications with investors regarding the UMG Deal, PSTH referred to the deal as a "proposal," describing the deal in the Company's official tender offer communications repeatedly as the "*proposed* UMG Business Combination." *See, e.g.*, PS Mot., Ex. C, at 52 (emphasis added).

Defendants argue that PSTH should not be made into an investment company as a result of the UMG Deal because PSTH chose to withdraw from the deal after receiving regulatory objections from the SEC. PS Mot. 22. This argument fails. First, a "proposal" to invest primarily in securities under section 3(a)(1)(A) does not require a completed investment. Since section 3(a)(1)(A) lists a company that "is" engaged in the business of investing in securities separately from a company that "proposes" to be so engaged, "proposing" must mean something different from actual investing. The only possible difference is that a "proposal" is not completed.

Second, having become an investment company by "proposing" to invest primarily in securities, PSTH now remains an investment company until it receives an order from the SEC declaring otherwise. Once a company becomes an investment company, the only way for it to cease being one is to obtain an order from the SEC declaring it no longer to be an investment

company. 15 U.S.C. § 80a-8(f). This is true whether or not the company has ever registered as an investment company. *S&P Nat'l*, 360 F.2d at 746.[20]

To the extent PSTH became an investment company as a result of its proposal of the UMG Deal (rather than or in addition to its investments in government securities), the transformation happened at the moment the proposal became public on June 4, 2021. AC ¶ 66. Prior to then, PSTH might still have avoided proposing a permanent purchase of securities by choosing instead to complete a business combination through a method other than a purchase of securities, such as a merger or asset acquisition, before exceeding the one-year grace period.

### C.    PSTH "Invests" in Securities

Defendants argue that although PSTH may "hold" securities, it does not "invest" in them. PS Mot. 29-30. Defendants offer no definition of the word "hold," and no account of why PSTH "holds" but does not "invest." There can be no dispute that PSTH's proposed investment in UMG counts as an investment. The courts have held that under section 3(a)(1)(A), "buying a stock for dividends or capital gain is investing." *Fifth Ave.* 289 F. Supp. at 30.

PSTH's investments in U.S. government securities also fall within the plain meaning of the word "invest," *as evidenced by PSTH's own usage*. The agreement between PSTH and the trustee that manages its investments is titled "*Investment* Management Trust Agreement." Prospectus II-7. Paragraph 1(c) instructs the trustee to "invest" PSTH's assets in securities. AC ¶ 44. PSTH's prospectus says that "The proceeds held in the trust account will be *invested* only in U.S. Treasury obligations . . . ." Prospectus 33.

---

[20] Nothing stops PSTH from pursuing another deal to purchase securities. PSTH's COI specifically authorizes PSTH to complete a business combination through a "stock purchase." COI § 4.3(b)(i); AC ¶ 59. Having proposed to do a stock purchase once before, PSTH may very well do so again.

The SEC and its staff have rejected many times the idea that active trading is necessary to qualify as an investment company under section 3(a)(1)(A). *See, e.g.*, *J.D. Gillespie*, 13 S.E.C. 470; *Credit Suisse First Boston*, 1998 WL 799305, at *3 ("[E]ven a completely passive trust may be considered to be engaged primarily in the business of investing in securities within the meaning of [Section 3(a)(1)(A)] . . . ."); *Centex Corp.*, SEC No-Action Letter, 1986 WL 67311, at *1 (Oct. 10, 1986); *Merrill, Lynch*, 1982 WL 30517, at *2. Yet even if active trading were required, PSTH would qualify, since its government securities are limited in duration to 180 days, requiring PSTH to continually replenish its portfolio with new purchases. AC ¶ 44.

### D.    PSTH Is Violating the ICA and Will Continue to Do So in the Future

For reasons listed in the complaint, the Illegal Contracts have violated, are now violating, and will continue to violate the ICA. AC ¶¶ [132-149]. In so alleging, Plaintiff is not arguing, as Defendants suggest, that "any business PSTH has ever done is invalid." PS Mot. 16. Instead, Plaintiff is alleging that *specific contracts* have violated *specific provisions* of the ICA.

**ICA Section 7(a).** The Illegal Contracts violate sections 7(a)(1), which prohibits an investment company from issuing securities unless it has registered as an investment company with the SEC. The Illegal Contracts require the issuance of common stock and warrants even though PSTH has never registered. 15 U.S.C. § 80a-7(a)(1); AC ¶¶ 135-37.

The Illegal Contracts require PSTH to issue securities now and in the future, after it has become an investment company. The Forward Purchase Rights must be exercised sometime before the business combination—and may even be exercised right now. AC ¶ 136. Upon exercise, they will require the Company to issue new shares of stock and warrants. *Id.* The Sponsor and Director Warrants become exercisable after the business combination, at which point they will also require PSTH to issue new shares of stock and warrants. *Id.* The issuance of securities under the Sponsor

30

and Director warrants will violate the ICA even after the business combination because the ICA will continue to apply. Once a company has become an investment company, the only way for it to stop being an investment company is to obtain an order from the SEC. 15 U.S.C. § 80a-8(f); *S&P Nat'l*, 360 F.2d at 746. This is true even if the company has failed to register as an investment company and even if it ceases the activities that made it one. *S&P*, 360 F.2d at 746.

In addition to issuing securities in breach of section 7(a)(1), PSTH will also violate section 7(a)(4), which prohibits any an unregistered investment company from engaging in interstate commerce. Defendants argue that section 7(a)(4) might make every contract entered by PSTH illegal. PS Mot. 16. But Plaintiff does not argue that every contract by PSTH is illegal—only that the specifically defined "Illegal Contracts" are. Performance of these contracts implicates transacting in interstate commerce, so under the plain terms of the statute the contracts violate this provision of the ICA.

**Sections 22(g) and 23(a).** The securities issued or to be issued under the Illegal Contracts will violate sections 22(g) and 23(a) of the ICA, which prohibit the issuance of securities by a registered investment company in exchange for "services." 15 U.S.C. §§ 80a-22(g), 23(a). Defendants argue that they paid cash for the securities they received. But Defendants did not pay a dime for the Forward Purchase Rights. AC ¶ 80. And although Defendants paid a small amount of cash for the Sponsor and Director Warrants and the Class B shares, the cash prices were far less than the securities' true value, making it clear that services were also part of the bargain. *Id.* ¶¶ 80-81, 90-95, 149. Because Defendants continue to provide the services contemplated by the Illegal Contracts even now that PSTH has become an investment company, the continued "performance" of the Illegal Contracts triggers the right of rescission under section 47(b).

**Section 18(i).** The COI has violated section 18(i) by granting the Class B shares—which PSTH issued solely to the Sponsor Defendant—the exclusive right to elect and remove the Company's directors prior to the business combination in breach of section 18(i)'s requirement that all shares have equal voting rights. 15 U.S.C. § 80a-18(i). Defendants' only defense is that the remedy Plaintiff seeks under the section amounts to "reformation" of the COI rather than rescission. PS Mot. 28-29. What Plaintiff requests under sections 47(b) and 18(i), however, is for this Court to require PSTH and the Sponsor Defendant to restore to each other the benefits they received under the COI. The Sponsor Defendant must return the Class B shares to PSTH and PSTH must return the $25,000 the Sponsor Defendant paid to purchase the shares. That is not reformation; it is rescission. RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT (2011) § 54 cmt. *a*. This remedy does not require Plaintiff to rescind the entire COI. Section 47(b) permits rescission of only those portions of a contract that are illegal. *See* 15 U.S.C. 80a-46(b)(3). Because Defendants continue to hold exclusive voting rights under the Class B shares even now that PSTH has become an investment company, the continued "performance" of these voting rights involves a violation of the ICA and triggers the right of rescission in section 47(b).

**Section 16(a).** The Director Warrants are illegal because the Directors received them by virtue of positions that they hold in violation of ICA section 16(a). That section requires directors to be elected by the holders of all outstanding voting shares. 15 U.S.C. § 80a-16(a); AC ¶ 140. But prior to the business combination, the right to elect directors belongs only to the Class B shares. COI § 9.9. Defendants say that the directors were elected prior to the time the Class A shares were issued. PS Mot. 28. But the directors should have faced election again since then. PSTH's COI and bylaws require the directors to be reelected annually. COI § 5.2; PSTH Bylaws § 2.1. The annual meeting is now long overdue.  Were PSTH to hold the meeting, the performance of the

exclusive voting rights by the Class B stockholders would violate sections 16(a) and 47(b).

**Section 36(b).** With respect to section 36(b), which prohibits compensation in violation of Defendants' fiduciary duties, Defendants say that Plaintiff has alleged no facts to show a violation. But the Amended Complaint describes a host of facts that easily satisfy the six factors the Second Circuit has set out for assessing section 36(b) claims, particularly at the pleading stage. *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989). The relevant facts include the enormous profits to be realized by Defendants through the warrants and shares of stock in the Company that Defendants have already received and whose value PSTH has already estimated at hundreds of millions of dollars (and many times more than what Defendants originally paid), AC ¶¶ 80-81, 90-95; the massive economies of scale achieved by PSTH, which is the largest SPAC in history; the lack of independence of the Director Defendants, who may be removed at any time by the Sponsor Defendant and who committed to pay themselves an extraordinary level of compensation in the UMG Deal, *id.* ¶ 155; and the poor quality of services evident in the long delay PSTH has taken in completing a deal and PSTH's pursuit of the UMG Deal even though it was plainly illegal.

Furthermore, Defendants are all proper defendants under section 36(b). The Sponsor and Pershing Fund Defendants are affiliates of PSTH's investment adviser and the Director Defendants are "person[s] enumerated in subsection (a)" of section 36. 15 U.S.C. § 80a-35(b).

**Sections 15 and 18(d).** Defendants offer no specific response to Plaintiff's allegations under either ICA section 15, which requires an investment advisory contract with an investment company to be written and approved by shareholders, AC ¶¶ 145-148, or under ICA section 18(d), which prohibits the Forward Purchase Rights and the Director and Sponsor Warrants because they create warrants with an exercise period of more than 120 days. *Id.* ¶ 139. Defendants have thus waived any merits arguments for dismissing Plaintiff's claims under these ICA sections.

### III.     PLAINTIFF PLAUSIBLY PLEADS VIOLATIONS OF THE IAA

#### A.     PSCM is an Investment Adviser under the ICA and IAA

PSCM is an investment adviser under the ICA and IAA. The IAA defines an investment adviser as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities. . . ." 15 U.S.C. § 80b-2(a)(11). The ICA provides a similar definition of an "investment adviser." 15 U.S.C. § 80a-2(a)(20); AC ¶¶ 80-81.

PSCM has provided advice regarding "the advisability of investing in, purchasing, or selling securities" because it advised PSTH on the UMG Deal. As explained above, the UMG Deal was an investment in and purchase of securities. All of the advice regarding the UMG Deal came from PSCM. PSTH has no full-time employees of its own and relies entirely on professionals who are compensated and employed by PSCM. AC ¶¶ 9, 52. By advising PSTH, PSCM is providing advice to "others," because PSCM and its employees are not officers, directors, or employees of PSTH. PSCM has acknowledged its role as an adviser publicly. PSCM is registered as an investment adviser and in the Form ADV it was required to file with the SEC, it expressly acknowledged its formation and management of PSTH under the heading "Advisory Services."[21]

PSCM received compensation for its advice in the form of the Forward Purchase Rights, Sponsor Warrants, and Class B shares that PSTH granted to the Sponsor and Pershing Fund Defendants on PSCM's behalf and from which PSCM derives an indirect benefit. *Id.* 77-84.

PSCM's advice was provided under a "contract" with PSTH. The complaint alleges an unwritten agreement by which PSCM agreed to supply investment advice and PSTH agreed to

---

[21] Pershing Square Capital Management, L.P. Part 2A of Form ADV, 1-2 (March 2021), https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=706119.

compensate it by issuing rights and warrants to the Sponsor and Pershing Fund Defendants on PSCM's behalf. *Id.* ¶¶ 146-48. PSTH has no full-time employees of its own, making it impossible for PSTH to do anything without PSCM's help. And PSCM is not being compensated in any other way. So unless PSCM is providing its help to PSTH as charity and PSTH is providing the Forward Purchase Rights and Sponsor Warrants to the Sponsor and Pershing Fund Defendants also as charity, PSCM must be getting compensated via the agreement Plaintiff alleges.

Defendants argue that PSCM was not a party to the Sponsor Warrant Purchase Agreement and the Forward Purchase Agreement. PS Mot. 29. But, as explained, these agreements were merely components of a larger, unwritten agreement covering PSTH, PSCM, and the Sponsor and Pershing Fund Defendants. The shell game made possible by PSCM's omission from the written portions of this multifaceted agreement is precisely why the ICA requires a contract between an investment company and its adviser to be entirely put in writing. 15 U.S.C. § 80a-15. Defendants similarly argue that PSCM is not a party to this lawsuit. PS Mot. 29. But the Sponsor and Pershing Fund Defendants are parties, so the compensation they received on behalf of PSCM may be recovered directly from them.

PSCM is an investment adviser even though PSTH withdrew from the UMG Deal. All the IAA requires is advice regarding the "*advisability*" of a purchase of securities. 15 U.S.C. § 80b-2(a)(11). The courts and the SEC staff have made clear that this advice need not concern a completed purchase of securities. Advice may qualify even if it is ignored, it concerns only the relative desirability of purchasing securities versus other types of investments, or it counsels *against* purchasing securities. *Matter of Living Benefits Asset Mgmt., LLC*, 916 F.3d 528, 534 (5th Cir. 2019); Inv. Adv. Act Rel. No. 1092, 39 S.E.C. Docket 494 (Oct. 8, 1987); *First United Mgmt. Co.*, SEC No-Action Ltr., 1974 WL 10912, at *4 (Aug. 13, 1973).

Additionally, unlike the definition of an investment company, the definitions of an investment adviser in the ICA and IAA do not use the words "primary" or "primarily." 15 U.S.C. §§ 80a-2(a)(20); 80b-2(a)(11). Any amount of advice-giving may suffice. Even if the UMG Deal was just one of several deals on which PSCM advised PSTH, the advice PSCM gave on the UMG Deal was enough to render PSCM an investment adviser.

It also does not matter under the IAA whether PSTH is an investment company. PS Mot. 30. The ICA and IAA are separate statutes. A person may be an investment adviser whether or not her client is an investment company. The IAA even covers advice given to ordinary individuals. *See, e.g., Abrahamson v. Fleschner*, 586 F.2d 862, 869-871 (2d Cir. 1977).

### B.      The Illegal Contracts Violate the IAA

The Forward Purchase Agreement and Sponsor Warrant Purchase Agreement have violated sections 203 and 205 of the IAA and must therefore be rescinded under IAA section 215. AC ¶¶ 144-48. Defendants argue that PSCM has not violated section 203 of the IAA because PSCM has registered with the SEC as an investment adviser with respect to its other investment funds. PS Mot. 30. But PSCM has not registered *with respect to PSTH*. Regarding section 205 of the IAA, which prohibits PSCM from taking compensation in shares of stock or warrants for stock on PSTH, Defendants offer no specific response.

Plaintiff has standing under IAA § 215 because Plaintiff is a party to the contract created by PSTH's COI, PS Mot. 3, 20, and the COI is the contract that creates the Class B common stock that is part of PSCM's compensation. Plaintiff also has standing to bring suit derivatively on behalf of PSTH, which is a party to all of the Illegal Contracts.

## IV.   PLAINTIFF'S CLAIMS ARE TIMELY

### A.      Plaintiff's ICA § 47 and IAA § 215 Claims are Timely

### 1.      The Applicable Statute of Limitations is Two Years

Sarbanes-Oxley ("SOX") section 804 changed the one-year statute of limitations/three-year statute of repose applicable to most securities claims to a two-year/five-year regime for certain statutory claims, including those brought under the ICA and IAA. Defendants argue the SOX change affects only a claim of fraud. But that is incorrect. Section 804 applies to "a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws." 28 U.S.C. § 1658.[22] Courts have applied the SOX statute of limitations many times to non-fraud claims under the IAA.[23] *See, e.g.*, *de Rothschild v. Serlin*, 2021 WL 860227, at *7 (S.D.N.Y. Mar. 8, 2021) (applying SOX statute of limitations to IAA claim for violation of requirements regarding maintenance of books and records); *Norman v. Salomon Smith Barney*, 350 F. Supp. 2d 382, 390, n.2 (S.D.N.Y. 2004) (applying SOX statute of limitations to IAA claims that did not sound in fraud); *Thomas v. Metropolitan Life Ins. Co.*, 2008 WL 4619822, at *3-4 (W.D. Okla. Oct. 16, 2008) (similar and collecting cases).

Crucially, the SOX provision applies not just to a claim of fraud, but also to any claim involving a "manipulation" or "contrivance in contravention of a regulatory requirement" of the ICA and IAA. To equate fraud with these other causes of action would render every word that

---

[22] The statute cross-references 15 U.S.C. § 78c(a)(47), which makes clear that the statute covers the ICA and IAA.

[23] Defendants cite some cases rejecting SOX's application. One did not conduct any analysis of why the plaintiff's ICA or IAA claims were not covered by SOX. *Phoenix Four, Inc. v. Strategic Res. Corp.*, 2006 WL 399396, at *6 (S.D.N.Y. Feb. 21, 2006). The other likewise assumed that because one of the plaintiff's IAA claims did not "sound in fraud," SOX did not apply, never discussing the rest of the statutory language. *See Hsu v. UBS Fin. Servs. Inc.*, 2011 WL 3443942, at *5 (N.D. Cal. Aug. 5, 2011). Moreover, Defendants' thesis that a statute of limitations for securities fraud should not apply to non-fraud claims was rejected by the Second Circuit. The *Kahn* Court ***rejected*** the argument that the statute of limitations applicable to securities fraud claims should not apply to the IAA (which Defendants do not argue should be treated any differently than the ICA). *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1038 (2d Cir. 1992).

follows "fraud" superfluous. Plaintiff alleges that Defendants have employed a contrivance in contravention of the ICA and IAA by crafting a structurally complex securities offering and repeatedly (and falsely) telling investors that it they avoided the ICA and IAA by doing so.

**2.      Plaintiff's Claims are Timely Under a One-Year Statute of Limitations**

Even if the Court declines to apply SOX to Plaintiff's ICA claims, the claims are timely because they did not accrue until PSTH became an investment company in June or July 2021. As explained above, the performance of the Illegal Contracts has violated the ICA in many ways since then and will continue to do so in the future.

Defendants' only response is to say that Plaintiff was put on notice of his claims by PSTH's registration statement. But at the time the registration statement was filed, there was still a chance that PSTH would avoid becoming an investment company by combining with an operating company less than one year after the IPO in a merger or other transaction not involving an investment in securities. *See, e.g.*, *Gabelli v. SEC*, 568 U.S. 442, 448 (2013) ("[T]he standard rule is that a claim accrues when the plaintiff has a complete and present cause of action."). This is a very different case from *Menowitz v. Brown*, on which Defendants rely, and in which the plaintiffs' allegations did not rest on events subsequent to the relevant SEC filings. *See Menowitz v. Brown*, 991 F.2d 36, 42 (2d Cir. 1993). Nor is Plaintiff invoking the "continuing wrong" doctrine, *see* PS Mot. 21, but, rather, precisely identifying when the elements of the claim were met.

Moreover, section 47(b) covers not merely "[a] contract that is made" in violation of the ICA, but also one "*whose performance involves*" a violation of the ICA. 15 U.S.C. § 80a-46(b) (emphasis added). As the court in *UFCW Loc. 1500 Pension Fund v. Mayer* explained when rejecting a statute of limitations defense, "[a]n ICA violation . . . does not occur when an investment company fails to register under the ICA. . . . An ICA violation occurs when an

unregistered investment company transacts interstate commerce" or otherwise performs a contract in violation of the ICA. 2016 WL 6122458, at *10 (N.D. Cal. Oct. 19, 2016).

Defendants' position that the statute of limitations began to run before PSTH ever became an investment company would make it impossible to ever bring a timely claim under the ICA. A plaintiff who challenged the Illegal Contracts before the one-year grace period had run would be too early, and a plaintiff who challenged the Illegal Contracts after then would be too late.

### B.      Plaintiff's ICA § 36(b) Claim is Timely

Plaintiff's section 36(b) claim is timely because the one-year period cited in section 36(b) does not apply to any of the equitable remedies Plaintiff is pursuing. Section 36(b)(3) states that: "[N]o damages *or other relief* shall be granted against any person other than the recipient of such compensation or payments. No award *of damages* shall be recoverable for any period prior to one year before the action was instituted." 15 U.S.C. § 80a-35(b)(3) (emphasis added). Both damages *and other relief* are available, but only damages are limited by the one-year look back.

That section 36(b)(3) provides for equitable remedies other than damages is well-settled. *See In re Gartenberg*, 636 F.2d 16, 17 (2d Cir. 1980). Plaintiffs under section 36(b) routinely seek rescission or injunctive relief as remedies without regard to any one-year limitation.[24] The availability of other remedies is consistent with the Supreme Court's mandate that, "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 7-71 (1992). In a statute prohibiting a breach of fiduciary duty, both

---

[24] *See, e.g.*, *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 341 (2010); *Curd ex rel. SEI Int'l Equity Fund v. SEI Inv. Mgmt. Corp.*, 2015 WL 4243495, at *1 (E.D. Pa. July 14, 2015); *Ingenhutt v. State Farm Inv. Mgmt. Corp.*, 2017 WL 1398646, at *9 (C.D. Ill. Apr. 18, 2017); *Strigliabotti v. Franklin Res., Inc.*, 398 F. Supp. 2d 1094, 1096 (N.D. Cal. 2005).

injunctions and rescission can be appropriate remedies.[25]

The injunction and rescission Plaintiff seeks under section 36(b) are not subject to the one-year limitation. *Kahn*, 970 F.2d at 1037-38 ("There is no express time limit on bringing an action under § 36(b), but the plaintiff may collect only those damages that have accrued in the prior year."); *see also In re Franklin Mut. Funds Fee Litigation*, 478 F. Supp. 2d 677, 685 (D.N.J. 2007). Defendants' reliance on *AllianceBernstein* is misplaced because in that case, the only remedy sought was damages. *In re AllianceBernstein Mutual Fund Excessive Fee Litig.*, 2006 WL 74439, at *2 (S.D.N.Y. Jan. 11, 2006).

Finally, even if Plaintiff sought only damages, the one-year lookback would not apply because the damages concern payments to be made by PSTH to Defendants upon the exercise of warrants and rights *in the future*. The one-year limitation does not prohibit the recovery of damages, let alone equitable relief, for actions to be taken after the commencement of a suit. *See, e.g.*, *Forsythe v. Sun Life Financial, Inc.*, 475 F. Supp. 2d 122, 124 (D. Mass. 2007); *Hunt v. Invesco Funds Group, Inc.*, 2006 WL 1751900, at *1 (S.D. Tex. June 22, 2006).

## C.    Plaintiff's Claims are Ripe

After arguing that Plaintiff's claims are too late, Defendants attempt to have it both ways by arguing that Plaintiff's claims are also too early and are therefore unripe. The claims are ripe, however, because PSTH has indisputably exhausted its grace period and is now an investment company, Defendants are performing the Illegal Contracts, and Defendants' contingent contracts

---

[25] *See, e.g.*, *Miller v. Butler*, 2014 WL 1716184, at *5 (D.N.J. Apr. 30, 2014) ("[R]escission is . . . an appropriate remedy in breach of fiduciary duty or fraud claim[.]"); *Morada Music, LLC v. Hays*, 2010 WL 11596237, at *4 (C.D. Cal. Jan. 27, 2010) ("Where a breach of fiduciary duty occurs, equitable remedies are available, including imposition of a constructive trust, rescission, restitution, and incidental damages."); *Avianca, Inc. v. Corriea*, 1993 WL 797455, at *4 (D.D.C. May 13, 1993) (similar).

are highly valuable *now*. *See Assoc. Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992) ("That the liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action.").[26]

Plaintiff's claims are now ripe because PSTH is an investment company today—regardless of what type of transaction it chooses to complete in the future. And the rights granted to Defendants under the Illegal Contracts would be binding and legally enforceable were it not for the claims raised here. Defendants argue that the ultimate value of the contingent rights given to Defendants is not yet definitively known. PS Mot. 32. But the compensation may still be valuable today. As explained above, it is a basic axiom of economics and securities law that a claim of uncertain value in the future may nevertheless have value in the present. This axiom is reflected in PSTH's own disclosures to investors, which value the rights created by the Illegal Contracts at hundreds of millions of dollars "as of" early 2021, AC ¶ 81 (citing PSTH, Quarterly Report (Form 10-Q), at Note 7 (May 24, 2021)).

## V.    PLAINTIFF HAS DERIVATIVE STANDING

### A.    Plaintiff Satisfies the Contemporaneous Ownership Requirement

Plaintiff does not need to satisfy the standing requirements of Rule 23.1 with regard to certain of his claims. Plaintiff may proceed directly on his section 36(b) claim because he is a "security holder" of PSTH. *Daily Income Fund v. Fox*, 464 U.S. 523, 527-42 (1984).[27] And

---

[26] In *Ebix*, on which Defendants rely, the court dismissed certain claims *without prejudice* as unripe because the plaintiffs did not plead any present infringements on their stock ownership rights or effects on the management of the company. *In re Ebix, Inc. Stockholder Litig.*, 2014 WL 3696655, at *13 (Del. Ch. July 24, 2014). There was no assertion that the contract at issue in the case was a present violation of federal securities law.

[27] Defendants cite a Northern District of California case, *Siemers*, to argue that a section 36(b) claim requires contemporaneous ownership. Mot. 18 n. 18. But the Court in *Siemers* was observing

Plaintiff may sue directly under section 47(b) of the ICA and section 215 of the IAA to rescind the illegal elements of PSTH's COI because, as Defendants acknowledge, Plaintiff is a party to the contract created by the COI. PS Mot. 7; *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991); *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1049-50 (Del. Ch. 2015); *Eaton Vance Senior Income Tr. v. Saba Capital Master Fund, Ltd.*, 2021 WL 2222812, at *5-6 (Sup. Ct. Mass. Mar. 31, 2021).

With respect to his derivative claims premised on ICA section 47(b) and IAA section 215(b), Rule 23.1 requires that the Plaintiff allege that he "was a shareholder or member at the time of the transaction complained of." Fed. R. Civ. P. 23.1(b)(1). The transactions complained of are PSTH's transformation into an investment company (which occurred either on July 22, 2021, the day the Company had invested all of its assets in securities for more than one year, or June 4, 2021, the day the Company announced the UMG Deal), and PSTH's continued subsequent violations of the ICA through its performance of the Illegal Contracts. *See Rubenstein v. Adamy*, 2021 WL 1269080, at *6-7 (S.D.N.Y. Apr. 6, 2021).[28]

Because Plaintiff purchased his shares before these key dates, Plaintiff owned and will own his shares at the time of the transactions complained of, including at the time PSTH first became

---

that the plaintiff did not hold shares at the time the complaint was filed—which is not in question here—and said nothing about ownership at the time of the relevant transaction. *Siemers v. Wells Fargo & Co.*, 2007 WL 760750, at *20-21 (N.D. Cal. Mar. 9, 2007). A section 36(b) claim is not subject to Rule 23.1 because although section 36(b) provides for recovery to be paid to an investment company, it grants the right to bring an action only to the SEC and a "security holder" of the company. As discussed below, Plaintiff did already own his shares at the time when PSTH became an investment company.

[28] Defendants rely on *In re Smiledirectclub*, which illustrates Plaintiff's point. 2021 WL 2182827, at *8 (Del. Ch. May 28, 2021). The court distinguished a claim that challenges the terms of a transaction that are set before the transaction is consummated—a claim that accrues at the time the terms are established—and a claim that challenges a transaction where some later factors related to the "actual consummation" form the basis of the claim. *Id.* Here, Plaintiff challenges *performance* of the Illegal Contracts *after* PSTH became an investment company.

an investment company.[29] Plaintiff also satisfies the contemporaneous ownership requirement because he seeks forward-looking relief for independently actionable violations of the ICA and IAA in the future. Courts have held that shareholders have standing to challenge unlawful corporate actions taken pursuant to a contract where the shareholders did not hold stock at the time the contract was executed, but did hold at the time the unlawful acts were committed. *See, e.g.*, *In re Penn Cent. Transp. Co.*, 341 F. Supp. 845, 846 (E.D. Pa. 1972).[30]

### B.     Plaintiff has Adequately Pleaded Demand Futility

The Director Defendants dedicate a dozen pages of briefing to arguing that Plaintiff has not adequately pleaded the futility of demand upon PSTH's board, but the question of demand futility is not close. Demand is clearly not required for Plaintiff's direct claims and his claims under ICA section 36(b). *Daily Income Fund*, 464 U.S. at 527-42. And demand is excused with respect to the other claims because all of the Director Defendants have received a material personal benefit from the misconduct that is the subject of the litigation. *United Food & Commercial Workers Union v. Zuckerberg*, 2021 WL 4344361, at *17 (Del. Sept. 23, 2021).[31]

Each of Ms. Gersh, Mr. Ovitz, Ms. Reses, and Mr. Steinberg personally received Director Warrants, Forward Purchase Rights, or both pursuant to contracts whose performance violate the ICA and IAA and which must therefore be rescinded. AC ¶¶ 86, 89, 99. The fifth director, Mr. Ackman, received a benefit from the Forward Purchase Rights and the Sponsor Warrants through his ownership of PSCM, which in turn benefits from these rights and warrants through the fees it derives from the Sponsor and Pershing Fund Defendants. *Id.* ¶¶ 186-87. Each of the directors thus

---

[29] Plaintiff purchased his shares on May 12, 2021. AC ¶ 23.

[30] Defendants do not distinguish *Penn Central*, except to note its court and year. PS Mot. 19.

[31] Defendants concede that Plaintiff needs to satisfy only one of the three *Zuckerberg* tests to excuse demand. Dir. Mot. 7; *Zuckerberg*, 2021 WL 4344361, at *17.

has a direct or indirect interest in a contractual claim that was purchased for far less than fair value, that PSTH itself has valued at hundreds of millions of dollars more than what Defendants paid, and that will be rescinded if Plaintiff prevails. There thus can be no serious doubt that all five members of this Board have "received a material personal benefit from the alleged misconduct that is the subject of the litigation," *Zuckerberg*, 2021 WL 43443561, at *17, and that demand is excused because the Director Defendants cannot "properly exercise[]" "independent and disinterested business judgment" regarding the subject of this litigation.[32]

It is true, as the Director Defendants argue, that in an action that challenges a transaction other than the directors' compensation, such as a merger or a supply agreement with a conflicted third party, "demand is not excused simply because directors receive compensation from the company." *London v. Tyrrell*, 2008 WL 2505435, at *5 (Del. Ch. June 24, 2008). But that point is irrelevant here, where what is at stake is the legal validity of the directors' own compensation. Over a decade ago, the Delaware courts responded to defendants who "cite . . . cases for the general rule that demand is not excused simply because directors receive compensation from the company," by explaining that "those cases do not address the slightly different question presented here—whether demand is excused where the challenged decision" bears on the legal validity of the directors' own pay. *Weiss v. Swanson*, 948 A.2d 433, 448 (Del. Ch. 2008) (describing this distinction as "well settled law").

Distinguishing cases that challenge other types of transactions from those that challenge directors' compensation, courts have held that directors "who have received [compensation that]

---

[32] At the pleading stage, plaintiff is entitled to the inference that total compensation for a board of directors exceeding hundreds of millions of dollars is material to each of its members. *See, e.g.*, *Frank v. Elgamal*, 2012 WL 1096090, at *11 & n.83 (Del. Ch. 2012); *Voigt v. Metcalf*, 2020 WL 614999, at *15 (Del. Ch. Feb. 10, 2020) (noting that materiality of compensation to a fiduciary is generally unknowable before merits discovery).

plaintiffs seek to challenge 'have a strong financial incentive to maintain the status quo by not authorizing any corrective action that would . . . cause them to disgorge improperly obtained profits.'" *Id.* (quoting *Conrad v. Blank*, 940 A.2d 28, 38 (Del. Ch. 2007)). Courts have similarly held that when a "majority of" "directors are recipients of the challenged [compensation]," "[d]emand is excused [because] a majority of the board is interested in the transaction being challenged." *Desimone v. Barrows*, 924 A.2d 908, 947 (Del. Ch. 2007). The cases cited by the Director Defendants stand only for the "general rule that demand is not excused simply because directors receive compensation from the company," and therefore "do not address" a case such as this one that directly challenges directors' compensation. *Weiss*, 948 A.2d at 448. [33]

Losing on the law, the Director Defendants offer, in bold type, a wildly implausible assertion about the facts: "***all of the PSTH Directors would benefit from rescission***" of the Director Warrants, so the Board might *prefer* to bring Plaintiff's claims for him. Dir. Mot. 10. This argument is as implausible as it sounds. The Director Defendants do not want rescission because, although they paid some money for their warrants, they know the warrants are actually worth more than what they paid. In the UMG Deal, PSTH valued the Director Warrants at ***thirteen times*** what the Director Defendants paid for them just a year before. AC ¶¶ 12, 93. As explained above, *see supra*, at 7-8, basic finance, decades-old securities law, and PSTH's own securities filings show the contingent rights the Director Defendants now hold have enormous value today.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court deny Defendants' motion.

---

[33] Defendants also cite *Tilden v. Cunningham*, 2018 WL 5307706, at *12 (Del. Ch. 2018), where the court refused to excuse demand based solely on allegations that, like "nearly every director of every publicly traded company," the directors received stock-based pay that "*might* be devalued as a result of derivative litigation," *id.* (emphasis in original). *Tilden* is irrelevant here because the plaintiffs in that case did not directly challenge the legality of the directors' compensation.

Dated: November 29, 2021
      New York, New York

**BERNSTEIN LITOWITZ BERGER**
 **& GROSSMANN LLP**

*/s/ Mark Lebovitch*
Mark Lebovitch
Daniel E. Meyer
Joseph W. Caputo (Bar Admission Pending)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1519
Facsimile: (212) 554-1444
MarkL@blbglaw.com
Daniel.Meyer@blbglaw.com
Joseph.Caputo@blbglaw.com

**SUSMAN GODFREY L.L.P.**
Shawn J. Rabin
Stephen Shackelford
Cory Buland
Beatrice Franklin
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
srabin@susmangodfrey.com
sshackelford@susmangodfrey.com
cbuland@susmangodfrey.com
bfranklin@susmangodfrey.com

Gregory V. Varallo
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3601
Greg.Varallo@blbglaw.com

**BUZIN LAW, P.C.**
Robert J. Jackson, Jr. (*admitted pro hac vice*)
John Morley (*admitted pro hac vice*)
111 Broadway, Suite 1204
New York, NY 10006
Telephone: (914) 819-7527
rjj6@nyu.edu
johndmorley@gmail.com

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Dr., Ste. 300
Berwyn, PA 19312
Telephone: (484) 258-1585
Facsimile: (484) 631-1305
rm@rmclasslaw.com