# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE ASSAD, Derivatively on Behalf of PERSHING SQUARE TONTINE HOLDINGS, LTD., <br>        Plaintiff, <br><br> v. <br><br> PERSHING SQUARE TONTINE HOLDINGS, LTD., <br><br>        Nominal Defendant, <br> v. <br><br> PERSHING SQUARE TH SPONSOR, LLC, LISA GERSH, MICHAEL OVITZ, JACQUELINE D. RESES, JOSEPH S. STEINBERG, PERSHING SQUARE, L.P., PERSHING SQUARE INTERNATIONAL, LTD., and PERSHING SQUARE HOLDINGS, LTD., <br>        Defendants. | Case No. 1:21-cv-06907 (AT) (BCM) |

**BRIEF OF *AMICI CURIAE* THE PSTH INDIVIDUAL SHAREHOLDERS
IN SUPPORT OF THE PERSHING SQUARE DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

Matthew A. Peller
ROLNICK KRAMER SADIGHI LLP
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 597-2800
Fax: (212) 597-2801
mpeller@rksllp.com

*Counsel for the PSTH Individual Shareholders*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................................ 1

INTERESTS OF *AMICI* ................................................................................................................. 1

SUMMARY OF ARGUMENT ........................................................................................................ 2

ARGUMENT .................................................................................................................................... 3

    I.    THIS LAWSUIT IS A MISGUIDED ATTEMPT TO USURP THE SEC'S AUTHORITY TO REGULATE SPACS ................................................................. 3

    II.   REASONABLE SHAREHOLDERS, SUCH AS THE PSTH INDIVIDUAL SHAREHOLDERS, DO NOT VIEW OR TREAT PSTH AS AN INVESTMENT COMPANY ................................................................................................................... 7

CONCLUSION ............................................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ford Motor Credit Co. v. Milhollin*,
  444 U.S. 555 (1980) .................................................................................................. 4

*In re ICOS Corp.*,
  51 S.E.C. 322, 1993 WL 78892 (Mar. 16, 1993) ..................................................... 15

*In re M.A. Hanna Co.*,
  10 S.E.C. 581, 1941 WL 37944 (Nov. 25, 1941) ..................................................... 15

*In re PacifiCare of Arizona, Inc.*
  84 S.E.C. Docket 859, 2004 WL 2674268 (Nov. 22, 2004) ..................................... 15

*In re Tonopah Mining Co.*,
  26 S.E.C. 426, 1947 WL 26116 (July 21, 1947) ........................................... 1, 7, 8, 14

*Levesque v. Block*,
  723 F.2d 175 (1st Cir. 1983) ....................................................................................... 7

*Moses v. Blank*,
  1981 WL 1599 (S.D.N.Y. Feb. 3, 1981) ............................................................... 8, 15

*National Association of Home Health Agencies v. Schweiker*,
  690 F.2d 932 (D.C. Cir. 1982) .................................................................................... 7

*SEC v. Fifth Ave. Coach Lines*,
  289 F. Supp. 3 (S.D.N.Y. 1968) ............................................................................... 10

*SEC v. Fifth Ave. Coach Lines*,
  435 F.2d 510 (2d Cir. 1970) ........................................................................ 10, 12, 13

*SEC v. National Presto Industries, Inc.*,
  486 F.3d 305 (7th Cir. 2007) ............................................................................. passim

*STAAR Surgical Co. v. Waggoner*,
  588 A.2d 1130 (Del. 1991) ......................................................................................... 8

*Wise v. El Paso National Gas Co.*,
  986 F.2d 929 (5th Cir. 1993) ...................................................................................... 4

**Statute**

Investment Company Act of 1940 § 3, 15 U.S.C. § 80a-3 ........................................... 10

## INTERESTS OF *AMICI*

*Amici* (the "PSTH Individual Shareholders") are a group of 62 individual Pershing Square Tontine Holdings, Ltd. ("PSTH") shareholders that fundamentally disagree with the premise of Plaintiff's lawsuit that PSTH—a special purpose acquisition company ("SPAC")—is subject to the Investment Company Act ("ICA").[1] The PSTH Individual Shareholders collectively own more than ***1.289 million*** shares in PSTH (worth over $25 million, as of December 10, 2021) and nearly 197,000 warrants to purchase PSTH shares.[2] The PSTH Individual Shareholders respectfully wish to provide the Court with the perspective of ordinary, individual PSTH shareholders, given that courts have held that "what principally matters" in determining whether a company is subject to the ICA "is the beliefs the company is likely to induce in investors.  Will its portfolio and activities lead investors to treat a firm as an investment vehicle or as an operating enterprise?"  *SEC v. Nat'l Presto Indus., Inc.*, 486 F.3d 305, 315 (7th Cir. 2007) (Easterbrook, J.); *see also In re Tonopah Mining Co.*, 26 S.E.C. 426, 1947 WL 26116, at *4 (July 21, 1947) ("the nature of the assets and income of the company, disclosed in the annual reports filed with the Commission and in reports

---

[1] The PSTH Individual Shareholders state that (i) counsel for none of the parties to this action authored this brief, in whole or in part; and (ii) no party, party's counsel, or person other than counsel for *amici* contributed money to fund the preparation or submission of this brief.  The PSTH Individual Shareholders are: Syed Moazzam Ahmed, Ahmad Khalid Alakoozi, Rory Banim, Francis Barton, Adam O. Botterbusch, David M. Broadway, Daniel Brown, Nicholas E. Cady, Giovanni Digiulio, Cecil Dean Ellison, Luis J. Feliu, John Franklin, Todd Fungard, Kyle Hansen, Matt Henry, James Herndon, Steven Ho, Brian Hwang, Nathaniel Jones, Tamilarasu Krishnamoorthy, Keerthana Krishnasamy, Stephan Kröber, Ryan Laks, Pavel Larionov, Brian Li, Ryan Lowe, Maksim P. Martynyuk, Justin Matasovsky, Kai McFarland, Michael R. McNett, Oliver Miller, Ramesh Nannapaneni, Christopher M. O'Neal, Kunal Oak, Aspyn Palatnick, Yash Pancholi, David Park, Aarsh Patel, Ali-Yaho Pearce, Jacob Aloysius Pervine, James Porteous, Jose Ramirez, Andrew Rosenblatt, David Rotter, Aaron P. Rupp, Ed Seaford, Pratik Shah, Christopher Shields, Timothy John Simmons, Thomas Slawinski, Avraham Smason, Matthew T. Smith, Jeffrey Stern, Taco Tico of New Orleans, Inc. (by Kimberly McDaniel), Hansel Tsai, Peter Van Alstyne, Kenneth Robert Watson, Jonathan Wilson, Darren Ngiam Zhi Xian, Ava Zandieh, Kevin Zhang, Benjamin Liu Zhiwei.

[2] Declaration of Matthew A. Peller, dated December 13, 2021, filed herewith ("Peller Decl."), ¶ 2.

sent to stockholders, *was such as to lead investors to believe* that the principal activity of the company was trading and investing in securities") (emphasis added).

## SUMMARY OF ARGUMENT

PSTH is a SPAC: a company that raises capital in an initial public offering ("IPO") with the express purpose of purchasing an operating company or assets within a specified time frame. PSTH conducted its initial public offering in July 2020. Like hundreds of SPACs before it since 2003, PSTH's registration statement was approved by the U.S. Securities and Exchange Commission ("SEC"). The PSTH Individual Shareholders purchased shares in that IPO or thereafter. They did so for a simple reason: they believed that PSTH, as it stated in its SEC disclosures and Certificate of Incorporation, would locate and merge with an appropriate operating company, thereby providing the PSTH Individual Shareholders with an ownership interest in the resulting publicly traded company. Yet Plaintiff, a single shareholder of PSTH, bases this lawsuit on the notion that unbeknownst to everyone—the SEC, the New York Stock Exchange ("NYSE"), PSTH, the investing public, etc.—PSTH is actually an investment company under the ICA. The PSTH Individual Shareholders emphatically disagree.

*First*, the SEC—which enforces the ICA—has never implied, stated or concluded (either formally or informally) that SPACs are subject to the ICA. Just last week, on December 9, 2021, SEC Chair Gary Gensler spoke about SPAC regulation before the Healthy Markets Association[3] and in a video released on the SEC website and YouTube.[4] Although he discussed the Securities Act of 1933, the Securities Exchange Act of 1934 and state blue-sky laws, he did not so much as mention the ICA. Plaintiff's lawsuit seeks either to wrest the mandate of SPAC regulation away

---

[3] https://www.sec.gov/news/speech/gensler-healthy-markets-association-conference-120921
[4] https://www.sec.gov/news/sec-videos/office-hours-gary-gensler-what-spac-anyway; https://www.youtube.com/watch?v=-_MLCCS-na0&t=170s

from the SEC, or is a backdoor way of lobbying for SEC action. Both purposes are improper. Subjecting PSTH (and other SPACs) to the ICA would upset two decades of market practice and individual shareholder expectations and likely kill the SPAC form, thereby further decreasing choices for individual investors. Any regulation of the SPAC market should come from the SEC (or Congress), and not from private litigants.

***Second***, answering whether a company is subject to the ICA should focus on "the beliefs the company is likely to induce in investors. Will its portfolio and activities lead investors to treat a firm as an investment vehicle or as an operating enterprise?" *Nat'l Presto*, 486 F.3d at 315. The PSTH Individual Shareholders purchased shares of PSTH for the sole reason that they believed it would combine with an existing operating company and increase in value. None of the PSTH Individual Shareholders hoped to profit from PSTH's meager gains on the government securities in its NYSE-mandated trust fund. Indeed, the approximate average cost basis of PSTH shares for the PSTH Individual Shareholders is $23.46, and before this lawsuit was filed, **PSTH never traded below its $20 redemption price**, making it implausible that these shareholders are arbitrageurs or that anyone purchased PSTH to access its *de minimis* trust fund returns. Moreover, PSTH does not resemble the companies that courts or the SEC have found became inadvertently subject to the ICA. Those were decaying operating companies that quietly slid into *de facto* investment companies, thus raising the risk, not present here, of shareholder deception or injury.

**ARGUMENT**

**I. THIS LAWSUIT IS A MISGUIDED ATTEMPT TO USURP THE SEC'S AUTHORITY TO REGULATE SPACS.**

Plaintiff does not allege that he was tricked into buying PSTH shares based on the mistaken belief that PSTH was regulated by the ICA, or that he believes, as a factual matter, that PSTH functions as an investment company. The most Plaintiff can muster is alleging that "the activities and organization of" PSTH "all point to the *legal conclusion*" that PSTH "is an investment

company as defined by the ICA." (Am. Compl. (ECF No. 44) ¶ 107 (emphasis added).) Instead, this lawsuit is, in reality, a vehicle to either (i) usurp the SEC's authority by obtaining a judicial ruling that SPACs are subject to the ICA; or (ii) coax the SEC into increasing its regulation of SPACs. The Court should look askance at these aims.

The SEC, which enforces the ICA, is perfectly capable of adopting additional regulations governing SPACs should it decide such action warranted. There have been more than 1,000 SPACs over the last nearly two decades. Each was issued under offering documents approved by the SEC. The SEC has never suggested, let alone stated, that SPACs are subject to the ICA. The SEC's silence on this issue speaks volumes.

Plaintiff insists that "the SEC's inaction in allowing these registration statements to become effective says nothing about the SEC's views regarding the status of" SPACs "under the ICA." (Pl.'s Opp'n to Mot. to Dismiss (ECF No. 69) ("Pl. Br.") at 13.) But from the standpoint of investors such as the PSTH Individual Shareholders, this ignores reality. The capital markets depend on certainty and individual investors should be able to rely on SEC inaction in choosing not to regulate an entire class of securities under the ICA as a signal that those companies are not governed by the ICA. Individual shareholders have purchased shares in SPACs for nearly 20 years while the SEC said nary a word that those companies might be subject to the ICA. As the Supreme Court has explained, "legislative silence is not always the result of a lack of prescience; it may instead betoken permission or, perhaps, considered abstention from regulation. In that event, judges are not accredited to supersede . . . the appropriate agency by embellishing upon the regulatory scheme. Accordingly, caution must temper judicial creativity in the face of . . . regulatory silence." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980); *see also, e.g.*, *Wise v. El Paso Nat'l Gas Co.*, 986 F.2d 929, 935 (5th Cir. 1993) ("We do not have the power to

assume the legislator's role and welcome additional layers of obligations. The provision must be read in the light of [the statutes]'s sweeping complexity. This is clearly not a case of inadvertent omission.").

Since at least December 2020—including after this lawsuit was filed—the SEC has issued a steady drumbeat of commentary about SPACs, including:

- On December 22, 2020, the SEC's Division of Corporation Finance issued *CF Disclosure Guidance: Topic No. 11*, discussing SPACs;[5]
- On March 10, 2021, the SEC's Office of Investor Education and Advocacy issued an investor alert, *Celebrity Involvement with SPACs – Investor Alert*;[6]
- On March 31, 2021, the staff of the SEC's Office of the Chief Accountant issued a statement, *Financial Reporting and Auditing Considerations of Companies Merging with SPACs*;[7]
- On March 31, 2021, the staff of the SEC's Division of Corporation Finance issued a statement, *Staff Statement on Select Issues Pertaining to Special Purpose Acquisition Companies*;[8]
- On April 8, 2021, the Acting Director of the SEC's Division of Corporation Finance issued a statement, *SPACs, IPOs and Liability Risk under the Securities Laws*;[9]
- On April 12, 2021, the staff of the SEC's Division of Corporation Finance and the Office of the Chief Accountant issued a statement, *Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs")*;[10]
- On May 25, 2021, the SEC's Office of Investor Education and Advocacy issued an investor bulletin, *What You Need to Know About SPACs – Updated Investor Bulletin*, which updated an earlier December 2020 bulletin;[11]
- On August 26, 2021—after this lawsuit was filed—the SEC's Investor Advisory Committee issued draft *Recommendations of the Investor as Purchaser and Investor*

---

[5] https://www.sec.gov/corpfin/disclosure-special-purpose-acquisition-companies

[6] https://www.sec.gov/oiea/investor-alerts-and-bulletins/celebrity-involvement-spacs-investor-alert

[7] https://www.sec.gov/news/public-statement/munter-spac-20200331

[8] https://www.sec.gov/news/public-statement/division-cf-spac-2021-03-31

[9] https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws

[10] https://www.sec.gov/news/public-statement/accounting-reporting-warrants-issued-spacs

[11] https://www.sec.gov/oiea/investor-alerts-and-bulletins/what-you-need-know-about-spacs-investor-bulletin

> *as Owner Subcommittees of the SEC Investor Advisory Committee regarding Special Purpose Acquisition Companies*;[12] and
>
> - On September 27, 2021, the SEC Chair issued *Prepared Remarks Before the Small Business Capital Formation Advisory Committee* that discussed SPACs.[13]

*None* of these SEC statements mention the possibility that SPACs might be subject to the ICA, let alone conclude that SPACs are within the ambit of the ICA. The SEC had every opportunity to address the issue of SPACs being potentially subject to the ICA, and tellingly never did so. Adopting Plaintiff's view would turn the markets on their head and signal to individual investors to be wary of any type or class of security that the SEC has not explicitly opined about, regardless of SEC approval of offerings, SEC commentary, and longstanding industry practices.

Moreover, if accepted, Plaintiff's theory would likely grind the entire SPAC market to a halt, all in the face of zero indication by the SEC that SPACs are subject to the ICA. Access to shares in private companies, private equity funds, and IPO share allocations typically is extremely limited—if not entirely unavailable—to individual investors. The option to purchase shares in SPACs thus levels the playing field for individuals, by providing similar exposure and returns to private companies or IPOs, while still protecting individual investors through the disclosure requirements and anti-fraud rules of the 1933 and 1934 Acts, as well as state blue-sky laws. *See, e.g.*, FINRA, *Investing in a SPAC*, Mar. 29, 2021 ("Most retail investors don't have the opportunity to invest in promising privately held companies due to a host of hurdles. SPACs are a way for public investors to now 'partner' with investment professionals and venture capital firms who source and perform due diligence on these companies, a partnership that has the potential to turn into an additional source of capital appreciation in their portfolios.").[14] The ability of individuals

---

[12] https://www.sec.gov/spotlight/investor-advisory-committee-2012/draft-recommendation-of-the-iap-and-iao-subcommittees-on-spacs-082621.pdf

[13] https://www.sec.gov/news/public-statement/gensler-sbcfac-2021-09-27

[14] https://www.finra.org/investors/insights/spacs; *see, e.g.*, *SEC Charges SPAC, Sponsor, Merger*

to purchase shares in SPACs should not be snuffed out based on the *ipse dixit* of Plaintiff and his law-professor backers.

The PSTH Individual Shareholders take no position on reforms to protect individual shareholders, to make it easier for private companies to raise capital or to ease the path for individual investors to share in the growth of early-stage or private companies. But any such changes should be made by the SEC or by Congress, and should not be foist upon a single SPAC (and its shareholders) out of the hundreds of SPACs that are publicly traded. Indeed, courts have warned against even *regulators*, such as the SEC, seeking to "adopt a new approach by filing briefs," rather than through "rulemaking or administrative adjudication." *Nat'l Presto*, 486 F.3d at 315. Public rulemaking ensures that agencies do not adopt rules that "substantially affect private parties and resolve important issues without the beneficial input that those parties could provide." *Nat'l Ass'n of Home Health Agencies v. Schweiker*, 690 F.2d 932, 950 (D.C. Cir. 1982). Public rulemaking is especially important where, as here, "one can expect real interest from the public in the content of the proposed regulation." *Levesque v. Block*, 723 F.2d 175, 185 (1st Cir. 1983).

**II. REASONABLE SHAREHOLDERS, SUCH AS THE PSTH INDIVIDUAL SHAREHOLDERS, DO NOT VIEW OR TREAT PSTH AS AN INVESTMENT COMPANY.**

As Plaintiff acknowledges (Pl. Br. at 24-25), in *National Presto*, the Seventh Circuit, interpreting *Tonopah Mining*, 26 S.E.C. 426, held that "what principally matters" in determining whether a company is subject to the ICA "is the beliefs the company is likely to induce in investors. Will its portfolio and activities lead investors to treat a firm as an investment vehicle or as an operating enterprise?" 486 F.3d at 315; *see also Moses v. Blank*, 1981 WL 1599, at *6 (S.D.N.Y. Feb. 3, 1981) ("There is no evidence . . . which would indicate that historically or in the statements

---

*Target, and CEOs for Misleading Disclosures Ahead of Proposed Business Combination*, July 13, 2021, https://www.sec.gov/news/press-release/2021-124.

of policy appearing in annual reports and public filings, [the company] . . . was known to the public as anything but primarily a fast food business operation . . . ."); *Tonopah Mining*, 26 S.E.C. 426, at *4 ("the nature of the assets and income of the company . . . was such as to lead investors to believe that the principal activity of the company was trading and investing in securities").

For his part, Plaintiff does not allege that he purchased PSTH shares believing that it was an investment company. Nor has he "tried to" allege "anything different about investors' perceptions or behaviors." *Id.* Plaintiff has "not identified even one confused investor who bought stock in [PSTH] thinking he was making an investment in a closed-end mutual fund whose assets were the [government] securities that [PSTH] holds" in its trust fund. *Id.* at 313. The PSTH Individual Shareholders collectively own more than 1.289 million shares of PSTH and emphatically state that they view PSTH as a SPAC that is seeking to combine with an operating company, and not as an "investment vehicle" subject to the ICA. None of the PSTH Individual Shareholders have been led to believe that PSTH's "principal activity" is the "trading and investing in securities." *Tonopah*, 26 S.E.C. 430, at *4. Nor do the PSTH Individual Shareholders view PSTH as "a competitor to a closed-end mutual fund." *Nat'l Presto*, 486 F.3d at 315.

Rather, the PSTH Individual Shareholders view PSTH as it has been described to them in the company's Certificate of Incorporation, numerous SEC filings and PSTH's website: as a special purpose acquisition company formed to identify and complete a merger with private, large capitalization, high quality growth companies. Thus, for example:

- PSTH's Certificate of Incorporation—the "contract" "with its shareholders" under Delaware law, *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991)—described its "Business Combination Requirements" and "Existence" as requiring either (1) "consummation of [an] Initial Business Combination" within two years of its IPO (or 30 months if it executes a letter of intent within two years), or (2) liquidation and distribution of the company's assets back to the shareholders.[15]

---

[15] Declaration of Jenna M. Dabbs, dated Nov. 4, 2021 (ECF No. 64) ("Dabbs Decl."), Ex. A (ECF

- On the first page of PSTH's prospectus, PSTH stated that it was "formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination"—"our initial business combination."[16]

- Also in its prospectus, PSTH described itself as a "special purpose acquisition company" and said that, for its "Proposed Business," "[w]e intend to pursue merger opportunities with private, large capitalization, high quality, growth companies."[17]

- PSTH explained in its prospectus that its "business will be to identify and complete our initial business combination and thereafter to operate the post-combination business or assets for the long term" and that it did "not plan to buy businesses or assets with a view to resale or profit from their resale" or "to buy unrelated businesses or assets or to be a passive investor."[18]

- PSTH explicitly stated in its prospectus that its IPO was "not intended for persons who are seeking a return on investments in government securities or investment securities."[19]

- PSTH's public website states that its "business strategy is to identify and complete a business combination that creates substantial long-term value for our stockholders."[20]

- From July through October 2020, PSTH and its team "performed due diligence on more than 20 potential business combination targets in a wide variety of industry sectors" and "entered into non-disclosure or confidentiality agreements in respect of six potential business combination targets."[21]

- Even after this lawsuit was filed, PSTH stated that it was "working diligently to identify and close a transaction, and . . . ha[d] begun discussions with potential merger candidates."[22]

Thus, PSTH "presents itself to the public (and to investors) as an operating company," *Nat'l Presto*, 486 F.3d at 313, albeit a company whose "operations" are seeking an operating company with which to combine. Plaintiff argues that PSTH is an investment company because it "presently invests nearly 100% of its assets in securities," *i.e.*, the government securities and

---

No. 64-1) §9.1 at 8.

[16] *Id.*, Ex. B (ECF No. 64-2).

[17] *Id.* at 3, 9, 94.

[18] *Id.* at 60.

[19] *Id.*

[20] https://pstontine.com/acquisition-criteria/

[21] Dabbs Decl., Ex. C (ECF No. 64-3) at 134.

[22] https://pstontine.com/wp-content/uploads/2021/08/8.19.2021-Press-Release-PSTH-Letter-to-Shareholders.pdf

money market mutual funds held in PSTH's trust account that is required under SEC-approved NYSE rules. (Pl. Br. at 15.) But the securities held in PSTH's trust account are not "investments" in "securities" under Section 3(a)(1)(A) of the ICA. Rather, as the SEC has recognized, SPAC trust funds hold relatively safe, interest-bearing instruments in order to preserve capital and ensure that PSTH will be able to return PSTH shareholders' money if they exercise their redemption rights.[23] Under the ICA, courts have interpreted "invest" as meaning "to put out money at risk in the hope of gain." *SEC v. Fifth Ave. Coach Lines*, 289 F. Supp. 3, 30 (S.D.N.Y. 1968), *aff'd*, 435 F.2d 510 (2d Cir. 1970). "[M]erely putting one's money in the bank, even though one thereby obtains some interest, in and of itself is [not] 'investing . . . in securities' under Section 3(a)(1)." *Id.* at 28.

Plaintiff also argues that "[l]ike a money market fund, PSTH offers redemption rights and direct access to the returns on a pool of U.S. government securities." (Pl. Br. at 1.) But the Court need not accept this assertion as to the PSTH Individual Shareholders: if the PSTH Individual Shareholders wanted to gain exposure to a money market fund or U.S. government securities, they would have purchased those products. Again, not even Plaintiff alleges that he purchased PSTH as a substitute for a money market fund or U.S. government securities. Rather, the PSTH Individual Shareholders purchased shares in PSTH based on their belief that it would combine with an operating company. That very objective is the basis on which the PSTH Individual Shareholders value their PSTH shares. It is of no moment that PSTH has not yet executed a combination with an operating company. As Plaintiff acknowledges, "[b]asic economic theory and law indisputably places a present value on rights . . . even when their ultimate payoffs may

---

[23] https://www.sec.gov/oiea/investor-alerts-and-bulletins/what-you-need-know-about-spacs-investor-bulletin

depend on future developments." (Pl. Br. at 7.)

Plaintiff speculates, relying on a single *Wall Street Journal* article, that SPACs are, in fact, not what they are widely viewed to be by SPAC issuers and sponsors, the SEC, the NYSE, and the investing public. According to Plaintiff, "[m]ost SPAC investors . . ., elect[] to take only the return on the SPACs' government and money market fund securities" and that "[m]any SPAC investors buy SPAC stock solely in anticipation of using their redemption rights to gain exposure to the returns on U.S. government securities." (Pl. Br. at 23.)

Plaintiff does not point to any allegations in the Amended Complaint that would establish that any PSTH shareholder (including Plaintiff himself) purchased shares in PSTH for this purpose. These allegations are lacking for good reason: ***before this lawsuit was filed, PSTH did not ever trade below its $20 redemption price on any national securities exchange (including the NYSE)***. (Peller Decl. ¶ 5 & Annex A.) It is implausible to suggest that PSTH shareholders purchased shares *above the redemption price* "in anticipation of using their redemption rights to gain exposure to the returns on U.S. government securities." For their part, the PSTH Individual Shareholders certainly did not purchase PSTH shares for this reason. ***Indeed, the average cost basis for PSTH shares held by the PSTH Individual Shareholders is approximately $23.46***. (Peller Decl. ¶¶ 3-4.) This is $3.46 above the $20 redemption price of PSTH and demonstrates that the PSTH Individual Shareholders purchased PSTH shares in anticipation of an eventual business combination, and not to share in PSTH's meager profits from its trust fund securities. Plaintiff is simply wrong that ordinary investors are treating PSTH as the equivalent of an investment "in a closed-end mutual fund whose assets [a]re the [government] securities that [PSTH] holds" in its trust fund. *Nat'l Presto*, 486 F.3d at 313. Nor is this limited to individual purchasers of PSTH. Publicly available SEC Form 13-F data shows that 200 institutional investors

purchased PSTH after its IPO at prices above $20 per share. (Peller Decl. ¶ 6.) Indeed, as of June 30, 2021, 135 institutions had purchased at least 22 million PSTH shares after the IPO at prices above $20 per share. (*Id.*) These institutions, like the PSTH Individual Shareholders, were thus purchasing PSTH shares based on the expectation that it would combine with an operating business, not to obtain exposure to any *de minimis* gain on PSTH's trust fund holdings.

Moreover, PSTH fundamentally differs from the inadvertent investment companies in the cases on which Plaintiff relies. Plaintiff asserts that those companies were found to be subject to the ICA when they "invested in securities while hoping to make acquisitions." (Pl. Br. at 15.) But from the standpoint of shareholders, these cases dealt with companies that were markedly different than SPACs. Rather than being formed as blank-check companies for the explicit purpose of combining with an existing business to become an operating company, the companies in these cases were originally operating companies that had decayed (whether through bad luck or bad business) into *de facto* investment companies. In so doing, these companies effectively held their existing shareholders hostage by refusing to distribute available cash to those shareholders and instead using those funds to chase investments. The harm in that scenario is clear: shareholders bought shares in an operating company, but the company had effectively changed its character and become an investment company. As the Seventh Circuit put it, those companies became "inadvertent investment companies" when they "sold off [their] operating assets *and chose not to distribute the proceeds to [their] stockholders*." *Nat'l Presto*, 486 F.3d at 312 (emphasis added).

The Second Circuit's *Fifth Avenue Coach* decision is instructive. Fifth Avenue Coach Lines ("Fifth") had "operated . . . one of the nation's largest privately owned municipal transit systems." 435 F.3d at 513. But in 1962, New York City acquired by condemnation "all the bus lines of Fifth within the city." *Id.* This gutted Fifth's operating assets. Three investors then

"acquired control of Fifth through a pyramid of interlocking shareholdings." *Id.* "The remainder of Fifth's stock . . . was owned by about 2,000 public shareholders." *Id.* at 514. In 1966, Fifth's controllers told the public shareholders that as soon as Fifth received its condemnation award from the City, "the company intends to make proper and advantageous *investments* for the benefit of the company." *Id.* (emphasis added). At that year's shareholder meeting, the controllers told shareholders that:

> There are bargains available today *in the form of investments* in transportation, in related fields, and in brand new fields—bargains which others cannot take advantage of because they do not have the cash available.
>
> We have been actively exploring several of these opportunities and . . . . we will be in a position *to put the money to work profitably* for you as soon as it is received.

*Id.* (emphasis added). Notably, the controllers then *rejected* a public shareholder proposal that the proceeds of the condemnation award "*be immediately distributed to Fifth's shareholders.*" *Id.* (emphasis added).

After Fifth received the $11.5 million condemnation award (worth approximately $100 million in 2021 dollars), it "immediately began its investing program," purchasing $8 million in various stocks by the end of the year and actively trading in stocks. *Id.* Although Fifth claimed it was trying to gain control of an operating company, "when Fifth's statements to its shareholders are viewed against the backdrop of Fifth's actual securities trading," the Second Circuit concluded that Fifth was an investment company under the ICA. *Id.*

The company in *Fifth Avenue Coach*—a bus operator whose routes had been condemned and who then used millions in proceeds from that seizure to go on a stock-buying spree rather than returning those funds to shareholders or purchasing operating assets—thus bears no resemblance to PSTH, a blank-check company formed for the explicit purpose of merging with an operating company that has never told its shareholders anything different.

*Tonopah Mining* is similar to *Fifth Avenue Coach*. Tonopah was a once-active mining company whose operations had dwindled to a single mine, which was about to run dry. Instead of buying other mines to operate, the company bought mining company securities, not "for the purpose of gaining control or operating th[ose] businesses," but as investments. 26 S.E.C. 430, at *2. Thus, from 1934 to 1945, Tonopah's mining P&L plummeted from about a $70,000 profit to about a $13,000 loss and its exploration expenditures essentially went to zero. *Id.* at *5. On the other hand, during that same time, Tonopah's interest-and-dividend income skyrocketed from $293 to about $56,000 and its profit from securities sales likewise leapt from $1,344 to about $56,500. *Id.* Although the company attached a list of the securities it owned to its annual reports, it did not distribute its investment profits to shareholders, but instead said that it was investing those funds "until such time as they may be required for mining purposes." *Id.* at *4. The SEC held that Tonopah had "changed its character" from a mining company to "a company engaged in the business of holding and trading in securities," and thus was subject to the ICA. *Id.* at *6. The potential shareholder injury in *Fifth Avenue Coach* and *Tonopah* simply does not exist here.

By contrast, where a company has not shifted its focus from operations to investments, courts have found the ICA inapplicable, even if the company engages in tangential investment activity. This makes sense, because in those cases, as here, there is minimal risk of shareholders being misled or injured by the company's incidental investments. Thus, in *Moses*, the court rejected as "completely without merit" the argument that a restaurant chain was an investment company under Section 3(a)(1)(A) of the ICA, based on its guarantee of a $10 million loan to its subsidiary to be used for securities trading, including purchasing AT&T stock, because the company "was both historically and during the time period at issue . . . a mercantile company engaged in the food purveying business." 1981 WL 1599, at *4; *see also In re M.A. Hanna Co.*,

10 S.E.C. 581, 1941 WL 37944, at *6 (Nov. 25, 1941) (ICA inapplicable where company's "activities and those of its predecessor[s] . . . have been primarily directed to the mining, transportation, processing and sale of coal and iron ore" and investments were "largely for the purpose of supplementing and abetting its industrial activities," despite 72% of assets held in investment securities, but warning that order would be revoked if company "subsequently becomes engaged . . . primarily in the business of investing . . . in securities").

Finally, there is no dispute that SPACs are not typical companies, given that they are formed for the specific purpose of seeking to combine with an operating company. Notably, in applying the ICA, the SEC has considered the atypical nature of specific types of companies. Thus, in *In re PacifiCare of Arizona, Inc.*, the SEC concluded that it was "appropriate for HMOs to determine whether they are primarily engaged in a non-investment business for purposes of sections 3(b)(1) and 3(b)(2) of the Act without considering the *Tonopah* factor relating to the nature of present assets." 84 S.E.C. Docket 859, 2004 WL 2674268, at *5 (Nov. 22, 2004). And in *In re ICOS Corp.*, the SEC found that "that *Tonopah*'s focus on the composition of present income and assets is ill-suited to ICOS and similar companies," where "the biotechnology industry did not exist at the time the Commission decided *Tonopah*" and "research and development companies require large amounts of capital to fund the development of products that may not produce income for many years." 51 S.E.C. 322, 1993 WL 78892, at *2 (Mar. 16, 1993). Thus, the SEC concluded that "[g]iven the unique nature of research and development companies, the Commission believes that it is appropriate to expand the traditional *Tonopah* analysis." *Id.* at *3.

## CONCLUSION

For the foregoing reasons, the PSTH Individual Shareholders respectfully urge the Court to grant the Pershing Square Defendants' Motion to Dismiss.

December 13, 2021

        Respectfully submitted,

        <u>*/s/ Matthew A. Peller*</u>
        Matthew A. Peller
        ROLNICK KRAMER SADIGHI LLP
        1251 Avenue of the Americas
        New York, New York 10020
        Tel.: (212) 597-2800
        Fax: (212) 597-2801
        mpeller@rksllp.com

        *Counsel for the PSTH Individual Shareholders*